# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## <u>JACKSONVILLE DIVISION</u>

| | |
|---|---|
| In re | ) |
| | ) |
| TIJUANA FLATS RESTAURANTS, | )     Case No.:  3:24-bk-1128-BAJ |
| LLC, a Florida limited liability company,[1] | ) |
| | )     Chapter 11 |
| Debtor. | ) |
| _____ | ) |

## DEBTOR'S EMERGENCY MOTION FOR
## <u>AUTHORITY TO USE CASH COLLATERAL</u>

Debtor, Tijuana Flats Restaurants, LLC ("Debtor"), for itself and its subsidiary, Tijuana Flats #176, LLC, moves the Court, pursuant to §§ 105(a), 361, 363(c), 503(b) and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of interim and final orders authorizing the Debtor to utilize the cash collateral of its secured creditor, LSC2022, LLC ("LSC2022"), and in support of the motion states:

## <u>Background</u>

1.     On April 19, 2024 (the "Petition Date"), Debtor and its wholly owned subsidiary, Tijuana Flats #176, LLC, filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

---

[1] The Federal Employer Identification Number of the Debtor is 47-4472442.  The principal address of the Debtor is 2300 Maitland Center Parkway, Suite 306, Maitland, Florida 32751.

Debtor is continuing in possession of its property and is managing its business, as debtor in possession, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2.     Debtor owns and operates 65 "Tijuana Flats" restaurants located across Florida, including the Jacksonville, Florida based restaurant operated by Tijuana Flats #176, LLC. Its restaurants provide fast, casual dining featuring a "Tex-Mex" cuisine.

3.     Previously, each of the restaurants operated as a separate limited liability company, all owned by the Debtor, with Debtor utilizing a consolidated Cash Management System for each of its subsidiaries. On April 15, 2024, however, all but one of the operating subsidiaries were "rolled up" and merged into the Debtor. Another 11 restaurants deemed to be unprofitable were not merged into the Debtor and were instead closed later that week. A separate subsidiary entity, TJF Franchise Group, LLC, continues to operate another 26 restaurants independently through franchise agreements with third-party operators.

4.     Debtor finds itself before this Court following a confluence of adverse events. In May of 2023, Debtor's then lender, Truist Bank, required Debtor to post $1.2 million in an interest reserve. That payment, coupled with the required scheduled quarterly principal reduction payments of $250,000 each, stripped the company of much-needed working capital during a challenging operational period.

5.     In 2021 and 2022, prior management sought to increase revenues and profits by expanding menu options. The menu changes had the opposite effect, however, as the menu additions required more equipment, staffing and time to prepare. The latter point led to slower delivery of food to the customers, higher costs, and growing dissatisfaction among the company's customer base, with a resulting drop in sales over time.

6.     In addition, profit margins have been extremely compressed due to the rapid increases in food and labor costs and changes in consumer spending habits in the post-COVID inflationary environment.   Attempts to raise prices to meet these economic challenges have met with limited success, eventually requiring the closure of 29 corporate-owned restaurants between January and April of 2024.  Competition in this market segment is also fierce.

7.     Debtor, and its subsidiary, Tijuana Flats #176, LLC, chose to file Chapter 11 proceedings to deal with the accounts payable and tax obligations which have accrued over the last two years through a reorganization plan or going-concern sale.

### The Secured Loan

8.     On March 4, 2022, Tijuana Flats Restaurants, LLC, its subsidiaries and its then parent company, TJ Flats Holdings, LLC, entered into a Credit Agreement with Truist Bank ("Truist") pursuant to which Truist provided $21,000,000 in financing to Debtor and its affiliates to refinance a $19,810,868 obligation owing to ABC Funding, LLC (Summit Partners Credit Advisors, L.P.), incurred in connection with AUA Private Equity Partners' purchase of the company in 2015.[2]  The Truist loans were evidenced by Promissory Notes dated March 4, 2022, one in the original principal amount of $20,000,000 (the "Term Loan") and the other in the original principal amount of $1,000,000 (the "Revolver").  A copy of the Credit Agreement, Promissory Notes and Security Agreements are appended hereto as **Composite Exhibit A**.  The loans were secured by blanket liens on the assets of all obligors and perfected by UCC-1 filings in Delaware and Florida.  Copies of the UCC-

---

[2]  AUA Private Equity Partners acquired 100% of the membership interest in Debtor through TJ Flats Holdings, LLC.

1 financing statements perfecting the lien of Debtor's assets is appended hereto as **Exhibit B**.

9.      On May 16, 2023, Tijuana Flats Restaurants, LLC and TJ Flats Holdings, LLC, entered into an Amendment to Loan Documents with Truist. Under the terms of the Amendment to Loan Documents, Debtor was obligated to post an interest reserve of $1,200,000. A copy of the Amendment to Loan Documents is appended as **Exhibit C**.

10.      On November 28, 2023, Truist notified Debtor that it was in default under the terms of the Credit Agreement as a result of its failure to maintain minimum liquidity levels. Truist did not, however, take enforcement action at that time. In fact, Truist released the interest reserves to Debtor to help cover operational shortfalls.

11.      On March 26, 2024, Truist assigned the loans and associated loan documents to LSC2022 pursuant to an Allonge and Bill of Sale and Assignment of Loan Documents dated as of March 26, 2024.

12.      Pursuant to a default notice sent by LSC2022 to Debtor on April 2, 2024, Debtor was deemed to be in default under its credit facilities as a result of its failure to make the quarterly installment payments due December 31, 2023 ($250,000) and March 31, 2024 ($500,000).

13.      On the Petition Date, Debtor was indebted to LSC2022 in the approximate amount of $18,803,950.

### Debtor's Cash Position

14.      Debtor operates on a near daily cash basis. Credit card receivables are remitted to it daily. Debtor does not therefore carry large receivable balances. The estimated credit card and third-party receivables owed to the Debtor as of the Petition Date

are $739,824 ($693,808 for the 65 current restaurants and $46,016 for 11 restaurants closed in April 2024). "Cash in bank" as of the Petition Date totaled approximately $425,786 (Truist Bank $405,066 and Regions Bank $20,720).

15.     Debtor's inventory consists mainly of perishable foods and paper products having an estimated value of $742,625.

16.     By virtue of 11 U.S.C. § 552(a), LSC2022's lien on and security interest in cash collateral does not extend to cash and receivables generated post-petition.

### Use of Cash Collateral

17.     To maintain its business operations and generate additional revenue, it is necessary that the Debtor be permitted to continue utilizing its cash and collections on prepetition receivables to fund such items as payroll, payroll taxes, insurance and lease obligations. A 13-week budget detailing Debtor's anticipated income and expenses for such period is appended hereto as **Exhibit D** (the "Cash Needs Budget").

18.     By this motion, Debtor seeks authority to use the cash collateral to pay post-petition expenses of maintaining and preserving the Debtor's ongoing business in accordance with its Cash Needs Budget. Specifically, and pending the entry of a final order authorizing the Debtors to use the cash collateral, the Debtor requests that the Court enter an interim cash collateral order in the form attached hereto as **Exhibit E**: (a) authorizing the Debtor to use the cash collateral on the terms contained therein; (b) granting LSC2022's adequate protection with respect thereto; and (c) scheduling the Final Hearing to further consider use of cash collateral.

19.     As a secured lender, LSC2022 is entitled to adequate protection against any diminution in value of its cash collateral pursuant to Bankruptcy Code §§ 361 and 363(e).

[817866/3]

To protect against such diminution, Debtor proposes that LSC2022 be granted a replacement lien on Debtor's cash, post-petition receivables and other assets to the same extent and priority as its prepetition collateral in accordance with a proposed final order in substantially the form attached hereto as **Exhibit F**. The relief provided in the proposed orders can be summarized as follows:[3]

a.  Term. Pursuant to the terms and conditions of the cash collateral order, the Debtor is authorized to use cash collateral of LSC2022 until this order is amended or superseded.

b.  Rollover Lien. As adequate protection for any diminution in the value of cash collateral and other prepetition collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), LSC2022 shall be entitled to a continuing replacement lien and security interest (the "Rollover Lien") in all assets of Debtor existing on or after the Petition Date of the same type as the prepetition collateral, together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the lien and security interest of LSC2022 as of the Petition Date. The Rollover Lien shall be limited to the amount of any Diminution, and does not extend to any avoidance claims held by the estate;

c.  The Rollover Lien. The Rollover Lien shall be subordinate to an administrative carve-out of $200,000 for Debtor's professionals (the "Carve-Out"), but otherwise shall not be subject or subordinate to (i) any liens arising after the Petition Date except for any liens or security interests in favor of any federal, state, municipal or other government unit, commission, board or court for any tax liability of the Debtor, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both and a tax of a kind specified in 11 U.S.C. § 507(a)(8), or (ii) any other lien or security interest under 11 U.S.C. §§ 363 or 364, or otherwise.

d.  Superpriority Claim. As additional adequate protection for any Diminution, LCS2022 shall have a superpriority administrative expense claim pursuant to § 507(b) of the Bankruptcy Code, with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of

---

[3] This summary of the cash collateral orders is qualified in its entirety by reference to the orders themselves. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the proposed orders.

the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual which for any reason cannot be made the subject of the Rollover Lien (the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims shall be subject to only the Carve-Out and shall have priority over any and all administrative expenses, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in §§ 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

e.    <u>Termination of Use of Cash Collateral Without Prior Notice</u>. The Debtor's authority to use Cash Collateral hereunder shall terminate without any further action by this Court and a Termination Event shall occur without prior notice upon the occurrence of any of the following (also a "Termination Event"):

 i.    the Debtor's Chapter 11 case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

 ii.    the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in §§ 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion, application or other pleading consenting to or acquiescing in any such appointment;

 iii.    this Interim Order becomes stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of LSC2022;

 iv.    an order is entered in the Chapter 11 Case over the objection of LSC2022 approving financing pursuant to § 364 that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claim granted to LSC2022 under this Interim Order; or

 v.    an adversary proceeding or contested matter is commenced by the Debtor challenging the amount, validity, enforceability, priority or extent of LSC2022's liens, security interests or claims.

f.    <u>Section 363(m) Protection</u>. LSC2022 shall be entitled to the full protections of § 363(m) of the Bankruptcy Code with respect to the Rollover Lien and all other adequate protection created or authorized by the cash collateral

order in the event that the order or any authorization contained therein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal, or vacation of the cash collateral order shall not affect the validity of any obligation of the Debtor to LSC2022, incurred pursuant to the cash collateral order.

20.    Section 363(e) of the Bankruptcy Code provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . ." Section 363(c)(2) contemplates that the Court may authorize the Debtors to use the cash collateral with or without the consent of the secured parties with an interest therein. *See* 11 U.S.C. § 363(c)(2)(B).

21.    In considering whether to authorize use of cash collateral, however, a court must find that the interests of the holder of the secured claim are adequately protected. 11 U.S.C. § 363(e). The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the particular collateral against diminution in the value of such collateral. *See, e.g., In re Continental Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (noting that all forms of adequate protection are designed to protect secured creditors from diminution in the value of their collateral).

22.    Courts have held that adequate protection may be demonstrated by a showing that use of cash collateral maintains the value of a secured lender's collateral. *See, e.g., In re Atrium Development Co.*, 159 B.R. 464, 470 (Bankr. E.D. Va. 1993)("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest.").

23.    Under Bankruptcy Code § 361, adequate protection may be provided by, among other things, periodic cash payments, granting a lienholder an additional or replacement lien and granting other relief to the extent that the usage of the cash collateral results in a decrease in the value of such entity's interest in such property.  As discussed above, the proposed interim and final cash collateral orders provide the Adequate Protection Liens to ensure that LSC2022 has continuing first priority liens in the Collateral.

24.    As the Debtor will establish at the hearing on this motion, the Debtor's proposed use of the cash collateral will preserve the going concern value of the business by providing funds, among other things, to pay payroll and generate new revenue, as well as provide funds for daily operations.

25.    For all the foregoing reasons, Debtor submits that the terms of the interim and final cash collateral orders are reasonable and beneficial to Debtor's estate, creditors and parties in interest under the circumstances of this case.

### Request for Authority to Use Cash Collateral Immediately

26.    Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion for authorization to use cash collateral pursuant to Bankruptcy Code § 363 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing.  Pursuant to Bankruptcy Rule 4001(b), Debtor requests that the Court conduct an interim hearing and authorize the Debtor to use, on an interim basis, cash collateral in accordance with the terms and provisions of the cash collateral order.

27.    As noted above, the Cash Collateral is the primary source of funds available to the Debtor, and the Debtor will be unable to maintain, operate and administer this Chapter 11 case unless the Court authorizes use of Cash Collateral on both an interim and final basis.

**THAMES | MARKEY**

*/s/ Richard R. Thames*

By _____
        Richard R. Thames
        Bradley R. Markey

Florida Bar No. 0718459
Florida Bar No. 0984213
50 N. Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 Facsimile
rrt@thamesmarkey.law
brm@thamesmarkey.law

Proposed Attorneys for Tijuana Flats Restaurants, LLC

## Certificate of Service

I hereby certify that on April 19, 2024, the foregoing was uploaded to the Court's CM/ECF System which will furnished an electronic copy of the foregoing to all parties who have consented to receive notices in this case.  A copy of this Motion was furnished by U.S. Mail, postage prepaid to the (i) Top 20 List of Creditors, and (ii) LSC2022, LLC, Attn: Aric Lasky, Its Manager, LS Capital, Inc., 16130 Ventura Boulevard, Suite 250, Encino, California 91436.

*/s/ Richard R. Thames*
_____
Attorney

# EXHIBIT "A"

EXECUTION VERSION

CREDIT AGREEMENT

dated as of March 4, 2022

among

TIJUANA FLATS RESTAURANTS, LLC,
as the Borrower,

TJ FLATS HOLDINGS, LLC,

THE GUARANTORS FROM TIME TO TIME PARTY HERETO,
as the Guarantors

and

TRUIST BANK,
as the Lender

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; CONSTRUCTION ............................................................................... 1

    Section 1.1      Definitions ................................................................................ 1
    Section 1.3      Accounting Terms and Determination ..................................... 27
    Section 1.4      Terms Generally ...................................................................... 28
    Section 1.6      Times of Day ........................................................................... 29
    Section 1.7      Divisions ................................................................................. 29

ARTICLE II AMOUNT AND TERMS OF THE COMMITMENTS ......................................... 29

    Section 2.1      General Description of Facilities .............................................. 29
    Section 2.2      Revolving Loans ...................................................................... 29
    Section 2.3      Procedure for Revolving Borrowings ...................................... 29
    Section 2.4      Term Loan Commitment .......................................................... 30
    Section 2.5      Optional Reduction and Termination of Commitments ............ 30
    Section 2.6      Repayment of Loans ................................................................ 30
    Section 2.7      Evidence of Indebtedness ........................................................ 31
    Section 2.8      Optional Prepayments ............................................................. 31
    Section 2.9      Mandatory Prepayments .......................................................... 31
    Section 2.10     Interest on Loans .................................................................... 32
    Section 2.11     Fees ........................................................................................ 32
    Section 2.12     Computation of Interest and Fees ............................................ 32
    Section 2.13     SOFR Addendum .................................................................... 33
    Section 2.14     Increased Costs ....................................................................... 33
    Section 2.16     Payments Generally ................................................................ 34

ARTICLE III CONDITIONS PRECEDENT TO LOANS ......................................................... 36

    Section 3.1      Conditions To Effectiveness ................................................... 36
    Section 3.2      Each Credit Event .................................................................... 38

ARTICLE IV REPRESENTATIONS AND WARRANTIES ..................................................... 39

    Section 4.1      Existence; Power ..................................................................... 39
    Section 4.2      Organizational Power; Authorization; Enforceability ............. 39
    Section 4.3      Governmental Approvals; No Conflicts ................................... 39
    Section 4.4      Financial Statements ............................................................... 40
    Section 4.5      Litigation and Environmental Matters ..................................... 40
    Section 4.6      Compliance with Laws and Agreements .................................. 41
    Section 4.7      No Default ............................................................................... 41
    Section 4.8      Investment Company Act, Etc .................................................. 41
    Section 4.9      Taxes ...................................................................................... 41
    Section 4.10     Margin Regulations ................................................................. 41
    Section 4.11     ERISA .................................................................................... 41
    Section 4.12     Ownership of Property; Intellectual Property; Insurance ........ 42
    Section 4.13     Disclosure .............................................................................. 43
    Section 4.14     Labor Relations ...................................................................... 43
    Section 4.15     Subsidiaries ............................................................................ 43
    Section 4.16     Solvency ................................................................................. 44
    Section 4.17     Business Locations; Taxpayer Identification Number ............. 44
    Section 4.18     Anti-Corruption Laws and Sanctions ...................................... 44

i

Section 4.19    Perfection of Security Interests in the Collateral ................................................ 44

ARTICLE V AFFIRMATIVE COVENANTS .................................................................................... 45

Section 5.1    Financial Statements and Other Information .................................. 45
Section 5.2    Notices ........................................................................................ 46
Section 5.3    Existence; Conduct of Business ................................................... 47
Section 5.4    Compliance with Laws, Etc ........................................................ 48
Section 5.5    Payment of Obligations .............................................................. 48
Section 5.6    Books and Records ..................................................................... 48
Section 5.7    Visitation, Inspection, Etc .......................................................... 48
Section 5.8    Maintenance of Properties; Insurance ......................................... 49
Section 5.9    Use of Proceeds ......................................................................... 49
Section 5.10    Additional Subsidiaries ............................................................. 49
Section 5.11    Further Assurances .................................................................... 50
Section 5.12    Cash Management ...................................................................... 50

ARTICLE VI FINANCIAL COVENANTS ........................................................................................ 50

Section 6.1    Consolidated Fixed Charge Coverage Ratio ................................ 51
Section 6.2    Consolidated Lease-Adjusted Leverage Ratio ............................ 51
Section 6.3    Maximum Capital Expenditures .................................................. 51
Section 6.4    Liquidity Requirement ................................................................ 52

ARTICLE VII NEGATIVE COVENANTS ....................................................................................... 52

Section 7.1    Indebtedness .............................................................................. 52
Section 7.2    Negative Pledge ......................................................................... 53
Section 7.3    Fundamental Changes; Conduct of Business ............................... 54
Section 7.4    Investments, Loans, Etc ............................................................. 54
Section 7.5    Restricted Payments ................................................................... 55
Section 7.6     Sale of Assets ........................................................................... 56
Section 7.7    Transactions with Affiliates ....................................................... 56
Section 7.8    Restrictive Agreements .............................................................. 56
Section 7.9    Sale and Leaseback Transactions ................................................ 57
Section 7.10    Hedging Transactions ................................................................ 57
Section 7.11    Legal Name, State of Formation and Form of Entity .................. 57
Section 7.12    Amendment to Organization Documents and Material Documents ................... 57
Section 7.13    Accounting Changes; Change in Fiscal Year .............................. 57
Section 7.14    Government Regulation .............................................................. 57
Section 7.15    Sanctions and Anti-Corruption Laws .......................................... 57
Section 7.16    Restrictions on Holdings ............................................................ 58

ARTICLE VIII EVENTS OF DEFAULT .......................................................................................... 58

Section 8.1    Events of Default ....................................................................... 58
Section 8.2    Application of Funds .................................................................. 61
Section 8.3    Certain Cure Rights ................................................................... 61

ARTICLE IX THE GUARANTY ...................................................................................................... 62

Section 9.1    The Guaranty ............................................................................. 62
Section 9.2    Obligations Unconditional .......................................................... 63
Section 9.3     Reinstatement ........................................................................... 64
Section 9.4    Certain Additional Waivers ........................................................ 64
Section 9.5    Remedies ................................................................................... 64

ii

Section 9.6      Rights of Contribution ................................................................... 64
Section 9.7      Guarantee of Payment; Continuing Guarantee .................................... 65
Section 9.8      Keepwell ................................................................................... 65

ARTICLE X MISCELLANEOUS ................................................................................. 65

Section 10.1     Notices ..................................................................................... 65
Section 10.2     Waiver; Amendments .................................................................. 67
Section 10.3     Expenses; Indemnification ............................................................ 68
Section 10.4     Successors and Assigns ................................................................ 69
Section 10.5     Governing Law; Jurisdiction; Consent to Service of Process .............. 70
Section 10.6     WAIVER OF JURY TRIAL ........................................................... 71
Section 10.7     Right of Setoff ........................................................................... 71
Section 10.8     Counterparts; Integration .............................................................. 72
Section 10.9     Survival ..................................................................................... 72
Section 10.10    Severability ................................................................................ 72
Section 10.11    Confidentiality ........................................................................... 72
Section 10.12    Interest Rate Limitation ................................................................ 73
Section 10.13    Waiver of Effect of Corporate Seal ................................................ 73
Section 10.14    Patriot Act ................................................................................. 73
Section 10.15    No Advisory or Fiduciary Responsibility .......................................... 73
Section 10.16    Electronic Execution of Assignments and Certain Other Documents .... 74

CHAR1\1875914v7

Schedules

| | | |
|---|---|---|
| Schedule 1 | - | List of Guarantors |
| Schedule 2.13 | - | SOFR Addendum |
| Schedule 4.15 | - | Subsidiaries |
| Schedule 4.17-1 | - | Locations of Real Property |
| Schedule 4.17-2 | - | Locations of Chief Executive Office, Taxpayer Identification Number, Etc. |
| Schedule 4.17-3 | - | Changes in Legal Name, State of Formation and Structure |
| Schedule 7.1 | - | Existing Indebtedness |
| Schedule 7.2 | - | Existing Liens |
| Schedule 7.4 | - | Existing Investments |

Exhibits

| | | |
|---|---|---|
| Exhibit 2.3 | - | Form of Notice of Revolving Borrowing |
| Exhibit 2.7 | - | Form of Note |
| Exhibit 5.1 | - | Form of Compliance Certificate |
| Exhibit 5.10 | - | Form of Guarantor Joinder Agreement |

CHAR1\1875914v7

<u>CREDIT AGREEMENT</u>

This CREDIT AGREEMENT (this "<u>Agreement</u>") is made and entered into as of March 4, 2022, by and among TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company (the "<u>Borrower</u>"), TJ FLATS HOLDINGS, LLC, a Delaware limited liability company ("<u>Holdings</u>"), the other Guarantors identified on <u>Schedule 1</u> attached hereto, and TRUIST BANK, a North Carolina banking corporation, as the lender (the "<u>Lender</u>").

W I T N E S S E T H :

WHEREAS, the Borrower has requested that the Lender provide, in its favor, a $1,000,000 revolving credit facility and a term loan (advanced on the Closing Date) in a principal amount of $20,000,000;

WHEREAS, subject to the terms and conditions of this Agreement, the Lender is willing to establish the requested revolving credit facility in favor of the Borrower, and the Lender agrees to make the term loan to the Borrower;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Loan Parties and the Lender agree as follows:

ARTICLE I

<u>DEFINITIONS; CONSTRUCTION</u>

1.1     <u>Definitions</u>.   In addition to the other terms defined herein, the following terms used herein shall have the meanings herein specified (to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Acquisition</u>" shall mean (a) any Investment by the Borrower or any of its Subsidiaries in any other Person pursuant to which such Person shall become a Subsidiary or shall be merged with the Borrower or any of its Subsidiaries or (b) any acquisition by the Borrower or any of its Subsidiaries of the assets of any Person (other than a Subsidiary) that constitute all or a substantial portion of the assets of such Person or a division or business unit of such Person.

"<u>Adjusted SOFR Rate</u>" shall have the meaning assigned to such term in <u>Schedule 2.13</u> attached hereto.

"<u>Affiliate</u>" shall mean, as to any Person, any other Person (excluding any Subsidiary) that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person. For the purposes of this definition, "Control" shall mean the power, directly or indirectly, either to (a) vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of a Person or (b) direct or cause the direction of the management and policies of a Person, whether through the ability to exercise voting power, by control or otherwise. The terms "Controlling", "Controlled by", and "under common Control with" have the meanings correlative thereto. Notwithstanding the foregoing, none of the following shall be deemed to be an Affiliate of any Loan Party or any of their respective Subsidiaries: (i) Lender, and (ii) any portfolio company of Sponsor (other than Holdings or Borrower or any of their Subsidiaries).

"<u>Agreement</u>" shall have the meaning set forth in the introductory paragraph hereto.

"<u>Anti-Corruption Laws</u>" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"<u>Asset Sale</u>" shall mean the sale, transfer, license, lease or other disposition of any property by any Loan Party or any Subsidiary, including any sale and leaseback transaction and any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding (a) the sale of inventory in the ordinary course of business; (b) the sale or disposition of obsolete or worn out property, other property not necessary for the operations of the Loan Parties disposed of in the ordinary course of business, or dispositions of property from any Restaurant that has been closed; (c) the disposition of property (including the cancellation of Indebtedness permitted by <u>Section 7.1(d)</u>) to a Loan Party; <u>provided</u>, that if the transferor of such property is a Loan Party then the transferee thereof must be a Loan Party; (d) the disposition of accounts receivable in connection with the collection or compromise thereof; (e) licenses, sublicenses, leases or subleases granted to others in the ordinary course of business or not interfering in any material respect with the business of the Loan Parties; (f) the sale or disposition of Cash Equivalents for fair market value in the ordinary course of business or conversions of Cash Equivalents into cash or other Cash Equivalents; (g) the disposition of shares of Capital Stock of any Subsidiary in order to qualify members of the governing body of such Subsidiary if required by applicable Law; (h) a surrender or waiver of contract rights or settlement, release or surrender of contract, tort or other claims, in each case in the ordinary course of business; (i) the non-exclusive licensing of IP Rights in the ordinary course of business or the abandonment or other disposition of intellectual property to third parties that is, in the reasonable good faith judgment of the applicable Loan Party, no longer economically practicable to maintain or useful in the conduct of the business of the Loan Parties and their Subsidiaries, taken as a whole; (j) dispositions resulting from any Event of Loss; (k) Ordinary Course Franchisee Asset Sales; and (l) the grant of a Lien not prohibited by this Agreement.  "Asset Sale" shall not include any closure of a Restaurant (and the disposition of any assets of such Restaurant in connection with such closure) to the extent permitted pursuant to <u>Section 7.6</u> or the liquidation or dissolution of any Subsidiary to the extent permitted pursuant to <u>Section 7.3</u>.

"<u>Audited Financial Statements</u>" shall mean the audited consolidated balance sheet of TJF USA, LLC and its Subsidiaries for the Fiscal Year ended December 31, 2020, and the related consolidated statements of operations, member's equity, and cash flows of TJF USA, LLC and its Subsidiaries for such Fiscal Year, including the notes thereto.

"<u>Availability Period</u>" shall mean the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"<u>Bank Product Obligations</u>" shall mean, collectively, all obligations and other liabilities of any Loan Party or any Subsidiary to any Bank Product Provider arising with respect to any Bank Products.

"<u>Bank Product Provider</u>" shall mean the Lender or an Affiliate of the Lender.

"<u>Bank Products</u>" shall mean any of the following services provided to any Loan Party or any Subsidiary by any Bank Product Provider: (a) any treasury or other cash management services, including deposit accounts, automated clearing house (ACH) origination and other funds transfer, depository

2

(including cash vault and check deposit), zero balance accounts and sweeps, return items processing, controlled disbursement accounts, positive pay, lockboxes and lockbox accounts, account reconciliation and information reporting, payables outsourcing, payroll processing, trade finance services, investment accounts and securities accounts, and (b) card services, including credit card (including purchasing card and commercial card), prepaid cards, including payroll, stored value and gift cards, merchant services processing, and debit card services.

"Bankruptcy Code" means Title 4 of the United States Code, any and all rules or regulations promulgated from time to time thereunder, or any similar federal or state law for the relief of debtors.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Borrower" shall have the meaning set forth in the introductory paragraph hereof.

"Borrowing" shall mean a borrowing consisting of Loans made, converted or continued on the same date.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which the Lender is authorized or required by Law to be closed.

"Capital Expenditures" shall mean for any period, without duplication, (a) the additions to property, plant and equipment and other capital expenditures of the Borrower and its Subsidiaries that are (or would be) set forth on a consolidated statement of cash flows of the Borrower for such period and (b) Capital Lease Obligations incurred by the Borrower and its Subsidiaries during such period, except expenditures during such period of calculation (i) for replacements, substitutions, restorations, acquisitions, repairs or other expenditures made with Net Cash Proceeds of (x) insurance or from a casualty event pursuant to any casualty insurance policy to the extent such capital expenditure is made during the reinvestment period provided in this Agreement, (y) cash awards of compensation arising from Events of Loss, or (z) an Asset Sale to the extent such capital expenditure is made during the reinvestment period provided in this Agreement, (ii) to the extent the purchase price therefor is credited against the trade-in value of equipment, or a concurrent sale of used or surplus equipment exchanged substantially concurrently with such expenditure, or (iii) expenditures in respect of leasehold improvements at any Restaurant that have actually been funded by the landlord of such leasehold or are committed to be funded by the landlord of such leasehold (in each case where the landlord is not seeking any reimbursement from any Loan Party or Subsidiary thereof) or for which such landlord has actually reimbursed or is committed to reimburse the applicable Loan Party or Subsidiary thereof; provided that readjustment to Consolidated Capital Expenditures shall be made if such amount is not funded or reimbursed in accordance within 90 days of such expected funding or reimbursement.

"Capital Lease Obligations" of any Person shall mean all obligations of such Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as

3

capital leases on a balance sheet of such Person, and the amount of such obligations shall be the capitalized amount thereof.

"Capital Stock" shall mean all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Securities Exchange Act of 1934).

"Cash Equivalents" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(b)     commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's and in either case maturing within six (6) months from the date of acquisition thereof;

(c)     certificates of deposit, bankers' acceptances and time deposits maturing within one hundred eighty (180) days of the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the Laws of the United States or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     mutual funds investing solely in any one or more of the Cash Equivalents described in clauses (a) through (d) above.

"Change in Control" shall mean an event or series of events by which:

(a)     The Sponsor shall cease to own and control, of record and beneficially, directly or indirectly, at least a majority of the aggregate voting power represented by the issued and outstanding Capital Stock in Holdings;

(b)     The Permitted Holder shall cease to own and control, of record and beneficially, directly 100% of the outstanding Capital Stock in Holdings; or

(c)     Holdings shall cease to own and control, of record and beneficially, directly 100% of the outstanding Capital Stock in the Borrower; or

4

(d)      the Borrower shall cease to own and control, of record and beneficially, directly 100% of the outstanding Capital Stock in each of its Subsidiaries, except pursuant to a transaction permitted hereunder.

"Change in Law" shall mean (a) the adoption of any applicable Law after the date of this Agreement, (b) any change in any applicable Law after the date of this Agreement, or (c) compliance by the Lender (or for purposes of Section 2.14(b), by the Parent Company of the Lender, if applicable) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.  Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and directives promulgated thereunder, and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, in each case, are deemed to have been introduced or adopted after the date hereof, regardless of the date enacted or adopted.

"Closing Date" shall mean the date hereof.

"Code" shall mean the Internal Revenue Code of 1986.

"Collateral" shall mean a collective reference to all personal property with respect to which Liens in favor of the Lender, for the benefit of itself and the holders of the Obligations, are purported to be granted pursuant to and in accordance with the terms of the Collateral Documents.  For the avoidance of doubt, "Collateral" shall not include any Excluded Property.

"Collateral Documents" shall mean a collective reference to the Security Agreement, and any other security documents executed and delivered by any Loan Party pursuant to Section 5.11.

"Commitment" shall mean a Revolving Commitment, a Term Loan Commitment or any combination thereof (as the context shall permit or require).

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.) and any successor statute.

"Competitor" means any Person which is a direct competitor of Borrower or its Subsidiaries if, at the time of a proposed assignment, Lender and the assigning Lender have actual knowledge that such Person is directly and primarily engaged in substantially similar business operations as Borrower or its Subsidiaries or such Person has been identified as a direct competitor of Borrower or its Subsidiaries in writing by Borrower to Lender from time to time.

"Compliance Certificate" shall mean a certificate from the principal executive officer or the chief financial officer of the Borrower in the form of, and containing the certifications set forth in, the certificate attached hereto as Exhibit 5.1.

"Consolidated Debt Service" shall mean, for Borrower and its Subsidiaries for any period, the sum, without duplication, of (a) scheduled principal payments made on Consolidated Funded Debt during

5

such period (excluding (i) payments on account of the Revolving Loans to the extent not accompanied by a permanent reduction of the Revolving Commitment, and (ii) the impact of payments made pursuant to Sections 2.8 and 2.9 or any other voluntary prepayments of principal with respect to other amortizing Indebtedness) and (b) Consolidated Interest Charges paid in cash (excluding upfront fees and/or break costs) for such period.

"Consolidated EBITDA" means, for any period, (A) Consolidated Net income (or loss) for the applicable period of measurement of Holdings and its Subsidiaries on a consolidated basis determined in accordance with GAAP;

Less (or plus),

(B) to the extent included above in Consolidated Net Income (or loss) for such period:

(1)    the proceeds of any life insurance policy;

(2)    the amount of any expense (or income) attributable to minority interests or non-controlling interests of third-parties in any non-wholly-owned Subsidiary of Holdings;

(3)    gains (or losses) from the sale, exchange, transfer, abandonment or other disposition of property or assets not in the ordinary course of business of Holdings and its Subsidiaries, and related tax effects in accordance with GAAP;

(4)    any other extraordinary gains (or losses) of Holdings or its Subsidiaries, and related tax effects in accordance with GAAP;

(5)    income tax refunds received, in excess of income tax liabilities for such period;

(6)    income (or loss) from the early extinguishment of Indebtedness, net of related tax effects and gains or losses (whether or not realized) with respect to obligations under Hedging Transactions;

(7)    the non-cash impact of purchase accounting adjustments including any post-closing adjustment to the value of Earn Out Obligations;

Plus, without duplication,

(C) to the extent included in the calculation of Consolidated Net Income (or loss) for such period:

(1)    depreciation and amortization;

(2)    Consolidated Interest Charges, and, to the extent not reflected in interest expense, letter of credit fees, any bank fees, financing fees and agency fees;

(3)    all taxes on or measured by income (excluding income tax refunds) or otherwise payable in cash, including without duplication, Permitted Tax Distributions paid in cash;

(4)    all directors' fees and expense reimbursement and indemnification payments paid to directors in their capacities as such, together will all management, monitoring, consulting, advisory fees and all transaction fees, indemnities and expense reimbursement payments paid pursuant to the Management Agreement, in each case, to the extent permitted to be paid hereunder and in an aggregate amount not to exceed $200,000 during any fiscal year;

(5)    all non-cash losses or expenses (or minus non-cash income or gain), including, without limitation, (a) non-cash adjustments resulting from the straight-lining of rent expense, amortization of tenant allowances, application of purchase accounting, non-cash expenses arising from grants of stock appreciation rights, stock options or restricted stock, non-cash impairment of goodwill and other long term intangible and tangible assets, unrealized non-cash losses (or minus unrealized non-cash gains) in such period due solely to fluctuations in currency values, but excluding any non-cash loss or expense (i) that is an accrual of a reserve for a cash expenditure or payment to be made, or anticipated to be made, in a future period or (ii) relating to a write-down, write off or reserve with respect to accounts and inventory, and (b) other such items not clearly qualifying as non-cash losses or expenses under GAAP and such other items;

(6)    fees (including (i) all loan fees paid to the Lender and (ii) the prepayment fee payable in connection with the retirement of the Existing Indebtedness on the Closing Date in the amount of $482,564.16 and expenses incurred in connection with the negotiation, execution and delivery on the Closing Date of the Loan Documents, to the extent that such fees and expenses do not exceed $380,000 in the aggregate for all fees and expenses;

(7)    (a) fees and expenses paid or payable to the Lender in connection with the on-going administration of the Loan Documents (including any post-closing obligations under this Agreement) and (b) other fees and reasonable and documented out-of-pocket expenses incurred in connection with any amendments or waivers to this Agreement and the other Loan Documents (whether consummated or unconsummated) to the extent such fees and expenses have been disclosed to the Lender;

(8)    one-time non-recurring or unusual expenses and other one-time expenses not otherwise added back to Consolidated EBITDA, provided, that the aggregate amount added back pursuant to this clause (8) for any four (4) consecutive Fiscal Quarter period commencing after the Closing Date shall not exceed $1,000,000;

(9)    Up to (a) $110,000 for each New Location that is owned by a Loan Party (i.e., in total for such New Location owned by a Loan Party, not for each period) incurred up to 60 days after the general opening of such New Location to the public and (b) $10,000 for each Restaurant that has been remodeled (i.e. in total for such Restaurant and not for each period) incurred within 60 days following completion of work for the remodel, in each case, incurred on account of pre-opening or opening expenses, including salary and wages, travel, rent, utilities, marketing and promotion fees, training, one-time stocking costs and reasonable professional fees;

(10)    Fees and expenses paid to an unaffiliated third party and incurred in connection with (a) an Ordinary Course Franchisee Acquisition (including any refinancing of (or amendment to) any Indebtedness acquired or assumed in connection therewith) or an Investment not in the ordinary course of

7

business, (b) a Disposition not in the ordinary course of business, (c) Indebtedness incurred or Capital Stock issued, in each instance in the foregoing clauses (a), (b) and (c), whether or not consummated; provided that such fees and expenses in respect of unconsummated transactions of the type described in the foregoing clauses (a)-(c) shall not exceed $250,000 for any four (4) consecutive Fiscal Quarter period, in each case of the foregoing clauses (a)-(c), which are permitted under this Agreement, and/or (d) an Event of Loss;

(11)     Aggregate amount of charges incurred relating to expenses in respect of closed store liabilities (including lease terminations, costs of legal settlements, judgments, orders, severance costs, restructuring charges and other non-ordinary course costs);

(12)     All losses, charges or expenses to the extent covered by insurance or indemnity (and for which such indemnification or reimbursement either has been received in cash or is reasonably expected to be received in cash within 6 months of the date of measurement (with a deduction in the subsequent period for any amount so added to the extent not so reimbursed or otherwise paid within such 6 month period));

(13)     The proceeds of business interruption insurance (to the extent not duplicative of clause (12) above) received in cash during such period or is reasonably expected to be received in cash within 6 months of the date of measurement (with a deduction in the subsequent period for any amount so added to the extent not so reimbursed or otherwise paid within such 6 month period);

(14)     Earn Out Obligations and contingent consideration obligations (including to the extent accounted for as bonuses, compensation or otherwise) and adjustments thereof and purchase price adjustments, in each case, in connection with Ordinary Course Franchisee Acquisitions or other permitted Investments hereunder;

(15)     Payments, fees and expenses paid in cash on or prior to the Closing Date related to the Existing Indebtedness, including with respect to the administration, amendments and forbearance thereof;

(16)     Pre-opening or opening expenses (including salary and wages, travel, marketing and promotion fees, training and reasonable professional fees, but excluding, for the avoidance of doubt, any general corporate overhead costs) incurred by a Loan Party for each New Location owned by a Franchisee incurred up to 60 days after the general opening of such New Location owned by a Franchisee, to the extent that such expenses incurred by a Loan Party do not exceed $20,000 per New Location opened by a Franchisee;

(17)     The aggregate amount of Restaurant Level Earnings for all Restaurants generally open to the public for less than 12 months;

(18)     The non-cash charges associated with the write-off of the unamortized debt issuance costs and expenses related to the Existing Indebtedness;

(19)     with respect to a Franchise location acquired by a Loan Party pursuant to an Ordinary Course Franchisee Acquisition or other permitted Investment hereunder for which the Lender has received financial statements pursuant to Section 5.1(b) for less than 12 months, Pro Forma Acquired

8

EBITDA (as defined below) allocated to each period prior to the acquisition thereof included in the trailing 12 month period for which Consolidated EBITDA is being calculated, to the extent reasonably satisfactory to the Lender (for the purposes hereof, "Pro Forma Acquired EBITDA" means (i) EBITDA of the Franchise location acquired in such Ordinary Course Franchisee Acquisition for the most recently ended 12 month period of the Franchise location that is being acquired in such Ordinary Course Franchisee Acquisition less (ii) actual franchise royalty fees paid to the Borrower or its Subsidiaries in respect of the Franchise location acquired in such Ordinary Course Franchisee Acquisition prior to the acquisition thereof included in the trailing 12 month period for which Consolidated EBITDA is being calculated) (for the avoidance of doubt, Pro Forma Acquired EBITDA figures only apply to periods prior to the consummation of the relevant Ordinary Course Franchisee Acquisition and roll off in subsequent periods);

(20)    Expenses related to investment banking fees, accounting, legal and other professional services and other fees, costs and expenses related to the exploration of strategic alternatives for the Borrower and its Subsidiaries; and

(21)    other addbacks acceptable to the Lender;

provided, that the aggregate amount added back to Consolidated EBITDA pursuant to clauses (C)(4), (8), (10), (11), (13), (14), (17) and (19) above shall not exceed twenty percent (20%) of Consolidated EBITDA for such period ending on such calculation date (as calculated prior to giving effect to such addbacks), and provided further, however, that only the amount in excess of $500,000, if any, added back to Consolidated EBITDA pursuant to clause (C)(11) on such calculation date, shall count towards the calculation of this 20% limitation; and

provided further that, notwithstanding the foregoing, Consolidated EBITDA for each month set forth below shall be deemed to equal the amount set forth below for such month:

| January 2021 | $483,596 | July 2021 | $377,414 |
| February 2021 | $412,206 | August 2021 | $571,082 |
| March 2021 | $1,256,647 | September 2021 | $212,406 |
| April 2021 | $845,658 | October 2021 | $594,206 |
| May 2021 | $856,685 | November 2021 | $473,184 |
| June 2021 | $276,868 | December 2021 | $845,773 |

"Consolidated EBITDAR" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, an amount equal to (a) Consolidated EBITDA for such period plus (b) Consolidated Rental Payments made in cash for such period.

"Consolidated Financed Capital Expenditures" shall mean, for the Borrower and its Subsidiaries for any period, determined on a consolidated basis, all Capital Expenditures for such period that are financed with long-term non-revolving Indebtedness (other than the Term Loan).

"Consolidated Fixed Charge Coverage Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated EBITDAR for the period of four (4) consecutive Fiscal Quarters most recently ended minus Restricted Payments paid in cash during such period (including, without limitation any management fees payable under the Management Agreement) to (b) Consolidated Fixed Charges for such period.

"Consolidated Fixed Charges" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, an amount equal to the sum of (a) Consolidated Debt Service for such period plus (b) Consolidated Rental Payments made in cash during such period, plus (c) Consolidated Maintenance Capital Expenditures made in cash during such period plus (d) the amount of accrued FICA payments that remain deferred and unpaid.

"Consolidated Funded Debt" shall mean, as of any date, all Indebtedness of Borrower and its Subsidiaries measured on a consolidated basis as of such date, but excluding Indebtedness of the type described in clauses (c) and (i) of the definition thereof, provided, however, notwithstanding the foregoing exclusion, Earn Out Obligations, to the extent determined to be Indebtedness in accordance with the definition of "Earn Out Obligations" set forth herein, shall not be excluded.

"Consolidated Growth Capital Expenditures" means, for any period, any Capital Expenditures for such period relating to the construction or opening after the Closing Date of new Restaurants owned or operated by the Borrower or any of its Subsidiaries or the remodeling or upgrading of Restaurants owned or operated by the Borrower or any of its Subsidiaries, including equipment purchases related to the foregoing.

"Consolidated Interest Charges" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, an amount equal to the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, plus (b) the portion of rent expense with respect to such period under Capital Leases that is treated as interest in accordance with GAAP plus (c) the implied interest component of Synthetic Leases with respect to such period plus (d) to the extent not included in (a), the net amount payable (or minus the net amount receivable) with respect to Hedging Transactions during such period (whether or not actually paid or received during such period); provided that Consolidated Interest Charges for any measurement period ended prior to the first anniversary of the Closing Date shall be deemed to be equal to the Consolidated Interest Charges for the period from the Closing Date through the end of such measurement period multiplied by a fraction equal to (i) 365 divided by (ii) the number of days actually elapsed from the Closing Date to the end of the applicable measurement period.

"Consolidated Lease-Adjusted Leverage Ratio" means, as of any date of determination, the ratio of (a) the sum of (i) Consolidated Funded Debt as of such date plus (ii) the product of Consolidated Rental Payments made in cash for the period of four (4) consecutive Fiscal Quarters most recently ended multiplied by six (6) to (b) Consolidated EBITDAR for such period.

"Consolidated Maintenance Capital Expenditures" means, for any period, any Capital Expenditures for such period that are not Consolidated Growth Capital Expenditures.

10

"Consolidated Net Income" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, the net income of the Borrower and its Subsidiaries (excluding extraordinary gains) for that period, as determined in accordance with GAAP.

"Consolidated Rental Payments" means, for any period, for the Borrower and its Subsidiaries on a consolidated basis, the aggregate amount of base rent, percentage rent, and common area maintenance payments with respect to real property leases relating to any Restaurant during such period.

"Contractual Obligation" of any Person shall mean any provision of any security issued by such Person or of any agreement, instrument or undertaking under which such Person is obligated or by which it or any of the property in which it has an interest is bound.

"Credit Event" shall mean the advancing of any Loan.

"Debtor Relief Laws" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.10(b).

"Disqualified Institution" means any Person (a) separately identified in writing delivered to and accepted by Lender prior to the Closing Date, (b) after the Closing Date, the Borrower designates as a "Disqualified Institution" pursuant to a written notice which is delivered to the Lender and is approved in writing by the Lender (such approval not to be unreasonably withheld, delayed or conditioned), or (c) that is a Competitor; provided, that, Disqualified Institutions shall exclude any Person that the Borrower has designated as no longer being a Disqualified Institution by written notice delivered to the Lender from time to time; and provided further, that, at any one time, the aggregate number of Disqualified Institutions designated under (a) or (b) shall not exceed three (3).  As of the Closing Date, the initial Disqualified Institutions are Capital One Bank & Affiliates, Cerberus Capital Management, L.P. & Affiliates and Fortress Investment Group & Affiliates.

"Dollar(s)" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean any Subsidiary that is organized under the laws of any political subdivision of the United States.

"Dormant Subsidiary" means any Subsidiary of a Loan Party which (a) has no employees, (b) conducts no business operations, (c) has no income, (d) has no material assets (other than its name and any associated goodwill) or material liabilities, and (e) maintains no deposit accounts.  All Dormant Subsidiaries as of the Closing Date are set forth on Schedule 4.15.

"Early Stage New Subsidiary" shall have the meaning set forth in Section 5.10.  All Early Stage New Subsidiaries in existence as of the Closing Date are set forth on Schedule 4.15.

"Earn Out Obligations" shall mean, with respect to an Acquisition, all obligations of the Borrower or any of its Subsidiaries to make earn out or other contingency payments (including purchase price adjustments, non-competition agreements, consulting agreements (other than consulting agreements for which associated costs are included in Consolidated Net Income) and other indemnity obligations, but excluding customary working capital adjustments) pursuant to the documentation relating to such Acquisition (and including fixed deferred payments related to such Acquisition).  For purposes of determining the aggregate consideration paid for an Acquisition and for determining the amount of any Earn Out Obligations to be included in the definition of "Indebtedness", the amount of Earn Out Obligations (i) shall be deemed to be the aggregate liability in respect thereof, as determined in accordance with GAAP and (ii) shall be included only if such Earn Out Obligations have become due and payable.

"EBITDA" shall mean earnings before interest, taxes, depreciation, and amortization.

"Engagement Letter" shall mean that certain engagement letter, dated as of February 2, 2022, executed by the Lender and accepted by Borrower.

"Environmental Laws" shall mean all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, binding notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to worker health and safety matters concerning exposure to Hazardous Materials.

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation and remediation, costs of administrative oversight, fines, natural resource damages, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any actual or alleged exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a "single employer" or otherwise aggregated with the Borrower or any of its Subsidiaries under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"ERISA Event" shall mean (i) any "reportable event" as defined in Section 4043 of ERISA with respect to a Plan (other than an event as to which the PBGC has waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified

of such event); (ii) any failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or any filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code or Section 302 of ERISA with respect to any Plan or Multiemployer Plan, or that such filing may be made, or any determination that any Plan is, or is expected to be, in at-risk status under Title IV of ERISA; (iii) any incurrence by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to any Plan or Multiemployer Plan (other than for premiums due and not delinquent under Section 4007 of ERISA); (iv) any institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC, under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (v) any incurrence by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan, or the receipt by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (vi) any receipt by any Loan Party or any Subsidiary or any of their respective ERISA Affiliates of any notice, or any receipt by any Multiemployer Plan from any Loan Party or any Subsidiary or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (vii) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA; or (viii) any filing of a notice of intent to terminate any Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, any filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan, or the termination of any Plan under Section 4041(c) of ERISA.

"Event of Default" shall have the meaning set forth in Article VIII.

"Event of Loss" means, with respect to any property of the Borrower or any Subsidiary, any of the following: (a) any loss, destruction or damage of such property; or (b) any condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such property (or any sale in lieu of such condemnation, seizure or taking), or confiscation of such property or the requisition of the use of such property.

"Excluded Accounts" shall mean, all payroll accounts, employee benefit accounts, trust accounts or escrow accounts of the Loan Parties.

"Excluded Property" shall mean, with respect to any Loan Party, (a) unless requested by the Lender after the occurrence and during the continuance of an Event of Default, any IP Rights for which a perfected Lien thereon is not effected either by filing of a Uniform Commercial Code financing statement or by appropriate evidence of such Lien being filed in either the United States Copyright Office or the United States Patent and Trademark Office, (b) unless requested by the Lender after the occurrence and during the continuance of an Event of Default, any personal property (other than personal property

13

described in <u>clause (a)</u> above) for which the attachment or perfection of a Lien thereon is not governed by the Uniform Commercial Code (including rolling stock, motor vehicles and other assets subject to certificates of title), (c) the Capital Stock of any Foreign Subsidiary to the extent not required to be pledged to secure the Obligations pursuant to <u>Section 5.11(a)</u>, (d) any Excluded Accounts, (e) any property which, subject to the terms of <u>Section 7.9</u>, is subject to a Lien of the type described in <u>Section 7.2(d)</u> pursuant to documents which prohibit such Loan Party from granting any other Liens in such property, (f) any assets to the extent that applicable Law or contract terms provide that the grant of a Lien on or assignment of such asset would impair the validity of such asset or is otherwise prohibited as a matter of Law or under the terms of such contract, (g) nominee or directors' qualifying shares, (h) leased real property, and (i) other assets to the extent the Lender determines in its reasonable judgment that the cost of obtaining or perfecting such pledge or security interest is excessive in relation to the benefit thereof.

"<u>Excluded Swap Obligation</u>" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor, or the grant by such Guarantor of a security interest, becomes effective with respect to such Swap Obligation; <u>provided</u> that, for the avoidance of doubt, in determining whether any Guarantor is an "eligible contract participant" under the Commodity Exchange Act, the keepwell agreement set forth in <u>Section 9.8</u> shall be taken into account. If a Swap Obligation arises under a Master Agreement governing more than one Hedging Transaction, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Hedging Transactions for which such Guaranty or security interest is or becomes excluded in accordance with the first sentence of this definition.

"<u>Excluded Taxes</u>" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.15(c) and (d) any withholding Taxes imposed under FATCA.

"<u>Existing Indebtedness</u>" shall have the meaning set forth in <u>Section 5.9(b)</u>.

CHAR1\1875914v7

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" shall mean, for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher one one-hundredth of one percent (1/100 of 1%)) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Lender on such day on such transactions as determined by the Lender.  For purposes of this Agreement the Federal Funds Rate shall not be less than zero percent (0%).

"Fiscal Quarter" shall mean any fiscal quarter of Borrower and its Subsidiaries.

"Fiscal Year" shall mean any fiscal year of Borrower and its Subsidiaries.

"Foreign Subsidiary" shall mean any Subsidiary that is not a Domestic Subsidiary.

"Franchise" means a franchise (including any master franchises, development agreements, sub-franchises, seller-assisted marketing plans or licenses) of the Tijuana Flats® system for the development and operation of restaurants specializing in the sale of Tex-Mex cuisine and complementary side dishes and beverages, among other food products, under the Tijuana Flats® brand and utilizing IP Rights.

"Franchisee" means any Person unaffiliated with the Loan Parties who purchases or purchased a Franchise from Borrower, or who otherwise owns a Franchise.

"GAAP" shall mean generally accepted accounting principles in the United States applied on a consistent basis and subject to the terms of Section 1.3.

"Governmental Authority" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" of or by any Person (the "guarantor") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to

15

purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.  The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor Joinder Agreement" shall mean a joinder agreement substantially in the form of Exhibit 5.10 executed and delivered by a Subsidiary in accordance with the provisions of Section 5.10 or any other documents as the Lender shall deem appropriate for such purpose.

"Guarantors" shall mean, collectively, (a) each Subsidiary identified as a "Guarantor" on the signature pages hereto, (b) each Person that joins as a Guarantor pursuant to Section 5.10 or otherwise, (c) the Borrower, with respect to (i) any Hedging Obligations between any Loan Party (other than the Borrower) or Subsidiary and any Lender-Related Hedge Provider that are permitted to be incurred pursuant to Section 7.10 and any Bank Products Obligations owing by any Loan Party (other than the Borrower) or Subsidiary, and (ii) the payment and performance by each Specified Loan Party of its obligations under its Guaranty with respect to all Swap Obligations, the Borrower, and (d) the successors and permitted assigns of the foregoing.

"Guaranty" shall mean the Guaranty made by the Guarantors in favor of the Lender, for the benefit of the holders of the Obligations, pursuant to Article IX.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedge Termination Value" shall mean, in respect of any one or more Hedging Obligations, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Obligations, (a) for any date on or after the date such Hedging Obligations have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Obligations, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Obligations (which may include the Lender or any Affiliate of the Lender).

"Hedging Obligations" of any Person shall mean any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired under (a)

16

any and all Hedging Transactions, (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Hedging Transactions and (c) any and all renewals, extensions and modifications of any Hedging Transactions and any and all substitutions for any Hedging Transactions.

"Hedging Transaction" of any Person shall mean (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into by such Person that is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, spot transaction, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether or not any such transaction is governed by or subject to any master agreement and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Holdings" shall mean TJ Flats Holdings, LLC, a Delaware limited liability company.

"Indebtedness" of any Person shall mean, without duplication (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments (other than as a result of endorsements of negotiable instruments in the ordinary course of business and performance or surety bonds purchased by such Person in the ordinary course of business), (c) all obligations of such Person in respect of the deferred purchase price of property or services (including, without limitation, all Earn Out Obligations and excluding trade payables incurred in the ordinary course of business; provided, that (i) trade payables overdue by more than one hundred twenty (120) days shall be included in this definition except to the extent that any of such trade payables are being disputed in good faith and by appropriate measures, and (ii) the accrued management fees owed to each of Sponsor and Triloma Capital, LLC and its Affiliates as of the Closing Date shall not constitute Indebtedness), (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all Capital Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) Off-Balance Sheet Liabilities, (i) the Hedge Termination Value of all Hedging Obligations, (j) all Guarantees of such Person of the type of Indebtedness described in clauses (a) through (i) above and (k) all Indebtedness of a third party secured by any Lien on property owned by such Person, whether or not such Indebtedness has been assumed by such Person.  The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

17

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Financial Statements" shall mean the unaudited consolidated financial statements of Holdings and its Subsidiaries for the fiscal quarter ending December 31, 2021, including consolidated balance sheets and consolidated statements of income or operations and cash flows.

"Investments" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) purchase or other acquisition of any Capital Stock of another Person, (b) a loan, advance, other evidence of indebtedness or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other indebtedness or equity participation or interest in, another Person, or (c) an Acquisition.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IP Rights" shall mean all of the trademarks, service marks, trade names, copyrights, patents, patent rights and other intellectual property rights that the Borrower or any of its Subsidiaries owns or possesses the legal right to use and that are necessary for the operation of their respective businesses.

"IRS" shall mean the United States Internal Revenue Service.

"ISDA Definitions" shall mean the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"Laws" or "Law" shall mean, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender-Related Hedge Provider" shall mean the Lender or an Affiliate of the Lender.

"Lender" shall have the meaning set forth in the introductory paragraph hereof.

"Lien" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of any of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

"Liquidity" shall mean, as of any date of determination, the aggregate amount of unrestricted and unencumbered (other than by Liens in favor of the Lender) cash and Cash Equivalents (measured at fair

market value) of the Borrower maintained in the United States *plus* the aggregate amount actually available to be drawn by the Borrower under the Revolving Commitment.

"Loan Documents" shall mean, collectively, this Agreement, the Collateral Documents, the Engagement Letter, the Management Fee Subordination Agreement, the Note, all Notices of Revolving Borrowings, all Compliance Certificates, any promissory notes issued hereunder and any and all other instruments, agreements and documents executed in connection with any of the foregoing.

"Loan Parties" shall mean, collectively, the Borrower, Holdings and each Guarantor, and shall not include any Early Stage New Subsidiary.

"Loans" shall mean all Revolving Loans and the Term Loan, or any of them, as the context shall require.

"Management Agreement" shall mean the Amended and Restated Management Services Agreement dated as of March 25, 2021 by and among AUA Private Equity Partners, LLC, TJF USA, LLC, TJF USA II, LLC, the Borrower and Holdings.

"Management Fee Subordination Agreement" shall mean the Management Fee Subordination Agreement (AUA) dated the date hereof given by the Sponsor, TJF USA, LLC, TJF USA II, LLC, the Borrower and Holdings in favor of the Lender.

"Master Agreement" shall have the meaning set forth in the definition of "Hedging Transaction".

"Material Adverse Effect" shall mean, with respect to any event, act, condition or occurrence of whatever nature, resulting in a material adverse change in, or a material adverse effect on, (a) the business, results of operations, financial condition, assets or liabilities of the Borrower and its Subsidiaries taken as a whole, (b) the ability of the Loan Parties to perform any of their respective obligations under this Agreement or any other Loan Document, (c) the rights and remedies of the Lender under any of the Loan Documents or (d) the legality, validity or enforceability of any of the Loan Documents.

"Material Indebtedness" shall mean any Indebtedness (other than the Loans) and Hedging Obligations of Borrower or any of its Subsidiaries, individually or in an aggregate committed or outstanding principal amount exceeding $500,000. For purposes of determining the amount of attributed Indebtedness from Hedging Obligations, the "principal amount" of any Hedging Obligations at any time shall be the Net Mark-to-Market Exposure of such Hedging Obligations.

"Maturity Date" shall mean with respect to the Term Loan, the earlier of (a) March 4, 2027 or (b) the date on which the principal amount of the Term Loan has been declared or automatically have become due and payable pursuant to Section 8.1 (whether by acceleration or otherwise).

"Moody's" shall mean Moody's Investors Service, Inc.

"Multiemployer Plan" shall mean any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the

19

Borrower, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Borrower, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"Net Cash Proceeds" shall mean the aggregate cash or Cash Equivalents proceeds received by Holdings or any Subsidiary in respect of any Asset Sale, Event of Loss, or any issuance of Indebtedness or equity securities net of (a) direct costs incurred in connection therewith (including legal, accounting and investment banking fees, and sales commissions), (b) taxes paid or payable as a result thereof and (c) in the case of any Asset Sale or any Event of Loss, the amount necessary to retire any Indebtedness secured by a Lien permitted by Section 7.2 (ranking senior to any Lien of the Lender) on the related property (net of any portion of such proceeds deposited into an escrow account pursuant to the documentation relating to such sale, transfer or other disposition (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the Borrower or applicable Subsidiary)).

"Net Mark-to-Market Exposure" of any Person shall mean, as of any date of determination with respect to any Hedging Obligation, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from such Hedging Obligation.  "Unrealized losses" shall mean the fair market value of the cost to such Person of replacing the Hedging Transaction giving rise to such Hedging Obligation as of the date of determination (assuming the Hedging Transaction were to be terminated as of that date), and "unrealized profits" shall mean the fair market value of the gain to such Person of replacing such Hedging Transaction as of the date of determination (assuming such Hedging Transaction were to be terminated as of that date).

"New Location" means a de novo location, facility or venue that is wholly owned by a Loan Party, a Subsidiary of a Loan Party, or a Franchisee; provided that a location shall no longer be deemed to be a New Location from and after the one year anniversary of its general opening to the public.

"New Restaurant Contribution Amount" shall mean pre-opening costs related to the formation of a new Subsidiary and its related new Restaurant location opening after the Closing Date incurred in an amount consistent with past practices and in any event not to exceed an aggregate amount $100,000 per new Restaurant.

"New Subsidiary" shall have the meaning set forth in Section 5.10.

"Non-U.S. Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States by the Borrower or one or more of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement, or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Note" shall have the meaning set forth in Section 2.7(b).

"Notice of Revolving Borrowing" shall have the meaning set forth in Section 2.3.

"Obligations" shall mean, collectively, (a) all amounts owing by the Borrower and Guarantors to the Lender pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to any Loan, including without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, indemnification and reimbursement payments, reimbursable costs and expenses (including all fees and expenses of counsel to the Lender incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, (b) all Hedging Obligations owed by any Loan Party to any Lender-Related Hedge Provider permitted by Section 7.10, and (c) all Bank Product Obligations, together with all renewals, extensions, modifications or refinancings of any of the foregoing; provided, that "Obligations" of a Guarantor shall exclude any Excluded Swap Obligations of such Guarantor.

"OFAC" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Off-Balance Sheet Liabilities" of any Person shall mean (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (c) any Synthetic Lease Obligation or (d) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Ordinary Course Franchisee Acquisition" means the Acquisition by a Loan Party of not less than 100% of the outstanding Capital Stock or substantially all the assets of an existing Franchisee.

"Ordinary Course Franchisee Asset Sale" means the sale by a Loan Party (or any Subsidiary of a Loan Party) of not less than 100% of the total outstanding Capital Stock or substantially all the assets of an existing Franchisee originally acquired by a Loan Party (or any Subsidiary of a Loan Party) pursuant to an Ordinary Course Franchisee Acquisition, and in connection with such sale the Person acquiring such assets becomes a Franchisee.

"Organization Documents" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"OSHA" shall mean the Occupational Safety and Health Act of 1970 and any successor statute.

21

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Parent Company" shall mean, with respect to the Lender, the bank holding company (as defined in Regulation Y), if any, of the Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of the Lender.

"Participant" shall have the meaning set forth in Section 10.4(d).

"Participant Register" shall have the meaning set forth in Section 10.4(d).

"Payment Office" shall mean the office of the Lender located at 333 S. Garland Avenue, 17th Floor, Orlando, FL 32801, or such other location as to which the Lender shall have given written notice to the Borrower.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA, and any successor entity performing similar functions.

"Permitted Encumbrances" shall mean:

(a)    Liens imposed by Law for taxes not yet due or which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP;

(b)    statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen and other Liens imposed by Law in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security Laws or regulations;

(d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)    judgment and attachment liens not giving rise to an Event of Default under Section 8.1(k) or Section 8.1(l) or Liens created by or existing from any litigation or legal proceeding that are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(f)    customary rights of set-off, revocation, refund or chargeback under deposit agreements or under the Uniform Commercial Code or common law of banks or other financial institutions where Borrower or any of its Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business; and

(g)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by Law or arising in the ordinary course of business that are not substantial in amount and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Borrower and its Subsidiaries taken as a whole;

provided, that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money.

"Permitted Holder" shall mean Tijuana Flats Intermediate Holdco, LLC, a Delaware limited liability company and its controlled Affiliates.

"Permitted Tax Distributions" shall mean, with respect to any Loan Party or any Subsidiary of a Loan Party classified for any taxable year (or portion thereof) as a partnership or disregarded entity for federal income tax purposes, for each taxable year (or portion thereof) of such Loan Party, a distribution or distributions by such Loan Party in respect of the Taxes payable (as determined in the good faith and reasonable discretion by such Loan Party taking into account reasonable or customary assumptions in making such determination) by its direct or indirect owners on the net taxable income for such taxable year (or portion thereof) that "flows-through" (or is otherwise attributable to the operations and activities of) such Loan Party and any Subsidiary as a result of their respective classification as a "partnership" or "disregarded" entity for federal income tax purposes.

"Person" shall mean any individual, partnership, firm, corporation, association, joint venture, limited liability company, trust or other entity, or any Governmental Authority.

"Plan" shall mean any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) that is subject to Title IV of ERISA and is maintained or contributed to by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which the Borrower or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

CHAR1\1875914v7

"<u>Pro Forma Basis</u>" shall mean, for purposes of calculating compliance with respect to any Asset Sale, Event of Loss, or incurrence of Indebtedness, or any other transaction subject to calculation on a "Pro Forma Basis" as indicated herein, that such transaction shall be deemed to have occurred as of the first day of the period of four Fiscal Quarters most recently ended for which the Borrower has delivered financial statements pursuant to <u>Section 5.1(a)</u> or <u>(b)</u>.

"<u>Pro Forma Compliance Certificate</u>" shall mean a certificate of a Responsible Officer of the Borrower containing reasonably detailed calculations of the financial covenants set forth in <u>Article VI</u> recomputed as of the end of the period of the four Fiscal Quarters most recently ended for which the Borrower has delivered financial statements pursuant to <u>Section 5.1(a)</u> or <u>(b)</u> after giving effect to the applicable transaction on a Pro Forma Basis.

"<u>Qualified ECP Guarantor</u>" shall mean, in respect of any Swap Obligation, the Borrower and each Guarantor that has total assets exceeding $10,000,000 at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Loan Party as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"<u>Recipient</u>" means the Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"<u>Regulation D</u>" shall mean Regulation D of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"<u>Regulation T</u>" shall mean Regulation T of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"<u>Regulation U</u>" shall mean Regulation U of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"<u>Regulation X</u>" shall mean Regulation X of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"<u>Regulation Y</u>" shall mean Regulation Y of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"<u>Related Parties</u>" shall mean, with respect to any specified Person, such Person's Affiliates and the respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors, legal counsel, consultants or other representatives of such Person and such Person's Affiliates.

"<u>Release</u>" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata.

24

CHAR1\1875914v7

"Responsible Officer" shall mean, with respect to any Person, any of the president, the chief executive officer, the chief operating officer, the chief financial officer, the treasurer or a vice president of such Person or such other representative of such Person as may be designated in writing by any one of the foregoing with the consent of the Lender.

"Restaurant" shall mean any "Tijuana Flats" restaurant owned by a Loan Party.

"Restaurant Level Earnings" means, as of any date of determination, for each Restaurant, the amount of aggregate earnings (before giving effect to general and administrative expenses) of such Restaurant in operation, which amount is referred to in the consolidated financial statements of Holdings and its Subsidiaries as "Restaurant Level Earnings".

"Restricted Payment" shall mean (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Person, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Capital Stock or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Person thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment, (c) any management, advisory, casualty or similar fees payable pursuant to the Management Agreement, or (d) any Earn Out Obligations.

"Revolving Commitment" shall mean the commitment of the Lender to make Revolving Loans to the Borrower in the maximum aggregate principal amount of $1,000,000.

"Revolving Commitment Termination Date" shall mean the earliest of (a) March 4, 2027, (b) the date on which the Revolving Commitment is terminated pursuant to Section 2.5 and (c) the date on which all amounts outstanding under this Agreement have been declared or have automatically become due and payable (whether by acceleration or otherwise).

"Revolving Credit Exposure" shall mean, at any time, the sum of the outstanding principal amount of Revolving Loans.

"Revolving Loan" shall mean a loan made by the Lender to the Borrower under the Revolving Commitment.

"S&P" shall mean Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto.

"Sanctioned Country" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"Sanctioned Person" shall mean, at any time, (a) any Person that is the subject or target of any Sanctions, (b) any Person located, organized, operating or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person.

25

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom or (c) any other relevant sanctions authority.

"SEC" shall mean the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Security Agreement" shall mean the security and pledge agreement dated as of the Closing Date executed in favor of the Lender by each of the Loan Parties.

"Solvent" shall mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including subordinated and contingent liabilities, of such Person; (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts and liabilities, including subordinated and contingent liabilities as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature; (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital; (e) such Person is able to pay its debts and other liabilities, contingent obligations and other commitments as they mature in the ordinary course of business; and (f) such Person does not intend, in any transaction, to hinder, delay or defraud either present or future creditors or any other person to which such Person is or will become, through such transaction, indebted.  The amount of contingent liabilities (such as litigation, guaranties and pension plan liabilities) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that could reasonably be expected to become an actual or matured liability.

"Specified Equity Contribution" means as defined in Section 8.3(a).

"Specified Loan Party" shall mean each Loan Party that is, at the time on which the relevant Guarantee or grant of the relevant security interest under the Loan Documents by such Loan Party becomes effective with respect to a Swap Obligation, a corporation, partnership, proprietorship, organization, trust or other entity that would not be an "eligible contract participant" under the Commodity Exchange Act at such time but for the effect of Section 9.8.

"Sponsor" shall mean AUA Private Equity Partners, LLC.

"Subsidiary" shall mean, with respect to any Person (the "parent"), any corporation, partnership, joint venture, limited liability company, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (a) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power, or in the case of a partnership, more than fifty percent (50%) of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or

26

more subsidiaries of the parent.  Unless otherwise indicated, all references to "Subsidiary" hereunder shall mean a Subsidiary of the Borrower.

"Swap Obligations" shall mean with respect to any Guarantor any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (a) the lease will be treated as an "operating lease" by the lessee pursuant to Accounting Standards Codification Sections 840-10 and 840-20 and (b) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Synthetic Lease Obligations" shall mean, with respect to any Person, the sum of (a) all remaining rental obligations of such Person as lessee under Synthetic Leases which are attributable to principal and, without duplication and (b) all rental and purchase price payment obligations of such Person under such Synthetic Leases assuming such Person exercises the option to purchase the lease property at the end of the lease term.

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"Term Loan" shall have the meaning set forth in Section 2.4.

"Term Loan Commitment" shall mean the obligation of the Lender to make the Term Loan hereunder in one advance on the Closing Date, in a principal amount not exceeding $20,000,000.

"Trading with the Enemy Act" shall mean the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.).

"Unfunded Pension Liability" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

"United States" or "U.S." shall mean the United States of America.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.2     Accounting Terms and Determination.

27

(a)      Unless otherwise defined or specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP as in effect from time to time, applied on a basis consistent with the most recent audited consolidated financial statement of Holdings and its Subsidiaries delivered pursuant to Section 5.1(a); provided, that if the Borrower notifies the Lender that the Borrower wishes to amend any covenant in Article VI to eliminate the effect of any change in GAAP on the operation of such covenant (or if the Lender notifies the Borrower that the Lender wishes to amend Article VI for such purpose), then the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner reasonably satisfactory to the Borrower and Lender.

(b)      Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification Section 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Subsidiary of any Loan Party at "fair value", as defined.  Without limiting the foregoing, for all purposes of this Agreement and the other Loan Documents, including negative covenants, financial covenants and component definitions, GAAP will be deemed to treat operating leases and capitalized leases in a manner consistent with the treatment under GAAP as in effect prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of Accounting Standards Update No. 2016-02.

(c)      Notwithstanding the above, the parties hereto acknowledge and agree that all calculations of the financial covenants in Article VI (including for any transaction that by the terms of this Agreement requires that any financial covenant contained in Article VI be calculated on a Pro Forma Basis) shall be made on a Pro Forma Basis with respect to any Asset Sale, Event of Loss or Acquisition occurring during such period.

1.3      Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the word "to" means "to but excluding".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed or as it may from time to time be amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "hereof", "herein" and "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision hereof, (d) all references to Articles, Sections, Exhibits and Schedules shall be

28

construed to refer to Articles, Sections, Exhibits and Schedules to this Agreement, (e) all references to a specific time shall be construed to refer to the time in the city and state of the Lender's principal office, unless otherwise indicated, and (f) any definition of or reference to any law shall include all statutory and regulatory provisions consolidating, amending, or interpreting any such law and any reference to or definition of any law or regulation, unless otherwise specified, shall refer to such law or regulation as amended, modified or supplemented from time to time.

1.4    <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.5    <u>Divisions</u>.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

<u>AMOUNT AND TERMS OF THE COMMITMENTS</u>

2.1    <u>General Description of Facilities</u>.  Subject to and upon the terms and conditions herein set forth, (a) the Lender hereby establishes in favor of the Borrower a revolving credit facility pursuant to which the Lender agrees (to the extent of the Lender's Revolving Commitment) to make Revolving Loans to the Borrower in Dollars in accordance with <u>Section 2.2</u>, and (b) the Lender agrees to advance the Term Loan to the Borrower in Dollars on the Closing Date in a principal amount not exceeding the Term Loan Commitment.

2.2    <u>Revolving Loans</u>.  Subject to the terms and conditions set forth herein, the Lender agrees to make Revolving Loans to the Borrower in Dollars, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time that will not result in the aggregate Revolving Credit Exposures exceeding the Revolving Commitment.  During the Availability Period, the Borrower shall be entitled to borrow, prepay and reborrow Revolving Loans in accordance with the terms and conditions of this Agreement; <u>provided</u>, that absent the express consent of the Lender, the Borrower may not borrow or reborrow should there exist a Default or Event of Default.

2.3    <u>Procedure for Revolving Borrowings</u>.  The Borrower shall give the Lender written notice (or telephonic notice promptly confirmed in writing) of each Revolving Borrowing substantially in the form of <u>Exhibit 2.3</u> (a "<u>Notice of Revolving Borrowing</u>") prior to 11:00 a.m. one (1) Business Day prior to the requested date of each Borrowing (or for the Closing Date Borrowing of the Term Loan, such shorter period as the Lender shall agree in its discretion).  Each Notice of Revolving Borrowing shall be irrevocable and shall specify: (a) the aggregate principal amount of such Borrowing, (b) the date of such Borrowing (which shall be a Business Day) and (c) the location and number of Borrower's account with the Lender to which proceeds of such Borrowing of Revolving Loans are to be disbursed.  The aggregate principal amount of each Borrowing shall be not less than $100,000 or a larger multiple of $50,000.  The

29

Lender will make such Loans available to the Borrower by promptly crediting the amounts requested by the close of business on such proposed date to an account maintained by the Borrower with the Lender.

2.4     <u>Term Loan Commitment</u>.  Subject to the terms and conditions set forth herein, the Lender agrees to make a single term loan (the "<u>Term Loan</u>") to the Borrower in Dollars in one (1) advance on the Closing Date in a principal amount equal to the Term Loan Commitment.  The execution and delivery of this Agreement by the Borrower and the satisfaction of all conditions precedent pursuant to <u>Article III</u> hereof shall be deemed to constitute the Borrower's request to borrow the Term Loan on the Closing Date.  Amounts repaid on the Term Loan may not be reborrowed.

2.5     <u>Optional Reduction and Termination of Commitments</u>.

(a)     Unless previously terminated, the Revolving Commitment shall terminate on the Revolving Commitment Termination Date.  The Term Loan Commitment shall terminate on the Closing Date upon the making of the Term Loan pursuant to <u>Section 2.4</u>.

(b)     Upon at least five (5) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Lender (which notice shall be irrevocable), the Borrower may prepay and terminate the Revolving Commitment or Term Loan Commitment in whole or in part; <u>provided</u>, that no such reduction shall be permitted which would reduce the Revolving Commitment to an amount less than the aggregate outstanding Revolving Credit Exposure.

2.6     <u>Repayment of Loans</u>.

(a)     The outstanding principal amount of all Revolving Loans shall be due and payable (together with accrued and unpaid interest thereon) on the Revolving Commitment Termination Date.

(b)     The Borrower unconditionally promises to pay to the Lender the then unpaid principal amount of the Term Loan in quarterly installments payable on the last day of each Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2022 (and on such other date(s) and in such other amounts as may be required from time to time pursuant to this Agreement), with each such installment being in the amount set forth below; <u>provided</u>, that, to the extent not previously paid, the aggregate unpaid principal balance of the Term Loan shall be due and payable on the Maturity Date:

| Payment Date | Quarterly Principal Payment Amount |
|---|---|
| March 31, 2022, and the last day of each Fiscal Quarter thereafter through and including December 31, 2023 | $250,000 |
| March 31, 2024, and the last day of each Fiscal Quarter thereafter through and including December 31, 2024 | $500,000 |
| March 31, 2025, and the last day of each Fiscal Quarter thereafter through and | $750,000 |

30

| including March 31, 2027 | |
|---|---|

2.7    <u>Evidence of Indebtedness</u>.

(a)    The Lender shall maintain in accordance with its usual practice appropriate records evidencing the Indebtedness of the Borrower to the Lender resulting from each Loan made by the Lender from time to time, including the amounts of principal and interest payable thereon and paid to the Lender from time to time under this Agreement.  The Lender shall maintain appropriate records in which shall be recorded (i) the amount of each Loan made hereunder by the Lender, (ii) the date and amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder in respect of such Loans and (iii) both the date and amount of any sum received by the Lender hereunder from the Borrower in respect of the Loans.  The entries made in such records shall be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; <u>provided</u>, that the failure or delay of the Lender in maintaining or making entries into any such record or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans (both principal and unpaid accrued interest) of the Lender in accordance with the terms of this Agreement.

(b)    The Borrower will execute and deliver to the Lender a promissory note payable to the order of the Lender in the form of <u>Exhibit 2.7</u> (the "<u>Note</u>") to evidence the obligation to repay the Loans.

2.8    <u>Optional Prepayments</u>.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, without premium or penalty, by giving irrevocable written notice (or telephonic notice promptly confirmed in writing) to the Lender no later than 11:00 a.m. not less than five (5) Business Day prior to any such prepayment.  Each such notice shall specify the proposed date of such prepayment and the principal amount of each Borrowing or portion thereof to be prepaid; <u>provided</u>, that a notice of prepayment delivered by the Borrower in connection with a prepayment of the Obligations in full may state that such prepayment is conditioned upon the effectiveness of other credit facilities, the proceeds of which shall be used to repay the Obligations in full in cash, in which case such notice of prepayment or reduction may be revoked by the Borrower (by written notice provided to the Lender prior to the specified effective date thereof). If such notice is given, the aggregate amount specified in such notice shall be due and payable on the date designated in such notice, together with accrued interest to such date on the amount so prepaid in accordance with <u>Section 2.10(c)</u>.  Each partial prepayment of any Loan shall be in an amount that would be permitted in the case of an advance of a Revolving Borrowing pursuant to <u>Section 2.3</u>.  Each prepayment of a Borrowing shall be applied ratably to the Loans comprising such Borrowing and, in the case of a prepayment of the Term Loan Borrowing, ratably to all remaining principal installments.

2.9    <u>Mandatory Prepayments</u>.

(a)    Immediately upon the receipt by the Borrower or any of its Subsidiaries of Net Cash Proceeds of any Asset Sale or Event of Loss, the Borrower shall prepay the Obligations in accordance with <u>Section 2.9(c)</u> in an amount equal to such Net Cash Proceeds.

CHAR1\1875914v7

(b)     Immediately upon the receipt by the Borrower or any of its Subsidiaries of Net Cash Proceeds of any issuance of Indebtedness (other than Indebtedness permitted under Section 7.1), the Borrower shall prepay the Obligations in accordance with Section 2.9(c) in an amount equal to such Net Cash Proceeds.

(c)     Any prepayments made by the Borrower pursuant to Sections 2.9(a) or (b) above and Specified Equity Contributions under Section 8.3 shall be applied as follows: first, to the principal balance of the Term Loan until the same shall have been paid in full, applied to the remaining principal installments thereof (including the Maturity Date thereof) on a pro rata basis and second, to the principal balance of the Revolving Loans (on a pro rata basis), until the same shall have been paid in full.  The Revolving Commitment of the Lender shall not be permanently reduced by the amount of any prepayments made pursuant to clause second above, unless an Event of Default has occurred and is continuing and the Lender so requests.

(d)     If at any time the Revolving Credit Exposure exceeds the Revolving Commitment, as reduced pursuant to Section 2.5 or otherwise, the Borrower shall immediately repay Revolving Loans in an amount equal to such excess, together with all accrued and unpaid interest on such excess amount.

(e)     All prepayments made pursuant to this Section 2.9 shall be made together with (i) accrued interest on the amount of the Obligations prepaid and (ii) any breakage cost relating to a negative mark-to-market on any Hedging Obligations.

2.10    Interest on Loans.

(a)     The Borrower shall pay interest on each Loan at the Adjusted SOFR Rate in effect from time to time.

(b)     Notwithstanding clause (a) above, if an Event of Default has occurred and is continuing, at the option of the Lender, or automatically in the case of an Event of Default under Sections 8.1(g) or (h), the Borrower shall pay interest ("Default Interest") with respect to all Loans and all other Obligations hereunder, at the rate per annum equal to two percent (2.00%) above the Adjusted SOFR Rate.

(c)     Interest on the principal amount of all Loans shall accrue from and including the date such Loans are made to but excluding the date of any repayment thereof.  Interest on all outstanding Loans shall be payable monthly in arrears on the last day of each calendar month and on the Revolving Commitment Termination Date or the Maturity Date, as the case may be.  All Default Interest shall be payable on demand.

2.11    Fees.  The Borrower shall pay on the Closing Date to the Lender and its affiliates all fees in the Engagement Letter that are due and payable on the Closing Date, net of any fees paid prior to the Closing Date.

2.12    Computation of Interest and Fees.  Interest hereunder based on the "Bank's Prime Rate" (as defined in Schedule 2.13) shall be computed on the basis of a year of three hundred sixty-five (365)

32

days (or three hundred sixty-six (366) days in a leap year) and paid for the actual number of days elapsed (including the first day but excluding the last day).  All other interest and all fees shall be computed on the basis of a year of three hundred sixty (360) days and paid for the actual number of days elapsed (including the first day but excluding the last day).  Each determination by the Lender of an interest rate or fee hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive and binding for all purposes.

2.13    <u>SOFR Addendum</u>.    Additional terms, conditions and covenants of this Agreement are described in <u>Schedule 2.13</u> attached hereto, the terms of which are incorporated herein by reference.

2.14    <u>Increased Costs</u>.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender;

(ii)    subject the Lender to any Tax of any kind whatsoever with respect to this Agreement or any Loan, or change the basis of taxation of payments to the Lender in respect thereof (except for the imposition of, or any change in the rate of, Excluded Taxes); or

(iii)    impose on the Lender any other condition affecting this Agreement or any Loans;

and the result of either of the foregoing is to increase the cost to the Lender of making, converting into, continuing or maintaining any Loan or to reduce the amount received or receivable by the Lender hereunder (whether of principal, interest or any other amount), then the Borrower shall promptly pay, upon written notice from and demand by the Lender on the Borrower, to the Lender, within five (5) Business Days after the date of such notice and demand, additional amount or amounts sufficient to compensate the Lender for such additional costs incurred or reduction suffered.

(b)    If the Lender shall have determined that on or after the date of this Agreement any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the Lender's capital (or on the capital of the Parent Company of the Lender) as a consequence of its obligations hereunder to a level below that which the Lender or the Parent Company of the Lender could have achieved but for such Change in Law (taking into consideration the Lender's policies or the policies of the Parent Company of the Lender with respect to capital adequacy) then, from time to time, within five (5) Business Days after receipt by the Borrower of written demand by the Lender, the Borrower shall pay to the Lender such additional amounts as will compensate the Lender or the Parent Company of the Lender for any such reduction suffered.

CHAR1\1875914v7

(c)      A certificate of the Lender setting forth in reasonable detail the amount or amounts necessary to compensate the Lender or the Parent Company of such the Lender and the calculation thereof, as the case may be, specified in clause (a) or (b) of this Section 2.14 shall be delivered to the Borrower and shall be conclusive, absent manifest error.

(d)      Failure or delay on the part of the Lender to demand compensation pursuant to this Section 2.14 shall not constitute a waiver of the Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate the Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six (6) months prior to the date that the Lender delivers to the Borrower the certificate referenced in Section 3.2(c) and notifies the Borrower of the Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.15    Payments Generally.

(a)      Yield Protection. The Borrower shall make each payment required to be made by it hereunder (whether of amounts payable under Section 2.14, or otherwise) prior to 12:00 p.m. noon on the date when due, in immediately available funds, free and clear of any defenses, rights of set-off, counterclaim, or withholding or deduction of Taxes, except as required by applicable Law.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Lender at the Payment Office.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be made payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)      If the Borrower makes a payment under this Agreement to which withholding of Tax is required under applicable Law or if any Taxes are at any time imposed on any payments under or in respect of this Agreement including, but not limited to, payments made pursuant to this Section 2.15 (other than Excluded Taxes), the Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

Further, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Lender timely reimburse it for the payment of, Other Taxes.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable

34

expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender shall be conclusive absent manifest error.

The Borrower shall promptly provide the Lender with an original or certified copy of a receipt issued by the relevant Governmental Authority evidencing the payment of Taxes required to be deducted or withheld from such a payment, a copy of a return reporting such payment of Taxes or other reasonable evidence of such payment of Taxes.

(c)      Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to Section 2.15(a) (including by the payment of additional amounts pursuant to Section 2.15(a)), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under Section 2.15(a) with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the written request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (b) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (b), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (b) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(d)      Status of Lenders. Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. Any Lender that is a U.S. Person (as the term is defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), properly completed and executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax. Any foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or about the date on which such foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), IRS Form W-8BEN-E, W-8IMY, W-8ECI or other IRS W-8 form, as applicable. Each Lender agrees that if any form or

35

certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(e)      Survival. Each party's obligations under this Section 2.15 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

ARTICLE III

CONDITIONS PRECEDENT TO LOANS

3.1      Conditions To Effectiveness.  This Agreement and the obligations of the Lender to make Loans hereunder shall be effective upon satisfaction of the following conditions precedent in each case in form and substance reasonably satisfactory to the Lender:

(a)      Loan Documents.  Receipt by the Lender of a counterpart of this Agreement and the other Loan Documents signed by or on behalf of each party hereto or thereto or written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of such signed signature page) that such party has signed a counterpart of this Agreement and the other Loan Documents to which such party is a party.

(b)      Organization Documents; Resolutions and Certificates.  Receipt by the Lender of:

(i)      a certificate of the secretary or assistant secretary of each Loan Party, attaching and certifying copies of such Loan Party's Organization Documents and resolutions of its board of directors (or equivalent governing body), authorizing the execution, delivery and performance of the Loan Documents to which it is a party and certifying the name, title and true signature of each officer of such Loan Party executing the Loan Documents to which it is a party; and

(ii)      certified copies of the articles or certificate of incorporation, certificate of organization or limited partnership, or other registered organizational documents of each Loan Party, together with certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Loan Party.

(c)      Opinions of Counsel.  Receipt by the Lender of a written opinion of McDermott Will & Emery, LLP, as counsel to the Loan Parties, addressed to the Lender, and covering such customary matters relating to the Loan Parties and the Loan Documents in form and substance reasonably satisfactory to the Lender.

(d)      Officer's Closing Certificate.  Receipt by the Lender of a certificate dated the Closing Date and signed by a Responsible Officer, certifying that after giving effect to the funding of the Term Loan and any initial Revolving Borrowing, (i) no Default or Event of

36

Default shall exist, (ii) all representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) as of such earlier date and (iii) since the date of the financial statements of the Borrower described in <u>Section 4.4</u>, there shall have been no change which has had or could reasonably be expected to have a Material Adverse Effect.

(e)    <u>Sources and Uses</u>.  Receipt by the Lender of a duly executed funds disbursement agreement, together with a report setting forth the sources and uses of the proceeds hereof.

(f)    <u>Required Consents and Approvals</u>.  The Loan Parties shall have received all consents (including any necessary governmental consents), approvals, authorizations, registrations and filings and orders required to be made or obtained under any applicable Law, the Organization Documents of any Loan Party or by any Contractual Obligation of any Loan Party, necessary in connection with the execution, delivery and performance, validity and enforceability of the Loan Documents or any of the transactions contemplated thereby, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect and all applicable waiting periods shall have expired, and no investigation or inquiry by any Governmental Authority regarding the Loan Documents or any other transaction being financed with the proceeds thereof shall be ongoing.

(g)    <u>Solvency</u>.  Receipt by the Lender of a certificate, dated the Closing Date and signed by the chief financial officer of the Borrower, confirming that the Loan Parties, taken as a whole, are Solvent before and after giving effect to the funding of the Term Loan and any Revolving Loans on the Closing Date and the consummation of the other transactions contemplated herein.

(h)    <u>Insurance</u>.  Receipt by the Lender of certificates of insurance issued on behalf of insurers of the Loan Parties and their Subsidiaries, describing in reasonable detail the types and amounts of insurance (property and liability) maintained by the Loan Parties.

(i)    <u>Personal Property Collateral</u>.  Receipt by the Lender of the following:

(i)    searches of Uniform Commercial Code filings in the jurisdiction of formation of each Loan Party;

(ii)    Uniform Commercial Code financing statements for each appropriate jurisdiction as is necessary, in the Lender's reasonable discretion, to perfect the Lender's security interest in the Collateral;

(iii)    all certificates evidencing any certificated Capital Stock pledged to the Lender pursuant to the Security Agreement or any other pledge agreement, together with duly executed in blank, undated stock powers attached thereto (unless, with respect to the pledged Capital Stock of any Foreign Subsidiary, such stock powers are deemed unnecessary by the Lender in its reasonable discretion under the Law of the jurisdiction of organization of such Person);

(iv)    searches of ownership of, and Liens on, United States registered intellectual property owned by the Borrower in the appropriate governmental offices; and

(v)    duly executed notices of grant of security interest in the form required by any security agreement as are necessary, in the Lender's reasonable discretion, to perfect the Lender's security interest in the United States registered intellectual property owned by the Loan Parties (if and to the extent perfection may be achieved in the United States Patent and Trademark Office or the United States Copyright Office by such filings).

(j)    <u>Refinancing of Existing Indebtedness</u>.  Receipt by the Lender of copies of duly executed payoff letters in form and substance satisfactory to the Lender, executed by each of the Borrower's existing lenders or the agent thereof (other than with respect to Indebtedness permitted to exist under this Agreement), together with (i) evidence of payment in full of such Indebtedness, (ii) UCC-3 or other appropriate termination statements, in form and substance satisfactory to the Lender, releasing all liens of any existing lenders or agent upon any of the personal property of the Loan Parties and its Subsidiaries, (iii) cancellations and releases, in form and substance reasonably satisfactory to the Lender, releasing all liens of any existing lenders or agent upon any of the real property of the Borrower and its Subsidiaries, if any, and (iv) any other releases, terminations or other documents reasonably required by the Lender to evidence the payoff of Indebtedness.

(k)    <u>Patriot Act; Anti-Money Laundering Laws</u>.  At least five (5) days prior to the date of this Agreement, receipt by the Lender of all documentation and other information required by bank regulatory authorities or reasonably requested by the Lender under or in respect of applicable "know your customer" and anti-money laundering laws including the Patriot Act and, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to Borrower.

(l)    <u>Fees and Expenses</u>.  Receipt by the Lender of all fees, expenses and other amounts due and payable on or prior to the Closing Date, including without limitation reimbursement or payment of all reasonable and documented out-of-pocket expenses of the Lender (including reasonable fees, charges and disbursements of counsel to the Lender) required to be reimbursed or paid by the Borrower hereunder, under any other Loan Document and under any agreement with the Lender.

3.2    <u>Each Credit Event.</u>  The obligation of the Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a)    at the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall exist;

(b)    at the time of and immediately after giving effect to such Borrowing, all representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) as of such earlier date; and

(c)    the Borrower shall have delivered the required Notice of Revolving Borrowing.

Each Borrowing shall be deemed to constitute a representation and warranty by the Loan Parties on the date thereof as to the matters specified in <u>clauses (a)</u> and <u>(b)</u> of this <u>Section 3.2</u>.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lender as follows:

4.1    <u>Existence; Power</u>.  Each Loan Party (other than a Dormant Subsidiary) (a) is duly organized, validly existing and in good standing as a corporation, partnership or limited liability company under the Laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted, and (c) is duly qualified to do business, and is in good standing, in each jurisdiction where such qualification is required, except where a failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

4.2    <u>Organizational Power; Authorization; Enforceability</u>.  The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party are within such Loan Party's organizational powers and have been duly authorized by all necessary organizational, and if required, shareholder, partner or member, action.  This Agreement has been duly executed and delivered by each Loan Party, and constitutes, and each other Loan Document to which any Loan Party is party, when executed and delivered by such Loan Party, will constitute a legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party thereto, in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

4.3    <u>Governmental Approvals; No Conflicts</u>.  The execution, delivery and performance by each Loan Party of this Agreement, and by each Loan Party of the other Loan Documents to which it is a party (a) do not and will not require any consent or approval of, registration or filing with, notice to, or any action by, any Governmental Authority, except (i) those as have been obtained or made and are in full

force and effect and (ii) filings necessary to perfect and maintain the perfection of the Liens created by the Collateral Documents, (b) do not and will not violate (i) the Organization Documents of any Loan Party or (ii) any Law applicable to the Loan Parties, any Subsidiary or any judgment, order, decree or ruling of any Governmental Authority, (c) do not and will not violate, conflict with, result in a breach or constitute (with due notice or lapse or time or both) a default under any Contractual Obligation on a Loan Party or any of its assets or give rise to a right thereunder to require any payment to be made by a Loan Party, (d) do not and will not result in the creation or imposition of any Lien on any asset or properties of a Loan Party, except Liens (if any) created under the Loan Documents and (e) do not and will not require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of a Loan Party, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to the Lender.

4.4     <u>Financial Statements</u>.    The Borrower has furnished to the Lender (a) the Audited Financial Statements and (b) the Interim Financial Statements.  Such Audited Financial Statements fairly present the financial condition of Holdings and its Subsidiaries, as of such dates and the results of operations for such periods in conformity with GAAP consistently applied.  Such Interim Financial Statements fairly present the financial condition of Holdings and its Subsidiaries as of such dates and the consolidated results of operations for such periods in conformity with GAAP consistently applied, subject to year-end audit adjustments and the absence of footnotes.  The financial statements delivered pursuant to <u>Section 5.1(a)</u> and <u>(b)</u> have been prepared in accordance with GAAP and present fairly (on the basis disclosed in the footnotes to such financial statements delivered pursuant to <u>Section 5.1(a)</u>) the consolidated financial condition, results of operations and cash flows of Holdings and its Subsidiaries as of the dates thereof and for the periods covered thereby, in the case of financial statements delivered pursuant to <u>Section 5.1(b)</u>, subject to the absence of footnotes and ordinary year-end adjustments.  Since the date of the Audited Financial Statements (or following the Closing Date, the last audited financial statements delivered by the Borrower pursuant to <u>Section 5.1(a)</u>), there have been no changes with respect to Holdings and its Subsidiaries which have had or could reasonably be expected to have, singly or in the aggregate, a Material Adverse Effect.

4.5     <u>Litigation and Environmental Matters</u>.

(a)     No litigation, investigation or proceeding of or before any arbitrators or Governmental Authorities is pending against or, to the knowledge of any Responsible Officer of the Loan Parties, threatened against or affecting the Loan Parties or any Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect or (ii) which in any manner draws into question the validity or enforceability of this Agreement or any other Loan Document.

(b)     No Loan Party, nor any of its Subsidiaries, (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, in the case of each of the foregoing, which could reasonably be expected to result in a Material Adverse Effect.

40

4.6    Compliance with Laws and Agreements.  Each Loan Party and each of its Subsidiaries is in compliance with (a) all Laws and all judgments, decrees and orders of any Governmental Authority and (b) all indentures, agreements or other instruments binding upon it or its properties, except where non-compliance, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

4.7    No Default.

(a)    No Loan Party nor any of its Subsidiaries is in default under or with respect to any Contractual Obligation that could reasonably be expected to have a Material Adverse Effect.

(b)    No Default has occurred and is continuing.

4.8    Investment Company Act, Etc.  No Loan Party nor any of its Subsidiaries is (a) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt or requiring any approval or consent from or registration or filing with, any Governmental Authority in connection therewith.

4.9    Taxes.  The Loan Parties, each of their Subsidiaries and each other Person for whose Taxes a Loan Party or Subsidiary could become liable have timely filed or caused to be filed all federal, state and other material tax returns required to be filed by them (taking into account filing extensions), and have paid all federal, state and other material taxes, assessments made against it or its property and all other Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority, except where the same are currently being contested in good faith by appropriate proceedings and for which a Loan Party or any of Subsidiaries, as the case may be, has set aside on its books adequate reserves in accordance with GAAP. The charges, accruals and reserves on the books of the Loan Parties and their Subsidiaries in respect of such taxes are adequate, and no tax liabilities that could be materially in excess of the amount so provided are anticipated.

4.10    Margin Regulations.  None of the proceeds of any of the Loans will be used, directly or indirectly, for "purchasing" or "carrying" any "margin stock" with the respective meanings of each of such terms under Regulation U or for any purpose that violates the provisions of the Regulation T, U or X.  No Loan Party nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock."

4.11    ERISA.  Each Plan is in substantial compliance in form and operation with its terms and with ERISA and the Code (including, without limitation, the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations.  Each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that

41

would adversely affect the issuance of a favorable determination letter or otherwise adversely affect such qualification). No ERISA Event has occurred or is reasonably expected to occur. There exists no Unfunded Pension Liability with respect to any Plan. No Loan Party, any of its Subsidiaries or any ERISA Affiliate is making or accruing an obligation to make contributions, or has, within any of the five calendar years immediately preceding the date this assurance is given or deemed given, made or accrued an obligation to make, contributions to any Multiemployer Plan. There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower, any of its Subsidiaries or any ERISA Affiliate, threatened, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to result in liability to the Borrower or any of its Subsidiaries. The Loan Parties, its Subsidiaries and each ERISA Affiliate have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, by the terms of such Plan or Multiemployer Plan, respectively, or by any contract or agreement requiring contributions to a Plan or Multiemployer Plan. No Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA. None of the Loan Parties, any Subsidiaries or any ERISA Affiliate have ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions. Each Non-U.S. Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, except as would not reasonably be expected to result in liability to any Loan Party nor any of its Subsidiaries. All contributions required to be made with respect to a Non-U.S. Plan have been timely made. No Loan Party nor any of its Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Non-U.S. Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Non-U.S. Plan, determined as of the end of Holdings' most recently ended fiscal year on the basis of reasonable actuarial assumptions, did not exceed the current value of the assets of such Non-U.S. Plan allocable to such benefit liabilities.

4.12    Ownership of Property; Intellectual Property; Insurance.

(a)    Each Loan Party and each of its Subsidiaries has good title to, or valid leasehold interests in, all of its real and personal property material to the operation of its business, including all such properties reflected in the Audited Financial Statements or the most recent audited consolidated balance sheet of Holdings and its Subsidiaries delivered pursuant to Section 5.1(a) after the Closing Date or purported to have been acquired by any Loan Party or any Subsidiary thereof after said date (except as sold or otherwise disposed of in the ordinary course of business), in each case free and clear of Liens not permitted by this Agreement, except in each case, where the failure of which is not reasonably expected to result in a Material Adverse Effect. All leases that individually or in the aggregate are material to the business or operations of the Loan Parties are valid and subsisting and are in full force, except to the extent that the failure of such lease or leases to be valid, subsisting or in full force could not reasonably be expected to result in a Material Adverse Effect.

CHAR1\1875914v7

(b)      The Borrower and each Subsidiary owns or has the right to use all IP Rights, and, to the knowledge of a Responsible Officer of any Loan Party, the use thereof by the Borrower or any Subsidiary thereof does not infringe in any material respect on the rights of any other Person.

(c)      The properties of the Loan Parties (other than Dormant Subsidiaries) and the Subsidiaries thereof are insured with financially sound and reputable insurance companies which are not Affiliates of any Loan Party or any Subsidiary thereof, in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where each such Loan Party and each Subsidiary thereof operates.

4.13    Disclosure.

(a)      Each Loan Party has disclosed to the Lender all agreements, instruments, and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports (including without limitation all reports that any Loan Party is required to file with the SEC), financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Lender in writing in connection with the negotiation or syndication of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by any other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, taken as a whole, in light of the circumstances under which they were made, not misleading; provided, that, with respect to projected financial information, the Loan Parties' represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

(b)      As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

4.14    Labor Relations.   There are no strikes, lockouts or other material labor disputes or grievances against a Loan Party or Subsidiary thereof, or, to the knowledge of a Responsible Officer of any Loan Party, threatened against or affecting any Loan Party or Subsidiary thereof, and no significant unfair labor practice, charges or grievances are pending against a Loan Party or Subsidiary thereof, or to the knowledge of a Responsible Officer of any Loan Party, threatened against any of them before any Governmental Authority.  All payments due from a Loan Party or Subsidiary thereof pursuant to the provisions of any collective bargaining agreement have been paid or accrued as a liability on the books of the Loan Parties, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

4.15    Subsidiaries.   Schedule 4.15 sets forth (a) the name of, the ownership interest of each Loan Party in, the jurisdiction of incorporation or organization of, and the type of, each Subsidiary and identifies each Subsidiary as a Loan Party, and, if applicable, a Dormant Subsidiary, or an Early Stage New Subsidiary, in each case as of the Closing Date and (b) the authorized Capital Stock of the Loan Parties as of the Closing Date.  All issued and outstanding Capital Stock of each Loan Party and each

43

Subsidiary thereof is duly authorized and validly issued, fully paid, non-assessable, as applicable, and free and clear of all Liens other than those in favor of the Lender, for the benefit of the holders of the Obligations. All such securities were issued in compliance in all material respects with all applicable state and federal Laws concerning the issuance of securities. As of the Closing Date, all of the issued and outstanding Capital Stock of the Loan Parties and each Subsidiary thereof is owned by the Persons and in the amounts set forth on <u>Schedule 4.15</u>. As of the Closing Date, except as set forth on <u>Schedule 4.15</u>, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights, commitments or other similar agreements or understandings for the purchase or acquisition of any Capital Stock of Holdings or any of its Subsidiaries, and there are no membership interest or other Capital Stock of the Loan Parties or any Subsidiary thereof outstanding which upon conversion or exchange would require the issuance by a Loan Party or Subsidiary thereof of any additional membership interests or other Capital Stock of such Loan Parties or Subsidiary or other securities convertible into, exchangeable for or evidencing the right to subscribe for a purchase, a membership interest or other Capital Stock of any Loan Party or any Subsidiary thereof.

4.16    <u>Solvency</u>. After giving effect to the execution and delivery of the Loan Documents and the making of the Loans under this Agreement, the Loan Parties, taken as a whole, are Solvent.

4.17    <u>Business Locations; Taxpayer Identification Number</u>. Set forth on <u>Schedule 4.17-1</u> is a list of all real property located in the United States that is owned or leased by any Loan Party or any Subsidiary as of the Closing Date (identifying whether such real property is owned or leased and which Loan Party or Subsidiary owns or leases such real property). Set forth on <u>Schedule 4.17-2</u> is the chief executive office, U.S. tax payer identification number (other than Early Stage New Subsidiaries) and organizational identification number of each Loan Party and Subsidiary as of the Closing Date. The exact legal name and state of organization of each Loan Party as of the Closing Date is as set forth on the signature pages hereto. Except as set forth on <u>Schedule 4.17-3</u>, no Loan Party nor Subsidiary has during the five years preceding the Closing Date (a) changed its legal name, (b) changed its state of formation, or (c) been party to a merger, consolidation or other change in structure.

4.18    <u>Anti-Corruption Laws and Sanctions</u>.

(a)    None of the Loan Parties, any Subsidiary thereof or any of their respective directors, officers, employees, agents or affiliates is a Sanctioned Person.

(b)    The Loan Parties, each Subsidiary thereof and their respective directors, officers and employees and, to the knowledge of the Loan Parties, the agents of the Loan Parties, are in compliance with applicable Anti-Corruption Laws and applicable Sanctions. The Loan Parties have, or shall have within 90 days (or such later date as may be agreed by the Lender in its sole discretion) of the Closing Date, instituted and maintain policies and procedures designed to promote and achieve continued compliance with applicable Sanctions and Anti-Corruption Laws.

4.19    <u>Perfection of Security Interests in the Collateral</u>. The Collateral Documents create valid security interests in, and Liens on, the property described in and subject to the lien-granting provisions of the Collateral Documents, which security interests and Liens are currently perfected security interests and Liens, prior to all other Liens other than Liens permitted under this Agreement.

ARTICLE V

<u>AFFIRMATIVE COVENANTS</u>

Each Loan Party covenants and agrees that so long as the Lender has a Commitment hereunder, any Obligation remains unpaid or outstanding (other than continuing indemnity or expense reimbursement Obligations), such Loan Party shall and shall cause each Subsidiary to:

5.1     <u>Financial Statements and Other Information</u>.  Deliver to the Lender:

(a)     as soon as available and in any event within one hundred twenty (120) days after the end of each Fiscal Year, a copy of the annual audited report for such Fiscal Year for Holdings and its Subsidiaries, containing a consolidated balance sheet of Holdings and its Subsidiaries as of the end of such Fiscal Year and the related consolidated statements of income or operations, changes in stockholders' equity and cash flows (together with all footnotes thereto) of Holdings and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and reported on by independent public accountants reasonably acceptable to the Lender (without a "going concern" or like qualification, exception or explanation and without any qualification or exception as to scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and the results of operations of Holdings and its Subsidiaries for such Fiscal Year on a consolidated basis in accordance with GAAP and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(b)     as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter ending after the Closing Date, an unaudited consolidated balance sheet of Holdings and its Subsidiaries as of the end of such Fiscal Quarter and the related unaudited consolidated statements of income or operations, changes in stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and the then elapsed portion of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding quarter and the corresponding portion of the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by the chief executive officer, chief financial officer, treasurer or controller of Borrower as presenting fairly the financial condition, results of operations, stockholders' equity and cash flows of Holdings and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)     concurrently with the delivery of the financial statements referred to in <u>clauses (a)</u> and <u>(b)</u> above (other than financial statements delivered pursuant to <u>clause (b)</u> above for each Fiscal Quarter ending contemporaneously with the end of any Fiscal Year), a Compliance Certificate signed by the chief executive officer or the chief financial officer of the Borrower (i) certifying as to whether there exists a Default or Event of Default on the date of such certificate, and if a Default or an Event of Default then exists, specifying the details thereof and the action which the Borrower has taken or proposes to take with respect thereto, (ii) setting forth in

45

reasonable detail calculations demonstrating compliance with the financial covenants set forth in Article VI, (iii) certifying that as of the date thereof, all representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties are true and correct in all respects), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) as of such earlier date, (iv) stating whether any change in GAAP or the application thereof has occurred since the date of the Audited Financial Statements, and if any change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate and (v) specifying any change in the identity or existence of the Subsidiaries (and qualification as a Dormant Subsidiary or an Early Stage New Subsidiary, as the case may be) as of the end of such Fiscal Year or Fiscal Quarter from the Subsidiaries identified to the Lender on the Closing Date or as of the most recent Fiscal Year or Fiscal Quarter, as the case may be;

(d)      concurrently with the delivery of the financial statements referred to in clause (a) above, an annual budget for the immediately succeeding year, in reasonable detail and consistent with previously provided annual budgets, signed by a Responsible Officer of Borrower, describing the operations and financial condition of Holdings and its Subsidiaries; and

(e)      promptly following any request therefor, (i) such other information regarding the results of operations, business affairs and financial condition of Holdings and its Subsidiaries as the Lender may reasonably request and (ii) information and documentation reasonably requested by the Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act, other applicable anti-money laundering laws or under the Beneficial Ownership Regulation.

5.2      Notices.  Furnish to the Lender prompt written notice of the following:

(a)      the occurrence of any Default or Event of Default;

(b)      the filing or commencement of, or any material development in, any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of any Loan Party, affecting a Loan Party or any Subsidiary thereof which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)      the occurrence of any event or any other development by which the Borrower or any of its Subsidiaries (i) fails to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) becomes subject to any Environmental Liability, (iii) receives notice of any claim with respect to any Environmental Liability, or (iv) becomes aware of any basis for any Environmental Liability

and in each of the preceding clauses, which individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(d)     promptly and in any event within fifteen (15) days after (i) a Loan Party, any of its Subsidiaries or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, a certificate of the chief executive officer of the Borrower describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by the Borrower, such Subsidiary or such ERISA Affiliate from the PBGC or any other governmental agency with respect thereto, and (ii) becoming aware (1) that there has been an increase in Unfunded Pension Liabilities (not taking into account Plans with negative Unfunded Pension Liabilities) since the date the representations hereunder are given or deemed given, or from any prior notice, as applicable, (2) of the existence of any Withdrawal Liability, (3) of the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by the Borrower, any of its Subsidiaries or any ERISA Affiliate, or (4) of the adoption of any amendment to a Plan subject to Section 412 of the Code which results in a material increase in contribution obligations of any Loan Party, any of its Subsidiaries or any ERISA Affiliate, a detailed written description thereof from the chief financial officer of the Borrower;

(e)     the payment of any Permitted Tax Distribution and a detailed calculation thereof from the chief financial officer of the Borrower;

(f)     the occurrence of any default or event of default, or the receipt by a Loan Party of any written notice of an alleged default or event of default, with respect to any Material Indebtedness;

(g)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(h)     any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification; and

(i)     notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's chief executive office, its principal place of business, any office in which it maintains its primary books or records or any office or facility at which a material portion of Collateral owned by it is located (including the establishment of any such new office or facility), (iii) in any Loan Party's identity or legal structure, (iv) in any Loan Party's federal taxpayer identification number or organizational number or (v) in any Loan Party's jurisdiction of organization.

Each notice delivered under this <u>Section 5.2</u> shall be accompanied by a written statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

5.3     <u>Existence; Conduct of Business</u>.

47

(a)     Other than with respect to a Dormant Subsidiary, do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence and its respective rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business; provided, that nothing in this Section 5.3 shall prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.3; and

(b)     Engage in the business of the type conducted by the Borrower and its Subsidiaries on the date hereof and businesses reasonably related thereto

(c)     Cause the voluntary dissolution of Tijuana Flats #256, LLC within 30 days of the Closing Date.

5.4     Compliance with Laws, Etc.

(a)     Comply with all Laws applicable to its business and properties, including without limitation, all with all laws, rules, regulations and requirements of any Governmental Authority applicable to its business and properties, including, without limitation, all Environmental Laws, ERISA and OSHA, except where the failure to do so, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Subject to Section 4.18, the Borrower will maintain in effect and enforce policies and procedures designed to promote and achieve compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

5.5     Payment of Obligations.  Pay and discharge at or before maturity, all of its obligations and liabilities (including without limitation all taxes, assessments and other governmental charges, levies and all other claims that could result in a statutory Lien) before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Loan Parties have set aside on their books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

5.6     Books and Records.  Keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities to the extent necessary to prepare the consolidated financial statements of Holdings and its Subsidiaries in conformity with GAAP.

5.7     Visitation, Inspection, Etc.  Permit any representative of the Lender to visit and inspect its properties, to examine its books and records and to make copies and take extracts therefrom, and to discuss its affairs, finances and accounts with any of its officers and with its independent certified public accountants, all at such reasonable times during normal business hours and as often as the Lender may reasonably request after reasonable prior notice to the Borrower; provided that if an Event of Default has occurred and is continuing, no prior notice shall be required; provided further that so long as no Event of

Default has occurred and is continuing, in no event will Borrower be obligated to pay for costs and expenses of more than one such visit in each twelve month period.

5.8     Maintenance of Properties; Insurance.

(a)     Keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, except where the failure of which could not reasonably be expected to result in a Material Adverse Effect.

(b)     Other than with respect to a Dormant Subsidiary, maintain with financially sound and reputable insurance companies which are not Affiliates of any Loan Party or any Subsidiary thereof (i) insurance with respect to its properties and business, and the properties and business of its Subsidiaries, against loss or damage of the kinds customarily insured against by companies in the same or similar businesses operating in the same or similar locations and (ii) all insurance required to be maintained pursuant to the Collateral Documents, and will, upon reasonable request of the Lender, furnish to the Lender at reasonable intervals a certificate of a Responsible Officer setting forth the nature and extent of all insurance maintained by the Loan Parties in accordance with this Section 5.8 (and if reasonably requested by the Lender a copy of any policy referenced therein if not already delivered).

(c)     At all times shall name the Lender as additional insured on all liability policies and lender's loss payable on all property or casualty polices of the Loan Parties and their Subsidiaries (which policies shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Lender as additional insured or lender's loss payable, in form and substance reasonably satisfactory to the Lender).

5.9     Use of Proceeds.

(a)     Use the proceeds of all the Revolving Loans during the Availability Period to finance working capital needs and for other general lawful purposes of the Loan Parties.

(b)     Use the proceeds of the Term Loan advanced on the Closing Date to refinance or retire existing Indebtedness of the Loan Parties (the "Existing Indebtedness"), to pay related transaction fees and expenses, and to finance working capital needs and for other general lawful purposes of the Loan Parties.

5.10    Additional Subsidiaries.  If any Subsidiary is acquired or formed after the Closing Date (a "New Subsidiary"), cause such Subsidiary to become a Guarantor on or prior to the date the next Compliance Certificate is required to be delivered to the Lender pursuant to Section 5.1(c) hereof, provided, however, that if the New Subsidiary is formed for the purpose of operating a new Restaurant that is not yet operational and, as of the date such Compliance Certificate is due to the Lender, such New Subsidiary is not capable of satisfying the requirements of Section 3.1(k) hereof (an "Early Stage New Subsidiary"), then such Early Stage New Subsidiary shall be made a Guarantor not later than the first occurring date that a Compliance Certificate is due to the Lender after such Early Stage New Subsidiary

49

can satisfy the requirements of <u>Section 3.1(k)</u> hereof.  A New Subsidiary shall become an additional Guarantor by executing and delivering to the Lender a Guarantor Joinder Agreement in form and substance reasonably satisfactory to the Lender, accompanied by (a) all other Loan Documents related thereto, (b) certified copies of Organization Documents, and appropriate authorizing resolutions of the board of directors or similar body of such Subsidiaries, (c) satisfaction of deliverables required pursuant to <u>Section 3.1(k)</u> and (d) such other documents as the Lender may reasonably request.

5.11    <u>Further Assurances</u>

(a)    <u>Capital Stock</u>.  Cause (i) one hundred percent (100%) of the issued and outstanding Capital Stock in each Domestic Subsidiary and (ii) sixty-five percent (65%) (or such greater percentage that, due to a Change in Law after the date hereof, (A) could not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent and (B) could not reasonably be expected to cause any adverse tax consequences) of the issued and outstanding Capital Stock entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and one hundred percent (100%) of the issued and outstanding Capital Stock not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each Foreign Subsidiary, in each case directly owned by any Loan Party to be subject at all times to a first priority, perfected Lien in favor of the Lender, for the benefit of the holders of the Obligations, to secure the Obligations pursuant to the Collateral Documents (subject to Liens permitted by <u>Section 7.2</u>), and, in connection with the foregoing, deliver to the Lender such other documentation as the Lender may reasonably request including, any filings and deliveries to perfect such Liens, Organization Documents, resolutions and opinions of counsel all in form, content and scope reasonably satisfactory to the Lender.

(b)    <u>Personal Property</u>.  Cause all personal property (other than Excluded Property) owned by each Loan Party to be subject at all times to first priority, perfected Liens in favor of the Lender, for the benefit of the holders of the Obligations, to secure the Obligations as required by the Collateral Documents (subject to Liens permitted by <u>Section 7.2</u>) and, in connection with the foregoing, deliver to the Lender such other documentation as the Lender may reasonably request including filings and deliveries necessary to perfect such Liens, Organization Documents, resolutions and written opinions of counsel to such Person, all in form, content and scope reasonably satisfactory to the Lender.

5.12    <u>Cash Management</u>.  Not later than August 31, 2022, establish and maintain all cash management and treasury business with the Lender, including, without limitation, all deposit accounts, disbursement accounts, investment accounts, and lockbox accounts.

ARTICLE VI

FINANCIAL COVENANTS

Each Loan Party covenants and agrees that so long as the Lender has a Commitment hereunder, any Obligation remains unpaid or outstanding (other than continuing indemnity or expense

50

reimbursement Obligations), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

6.1    <u>Consolidated Fixed Charge Coverage Ratio</u>.  Permit the Consolidated Fixed Charge Ratio as of the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending March 31, 2022, to be less than:

| Fiscal Quarter Period Measuring Dates | Consolidated Fixed Charge Coverage Ratio Shall Not Be Less Than: |
|---|---|
| March 31, 2022 and June 30, 2022 | 1.10:1.00 |
| September 30, 2022 and December 31, 2022 | 1.15:1.00 |
| March 31, 2023 and Each Fiscal Quarter End Thereafter | 1.25:1.00 |

6.2    <u>Consolidated Lease-Adjusted Leverage Ratio</u>.  Permit the Consolidated Lease-Adjusted Leverage Ratio as of the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending March 31, 2022, to be greater than:.

| Fiscal Quarter Period Measuring Dates | Consolidated Lease-Adjusted Leverage Ratio Shall Not Be Greater Than: |
|---|---|
| March 31, 2022 and June 30, 2022 | 5.75:1.00 |
| September 30, 2022 and December 31, 2022 | 5.50:1.00 |
| March 31, 2023 and Each Fiscal Quarter End Thereafter | 5.25:1.00 |

6.3    <u>Maximum Capital Expenditures</u>.  Permit Capital Expenditures to be greater than the following for the corresponding fiscal year:

| Fiscal Year Ending | Capital Expenditures Shall Not Be Greater Than: |
|---|---|
| December 31, 2022 | $9,500,000 |
| December 31, 2023 | $10,000,000 |
| December 31, 2024 | $10,300,000 |
| December 31, 2025 | $10,650,000 |
| December 31, 2026 | $11,000,000 |

51

6.4    <u>Liquidity Requirement</u>.  Permit Liquidity of the Borrower to be less than $2,000,000.

ARTICLE VII

<u>NEGATIVE COVENANTS</u>

Each Loan Party covenants and agrees that so long as the Lender has a Commitment hereunder, any Obligation remains unpaid or outstanding (other than continuing indemnity or expense reimbursement Obligations), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

7.1    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness created pursuant to the Loan Documents;

(b)    Indebtedness of the Loan Parties (other than Holdings) or any Subsidiary existing on the date hereof and set forth on <u>Schedule 7.1</u> and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (immediately prior to giving effect to such extension, renewal or replacement) or shorten the maturity or the weighted average life thereof;

(c)    Indebtedness of the Loan Parties (other than Holdings) or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations; <u>provided</u>, that such Indebtedness is incurred prior to or within ninety (90) days after such acquisition or the completion of such construction or improvements or extensions, renewals, and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (immediately prior to giving effect to such extension, renewal or replacement) or shorten the maturity or the weighted average life thereof; <u>provided</u> further, that the aggregate principal amount of such Indebtedness does not exceed $500,000 at any time outstanding;

(d)    Indebtedness of any Loan Party (other than Holdings) to any other Loan Party (other than Holdings);

(e)    Guarantees by any Loan Party (other than Holdings) of Indebtedness of any other Loan Party (other than Holdings) and by any Loan Party (other than Holdings) of Indebtedness of the Borrower or any other Loan Party (other than Holdings) or Early Stage New Subsidiary; <u>provided</u>, that Guarantees by any Loan Party of Indebtedness of any Early Stage New Subsidiary shall be subject to <u>Section 7.4</u>;

(f)    cash management obligations and other Indebtedness in respect of netting services, overdraft protections and similar arrangements;

(g)    Indebtedness consisting of the financing of insurance premiums in the ordinary course of business not exceeding $200,000 in the aggregate at any time outstanding;

52

(h)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations and obligations in respect of letters of credit, bank guarantees and similar instruments related thereto, in each case, incurred in the ordinary course of business;

(i)     Hedging Obligations permitted by Section 7.10 in an aggregate notional principal amount not to exceed 50% of the aggregate principal amount of the Term Loan then outstanding;

(j)     Indebtedness in the form of self-insurance obligations in the ordinary course of business; and

(k)     other unsecured Indebtedness of the Loan Parties (other than Holdings) in an aggregate principal amount not to exceed $500,000 at any time outstanding.

7.2     Negative Pledge.  Create, incur, assume or suffer to exist any Lien on any of its assets or property now owned or hereafter acquired or, except:

(a)     Liens securing the Obligations pursuant to the Loan Documents;

(b)     Permitted Encumbrances;

(c)     any Liens on any property or assets of the Loan Parties (other than Holdings) or any Subsidiary existing on the Closing Date set forth on Schedule 7.2; provided, that such Lien shall not apply to any other property or asset of such Loan Party or Subsidiary (other than proceeds of the assets or property so encumbered);

(d)     purchase money Liens upon or in any fixed or capital assets to secure the purchase price or the cost of construction or improvement of such fixed or capital assets or to secure Indebtedness incurred solely for the purpose of financing the acquisition, construction or improvement of such fixed or capital assets (including Liens securing any Capital Lease Obligations); provided, that (i) such Lien secures Indebtedness permitted by Section 7.1(c), (ii) such Lien attaches to such asset concurrently or within ninety (90) days after the acquisition, improvement or completion of the construction thereof; (iii) such Lien does not extend to any other asset; and (iv) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets;

(e)     any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

(f)     non-exclusive licenses and sublicenses granted by a Loan Party or any Subsidiary of a Loan Party and leases and subleases (by a Loan Party or any Subsidiary of a Loan Party as lessor or sublessor) to third parties in the ordinary course of business not interfering in any material respect with the business of the Loan Parties or any of their Subsidiaries;

(g)     Liens in favor of collecting banks arising by operation of law under Section 4-210 of the UCC or, with respect to collecting banks located in the State of New York, under Section 4-208 of the UCC;

(h)     Liens (including the right of setoff) for bank services (but not for obligations for borrowed money) in favor of Regions Bank encumbering deposits or other funds maintained with Regions Bank until August 31, 2022;

(i)     other Liens in an aggregate amount not to exceed $100,000 at any time outstanding;

(j)     Liens on the insurance policies and any additional premiums required under the insurance policies in respect of Indebtedness permitted under Section 7.1(g); and

(k)     extensions, renewals, or replacements of any Lien referred to in clauses (a) through (j) of this Section 7.2; provided, that the principal amount of the Indebtedness secured thereby is not increased and that any such extension, renewal or replacement is limited to the assets originally encumbered thereby.

7.3     Fundamental Changes; Conduct of Business.

(a)     Merge into or consolidate into any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired) or any line of business or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired) or liquidate or dissolve; provided, that (i) any Subsidiary may merge into another Subsidiary; provided, that if any party to such merger is a Guarantor, the Guarantor shall be the surviving Person, (ii) any Subsidiary may merge into the Borrower so long as the Borrower shall be the surviving Person, (iii) any Subsidiary may sell, transfer, lease or otherwise dispose of all or substantially all of its assets to any Loan Party (other than Holdings) and (iv) so long as no Default or Event of Default shall have occurred and be continuing, any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lender; provided, that (x) all of its assets are transferred to a Loan Party or disposed of pursuant to Section 2.9(a) and (y) any such merger involving a Person that is not a wholly-owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 7.4.

(b)     Engage in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the date hereof and businesses reasonably related thereto.

7.4     Investments, Loans, Etc.  Make any Investment, except:

(a)     Investments existing on the date hereof and set forth on Schedule 7.4 (including Investments in Subsidiaries);

CHAR1\1875914v7

(b)        cash and Cash Equivalents;

(c)        Guarantees by a Loan Party (other than Holdings) or Subsidiary constituting Indebtedness permitted by <u>Section 7.1</u>;

(d)        Investments made by a Loan Party to or in another Loan Party (other than Holdings), including the creation and capitalization of a New Subsidiary, so long as <u>Sections 5.10</u> and <u>5.11</u> are satisfied in connection therewith;

(e)        Investments made by a Loan Party to or in an Early Stage New Subsidiary in an amount which, prior to such time that the Early Stage New Subsidiary becomes a Loan Party pursuant to <u>Section 5.10</u>, does not exceed the New Restaurant Contribution Amount, and provided that, at any one time, the aggregate of all Investments made pursuant to this <u>Section 7.4(e)</u> shall not exceed $200,000;

(f)        pledges and deposits made by a Loan Party or any of its Subsidiaries to the extent permitted under <u>Section 7.2</u>;

(g)        Investments made under Hedging Transactions, to the extent permitted under <u>Section 7.1(i)</u>;

(h)        Ordinary Course Franchisee Acquisitions; and

(i)        other Investments not exceeding $250,000 at any time outstanding.

7.5        <u>Restricted Payments</u>.  Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment; <u>provided</u>, that:

(a)        each Subsidiary of the Borrower may make Restricted Payments to any Loan Party (other than Holdings);

(b)        Holdings may declare and make dividend payments or other distributions payable solely in the Capital Stock of such Person;

(c)        the Borrower may make dividends or distributions to Holdings to pay the general corporate and overhead expenses of Holdings to the extent such expenses are attributable to the ownership or operation of the Borrower or its Subsidiaries and including amounts sufficient to pay out-of-pocket expenses, board activities, accounting, tax preparation and other expenses in the nature of overhead, in each case in the ordinary course of business;

(d)        Any Subsidiary may make or declare Restricted Payments to Persons that own Capital Stock in such Subsidiary, on a pro rata basis according to their respective holdings of the type of Capital Stock in respect of which such Restricted Payment is being made with any other members if such Subsidiary is not wholly owned by the Borrower and other wholly owned Subsidiaries; <u>provided</u> that no Event of Default shall exist immediately before or after giving effect thereto;

55

(e)      Loan Parties and Subsidiaries thereof may make or declare Permitted Tax Distributions;

(f)      the Loan Parties may pay, prepay, redeem, repurchase, defease or otherwise satisfy, when due and payable prior to any scheduled maturity thereof, any subordinated Indebtedness solely to the extent permitted under the applicable subordination agreement or other applicable subordination terms;

(g)      Loan Parties and Subsidiaries thereof may make expense reimbursement payments required under the Management Agreement; and

(h)      Loan Parties and Subsidiaries thereof may make or declare other Restricted Payments solely to the extent approved in writing by the Lender.

7.6      <u>Sale of Assets.</u>  Make any Asset Sale, except any sale or other disposition of such assets so long as (a) at least seventy-five percent (75%) of the consideration paid in connection therewith shall be cash or Cash Equivalents paid contemporaneously with the consummation of the transaction and shall be in an amount not less than the fair market value of the property disposed of, (b) such transaction is not prohibited by the terms of <u>Section 7.9</u>, (c) such transaction does not involve the sale or other disposition of a minority Capital Stock in any Subsidiary, (d) such transaction does not involve a sale or other disposition of receivables other than receivables owned by or attributable to other property concurrently being disposed of in a transaction otherwise permitted under this <u>Section 7.6</u>, and (e) the aggregate net book value of all of the assets sold or otherwise disposed of by the Borrower and its Subsidiaries in all such transactions under this <u>Section 7.6</u> in any Fiscal Year shall not exceed $250,000.

7.7      <u>Transactions with Affiliates.</u>  Sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Loan Parties and their Subsidiaries, and provided that any transaction with an Early Stage New Subsidiary is subject to <u>Section 7.4</u>, and (c) any Restricted Payment permitted by <u>Section 7.5</u>.

7.8      <u>Restrictive Agreements.</u>  Enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit any Lien upon any of its assets or properties, whether now owned or hereafter acquired, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to its Capital Stock, to make or repay loans or advances to the Borrower or any other Subsidiary, to Guarantee Indebtedness of the Borrower or any other Subsidiary or to transfer any of its property or assets to the Borrower or any Subsidiary of the Borrower; <u>provided</u>, that (i) the foregoing shall not apply to restrictions or conditions imposed by Law or by this Agreement or any other Loan Document, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, <u>provided</u> such restrictions and conditions apply only to the Subsidiary that is sold and such sale is permitted hereunder, (iii) <u>clause (a)</u> shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement so long as such restrictions and

56

conditions apply only to the property or assets securing such Indebtedness and (iv) <u>clause (a)</u> shall not apply to customary provision in leases restricting the assignment thereof.

7.9     <u>Sale and Leaseback Transactions</u>.  Enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

7.10     <u>Hedging Transactions</u>.  Enter into any Hedging Transaction, other than Hedging Transactions entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary is exposed in the conduct of its business or the management of its liabilities. Solely for the avoidance of doubt, the Borrower acknowledges that a Hedging Transaction entered into for speculative purposes or of a speculative nature (which shall be deemed to include any Hedging Transaction under which the Borrower or any of the Subsidiaries is or may become obliged to make any payment (i) in connection with the purchase by any third party of any Capital Stock or any Indebtedness or (ii) as a result of changes in the market value of any Capital Stock or any Indebtedness) is not a Hedging Transaction entered into in the ordinary course of business to hedge or mitigate risks.

7.11     <u>Legal Name, State of Formation and Form of Entity</u>.  Without providing thirty (30) days' prior written notice to the Lender (or such lesser period as the Lender may agree), change its name, state of formation or form of organization.

7.12     <u>Amendment to Organization Documents and Material Documents</u>.  Amend, modify or waive any of its rights in a manner materially adverse to the Lender or any Loan Party under its Organization Documents or the Management Agreement, except in any manner that would not have a material adverse effect on the Lender, the Borrower or any of its Subsidiaries.

7.13     <u>Accounting Changes; Change in Fiscal Year</u>. Without the prior written consent of the Lender (such consent not to be unreasonably withheld), make any significant change in accounting treatment or reporting practices, except as required by GAAP, or change the Fiscal Year of Holdings or of any of its Subsidiaries, except to change the fiscal year of a Subsidiary to conform its fiscal year to that of Holdings.

7.14     <u>Government Regulation</u>.  (a) Be or become subject at any time to any law, regulation or list of any Governmental Authority of the United States (including, without limitation, the OFAC list) that prohibits or limits the Lender from making any advance or extension of credit to the Borrower or from otherwise conducting business with the Loan Parties, or (b) fail to provide documentary and other evidence of the identity of the Loan Parties as may be reasonably requested by the Lender at any time to enable the Lender to verify the identity of the Loan Parties or to comply with any applicable Law or regulation, including, without limitation, Section 326 of the Patriot Act at 31 U.S.C. Section 5318.

7.15     <u>Sanctions and Anti-Corruption Laws</u>. Request any Loan or, directly or indirectly, use the proceeds of any Loan, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person (a) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, (b) in any other manner

that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as the Lender, underwriter, advisor, investor or otherwise), or (c) in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money or anything else of value to any Person in violation of applicable Anti-Corruption Laws.

7.16    <u>Restrictions on Holdings</u>. Holdings shall not: (a) own any material property, other than the Capital Stock in the Borrower; (b) have any material liabilities, other than (i) obligations under the Loan Documents and contracts and agreements (including with respect to indemnities) with its respective officers, directors, consultants and employees relating to their employment, services or directorships, (ii) tax liabilities in the ordinary course of business (including Permitted Tax Distributions), and (iii) corporate, administrative and operating expenses incurred in the ordinary course of business (including registration fees); or (c) engage in any business, other than (i) owning the Capital Stock in the Borrower and activities incidental or related thereto, and (ii) performing its obligations under the Loan Documents and contracts and agreements (including with respect to indemnities) with its respective officers, directors, consultants and employees relating to their employment, services or directorships.

ARTICLE VIII

<u>EVENTS OF DEFAULT</u>

8.1    <u>Events of Default</u>.  If any of the following events (each an "<u>Event of Default</u>") shall occur:

(a)    Borrower or any Guarantor shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or otherwise; or

(b)    Borrower or any Guarantor shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount payable under <u>clause (a)</u> of this <u>Section 8.1</u> or an amount related to a Bank Product Obligation) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days; or

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in or in connection with this Agreement or any other Loan Document (including the Schedules attached thereto) and any amendments or modifications hereof or waivers hereunder, or in any certificate, report, financial statement or other document submitted to the Lender by any Loan Party or any representative of any Loan Party pursuant to or in connection with this Agreement or any other Loan Document shall prove to be incorrect in any material respect (other than a representation or warranty that is expressly qualified by a Material Adverse Effect or materiality, in which case such representation or warranty shall prove to be incorrect in all respects) when made or deemed made or submitted; or

58

(d)      any Loan Party shall fail to observe or perform any covenant or agreement contained in (i) <u>Sections 5.1</u>, <u>5.2</u>, or <u>5.10</u> and such failure shall continue for three (3) Business Days or (ii) <u>Sections 5.3</u>, <u>5.7</u>, <u>5.8</u>, <u>5.9</u>, <u>5.11</u> or <u>5.12</u> or <u>Articles VI</u> or <u>VII</u>; or

(e)      any Loan Party shall fail to observe or perform any covenant or agreement contained in this Agreement (other than those referred to in <u>clauses (a)</u>, <u>(b)</u> and <u>(d)</u> above) or any other Loan Document or related to any Bank Product Obligation, and such failure shall remain unremedied for thirty (30) days after the earlier of (i) any officer of any Loan Party becomes aware of such failure, or (ii) notice thereof shall have been given to any Loan Party by the Lender; or

(f)      any Loan Party or any Subsidiary (whether as primary obligor or as guarantor or other surety) shall fail to pay any principal of, or premium or interest on, any Material Indebtedness that is outstanding, when and as the same shall become due and payable (whether at scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument evidencing or governing such Material Indebtedness; or any other event shall occur or condition shall exist under any agreement or instrument relating to such Material Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of such Material Indebtedness; or any such Material Indebtedness shall be declared to be due and payable, or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or any offer to prepay, redeem, purchase or defease such Material Indebtedness shall be required to be made, in each case prior to the stated maturity thereof; or

(g)      any Loan Party or any Subsidiary shall (i) commence a voluntary case or other proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency or other similar Law now or hereafter in effect or seeking the appointment of a custodian, trustee, receiver, liquidator or other similar official of it or any substantial part of its property, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in <u>clause (h)</u> of this <u>Section 8.1</u>, (iii) apply for or consent to the appointment of a custodian, trustee, receiver, liquidator or other similar official for any such Loan Party or such Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, or (vi) take any action indicating consent to, approval of, or acquiescence in any of the foregoing; or

(h)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Loan Party or any Subsidiary or its debts, or any substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency or other similar Law now or hereafter in effect or (ii) the appointment of a custodian, trustee, receiver, liquidator or other similar official for any Loan Party or any Subsidiary or for a substantial part of its assets, and in any such case, such proceeding or petition

59

shall remain undismissed for a period of sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or

(i)    any Loan Party or any Subsidiary shall become unable to pay, shall admit in writing its inability to pay, or shall generally fail to pay, its debts as they become due, subject to applicable grace periods; or

(j)    (i) an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with other ERISA Events that have occurred, could reasonably be expected to result in liability to the Loan Parties and their Subsidiaries in an aggregate amount exceeding $500,000, (ii) there is or arises an Unfunded Pension Liability (not taking into account Plans with negative Unfunded Pension Liability) in an aggregate amount exceeding $500,000, or (iii) there is or arises any potential Withdrawal Liability in an aggregate amount exceeding $500,000; or

(k)    any judgment or order for the payment of money in excess of $500,000, individually or in the aggregate, shall be rendered against any Loan Party or any Subsidiary (excluding amounts covered by indemnities or insurance to the extent the relevant independent insurer has not denied coverage therefor), and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(l)    any non-monetary judgment or order shall be rendered against any Loan Party or any Subsidiary that could reasonably be expected to have a Material Adverse Effect, and there shall be a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(m)    a Change in Control shall occur or exist; or

(n)    any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to give the Lender any material part of the Liens purported to be created thereby; or any Loan Party or any other Person contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document to which it is a party; or

(o)    any Lien purported to be created under any Collateral Document shall fail or cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on a material portion of the Collateral, with the priority required by the applicable Collateral Documents;

then, and in every such event (other than an event with respect to the Borrower described in clause (g) or (h) of this Section 8.1) and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrower, take any or all of the following actions, at the

60

same or different times: (i) terminate the Commitments, whereupon the Commitments of the Lender shall terminate immediately, (ii) declare the principal of and any accrued interest on the Loans, and all other Obligations owing hereunder, to be, whereupon the same shall become, due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, (iii) exercise all remedies contained in any other Loan Document, and (iv) exercise any other remedies available at Law or in equity; and that, if an Event of Default specified in either clause (g) or (h) shall occur, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon, and all fees, and all other Obligations shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Notwithstanding anything herein or otherwise to the contrary, any Event of Default occurring hereunder shall continue to exist (and shall be deemed to be continuing) until such time as such Event of Default is waived in writing in accordance with the terms of Section 10.2 notwithstanding (A) any attempted cure or other action taken by the Borrower or any other Person subsequent to the occurrence of such Event of Default or (B) any action taken or omitted to be taken by the Lender prior to or subsequent to the occurrence of such Event of Default (other than the granting of a waiver in writing in accordance with the terms of Section 10.2).

8.2     Application of Funds.

After the exercise of remedies provided for in Section 8.1 (or immediately after an Event of Default specified in either clause (g) or (h) of Section 8.1), any amounts received on account of the Obligations shall be applied by the Lender thereto in its sole discretion and then, to the extent any proceeds remain, to the Borrower or other parties lawfully entitled thereto.

Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section 8.2.

8.3     Certain Cure Rights.

(a)     Notwithstanding anything to the contrary contained in Section 8.1, but subject to Sections 8.3(b) and 8.3(c), for the purpose of determining whether an Event of Default has occurred under Section 6.1 and Section 6.2, the Borrower may apply the proceeds of Equity Interests issued by Holdings (in the form of common equity of Holdings or, if on terms reasonably acceptable to the Lender, in the form of preferred equity of Holdings (which terms shall include, without limitation, that such preferred equity shall not provide for any cash payments prior to the payment in full of the Obligations)) and subsequently contributed to the Borrower (any such equity contribution, a "Specified Equity Contribution") to increase Consolidated EBITDA and Consolidated EBITDAR for the applicable fiscal period; provided that the Specified Equity Contribution shall be no more than the amount required to cause the Borrower to be in compliance with the financial covenants set forth in Section 6.1 and Section 6.2 for such applicable fiscal quarter and the proceeds of such Equity Interests are actually received by the Borrower after the last day of the fiscal quarter with respect to which the financial covenants are being

61

measured and on or prior to the tenth (10th) Business Day after the date on which financial statements are required to be delivered with respect to such applicable fiscal quarter (the "Cure Expiration Date").  The Specified Equity Contribution shall be used and included in the calculation of Consolidated EBITDA and Consolidated EBITDAR for such fiscal quarter, and shall be used and included when calculating Consolidated EBITDA and Consolidated EBITDAR for each period that includes such fiscal quarter.  The parties hereby acknowledge that this Section 8.3(a) may not be relied on for purposes of calculating any financial ratios other than as applicable to Section 6.1 and Section 6.2 and shall not result in any adjustment to any amounts in calculation of such ratios other than the amount of Consolidated EBITDA and Consolidated EBITDAR referred to in the immediately preceding sentence for the purposes of compliance with Section 6.1 and Section 6.2 and shall not be effective with respect to any other purpose for which the Consolidated Lease-Adjusted Leverage Ratio, Consolidated EBITDA or Consolidated EBITDAR is calculated hereunder.  For the fiscal quarter with respect to which the proceeds of any Specified Equity Contribution are received and the next three fiscal quarters thereafter, there shall be no pro forma reduction in the outstanding balances of the Loans or Indebtedness prepaid with the proceeds of such Specified Equity Contribution for purposes of determining compliance with Section 6.1 and Section 6.2.  One hundred percent (100%) of the proceeds of a Specified Equity Contribution shall be applied as a mandatory prepayment of the Loans in accordance with Section 2.9(c).  Notwithstanding anything to the contrary contained herein, (A) upon receipt of a Specified Equity Contribution by the Borrower sufficient to bring the Borrower into compliance with Section 6.1 and Section 6.2 calculated in accordance with the second sentence of this Section 8.3(a), the covenants under Article VI shall be deemed satisfied and complied with as of the end of the relevant fiscal quarter with the same effect as though there had been no failure to comply with any covenant under Section 6.1 and Section 6.2 and any Default or Event of Default related to any failure to comply with any covenant under Section 6.1 and Section 6.2 shall be deemed not to have occurred for purposes of the Loan Documents and (B) upon receipt by the Lender of a Notice of Intent to Cure prior to the Cure Expiration Date, the Lender shall not exercise any rights or remedies under this Article VIII (or under any other Loan Document available during the continuance of any Default or Event of Default, excluding, for the avoidance of doubt, failing to advance any Loan) on the basis of any actual or purported failure to comply with any covenant under Section 6.1 and Section 6.2 until such failure is not cured pursuant to the Notice of Intent to Cure on or prior to the Cure Expiration Date.

(b)    In each period of four (4) consecutive Fiscal Quarters, there shall be at least two (2) Fiscal Quarters in which no Specified Equity Contribution set forth in Section 8.3(a) is made.

(c)    There can be no more than four (4) Fiscal Quarters in which a Specified Equity Contribution set forth in Section 8.3(a) is made during the term of this Agreement.

ARTICLE IX

THE GUARANTY

9.1    The Guaranty.  Each of the Guarantors hereby jointly and severally guarantees to the Lender and/or each Affiliate of the Lender that enters into Bank Products or a Hedging Transaction with the Borrower or any Subsidiary, and each other holder of the Obligations as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at

stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof.  The Guarantors hereby further agree that if any of the Obligations is not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents or the other documents relating to the Obligations, the obligations of each Guarantor under this Agreement and the other Loan Documents shall not exceed an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under applicable Debtor Relief Laws.

9.2     Obligations Unconditional.  The obligations of the Guarantors under Section 9.1 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or other documents relating to the Obligations, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 9.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances (until payment in full of the Obligations). Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrower or any other Guarantor for amounts paid under this Article IX until such time as the Obligations have been paid in full and the Commitments have expired or terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by Law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of any of the Loan Documents or any other document relating to the Obligations shall be done or omitted;

(c)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Loan Documents or any other document relating to the Obligations shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)     any Lien granted to, or in favor of, the Lender or any other holder of the Obligations as security for any of the Obligations shall fail to attach or be perfected; or

63

(e)        any of the Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever and any requirement that the Lender or any other holder of the Obligations exhaust any right, power or remedy or proceed against any Person under any of the Loan Documents or any other document relating to the Obligations or against any other Person under any other guarantee of, or security for, any of the Obligations.

9.3        Reinstatement.    The obligations of each Guarantor under this Article IX shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any Debtor Relief Law or otherwise, and each Guarantor agrees that it will indemnify the Lender and each other holder of the Obligations on demand for all reasonable and documented out-of-pocket costs and expenses (including the reasonable and documented out-of-pocket fees, charges and disbursements of counsel) incurred by the Lender or such holder of the Obligations in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

9.4        Certain Additional Waivers.    Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 9.2 and through the exercise of rights of contribution pursuant to Section 9.6.

9.5        Remedies.    The Guarantors agree that, to the fullest extent permitted by Law, as between the Guarantors, on the one hand, and the Lender and the other holders of the Obligations, on the other hand, the Obligations may be declared to be forthwith due and payable as specified in Section 8.1 (and shall be deemed to have become automatically due and payable in the circumstances specified in Section 8.1) for purposes of Section 9.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantors for purposes of Section 9.1.    The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the holders of the Obligations may exercise their remedies thereunder in accordance with the terms thereof.

9.6        Rights of Contribution.    The Guarantors agree among themselves that, in connection with payments made hereunder, each Guarantor shall have contribution rights against the other Guarantors as permitted under applicable Law.    Such contribution rights shall be subordinate and subject in right of payment to the obligations of such Guarantors under the Loan Documents and no Guarantor shall exercise such rights of contribution until the Obligations have been paid in full and the Commitments have terminated.

64

9.7 <u>Guarantee of Payment; Continuing Guarantee</u>.  The guarantee in this <u>Article IX</u> is a guaranty of payment and not of collection, is a continuing guarantee, and shall apply to the Obligations whenever arising.

9.8 <u>Keepwell</u>.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Specified Loan Party to honor all of such Specified Loan Party's obligations under this Agreement and the other Loan Documents in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this <u>Section 9.8</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 9.8</u> or otherwise under this Agreement voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this <u>Section 9.8</u> shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full.  Each Qualified ECP Guarantor intends that this <u>Section 9.8</u> constitute, and this <u>Section 9.8</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each Specified Loan Party for all purposes of Section la(18)(A)(v)(II) of the Commodity Exchange Act.

ARTICLE X

<u>MISCELLANEOUS</u>

10.1 <u>Notices</u>.

(a) <u>Written Notices</u>.

(i) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

| | |
|---|---|
| To any Loan Party: | Tijuana Flats Restaurants, LLC<br>2300 Maitland Center Parkway, #306<br>Maitland, FL 32751<br>Attention: Louie Psallidas, Chief Financial Officer<br>Email: Louie.P@tijuanaflats.com |
| With a copy to: | AUA Private Equity Partners, LLC<br>1 N Clematis St, STE 307<br>West Palm Beach, Florida 33401<br>Attention: Steve Flyer and Kyce Chihi<br>E-Mail: steve.flyer@auaequity.com;<br>kyce.chihi@auaequity.com |

65

McDermott Will & Emery LLP
2049 Century Park East, Suite 3200
Los Angeles, CA 90067
Attention: Gary Rosenbaum
Email: grosenbaum@mwe.com

McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
Attention: Laurence Bronska
Email: lbronska@mwe.com

To the Lender:          Truist Bank
                        333 S. Garland Avenue, 17th Floor,
                        Orlando, FL 32801
                        Attention: Lisa Z. Cox
                        Email: lisa.z.cox@truist.com

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All such notices and other communications sent to any party hereto in accordance with the provisions of this Agreement or made upon the earlier to occur of (A) actual receipt by the relevant party hereto and (B) (1) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (2) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (3) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (4) if delivered by electronic mail, to the extent provided in clause (b) below and effective as provided in such clause; provided that notices and other communications to the Lender pursuant to Article II shall not be effective until actually received by the Lender.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(ii)     Any agreement of the Lender herein to receive certain notices by telephone or facsimile is solely for the convenience and at the request of the Borrower. The Lender shall be entitled to rely on the authority of any Person purporting to be a Person authorized by the Borrower to give such notice and the Lender shall not have any liability to the Borrower or other Person on account of any action taken or not taken by the Lender in reliance upon such telephonic or facsimile notice.  The obligation of the Borrower to repay the Loans and all other Obligations hereunder shall not be affected in any way or to any extent by any failure of the Lender to receive written confirmation of any telephonic or facsimile notice or the receipt by the Lender of a confirmation which is at variance with the terms understood by the Lender to be contained in any such telephonic or facsimile notice.

(b)     Electronic Communications.

66

CHAR1\1875914v7

(i)    Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Lender, provided that the foregoing shall not apply to notices to the Lender if the Lender has agreed to receive notices by electronic communication and has agreed to the procedures governing such communications.  The Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(ii)    Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

10.2    Waiver; Amendments.

(a)    No failure or delay by the Lender in exercising any right or power hereunder or any other Loan Document, and no course of dealing between any Loan Party and the Lender, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power hereunder or thereunder.  The rights and remedies of the Lender hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies provided by Law.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) of this Section 10.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Except as otherwise provided in this Agreement, including, without limitation, as provided in Section 3 of Schedule 2.13, no amendment or waiver of any provision of this Agreement or the other Loan Documents, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

CHAR1\1875914v7

10.3     Expenses; Indemnification.

(a)     The Borrower and Guarantors, on a joint and several basis, shall pay (i) all reasonable and documented, out-of-pocket costs and expenses of the Lender and its Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of outside counsel for the Lender and its Affiliates, in connection with the preparation and administration of the Loan Documents and any amendments, modifications or waivers thereof, including the reasonable fees, charges and disbursements of outside counsel for the Lender and its Affiliates and (ii) all out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of outside counsel) incurred by the Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.3, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     The Borrower and Guarantors, on a joint and several basis, shall indemnify the Lender and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, penalties and related expenses (including the fees, charges and disbursements of any outside counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any actual or alleged Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, penalties or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee (including any Related Party of such Indemnitee).  This Section 10.3(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     To the extent permitted by applicable Law, no Loan Party or any Subsidiary shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to actual or direct damages) arising out of, in connection with or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated therein, any Loan or the use of proceeds thereof.

CHAR1\1875914v7

(d)     All amounts due under this Section 10.3 shall be payable promptly after written demand therefor.

10.4    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any other attempted assignment or transfer by the Borrower shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in clause (d) of this Section 10.4 and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     The Lender may at any time assign to one or more assignees (other than Disqualified Institutions) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments, Loans, and other Revolving Credit Exposure at the time owing to it).

(c)     Upon the execution and delivery of an assignment agreement by the Lender and such assignee and payment by such assignee of an amount equal to the purchase price agreed between the Lender and such assignee, such assignee shall be a party to this Agreement and, to the extent of the interest assigned by such assignment agreement, have the rights and obligations of a "Lender" under this Agreement, and the Lender shall, to the extent of the interest assigned by such assignment agreement, be released from its obligations under this Agreement.

(d)     The Lender may at any time, without the consent of, or notice to the Borrower, sell participations to any Person (other than a Disqualified Institution, a natural person, the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that the Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver to the extent affecting such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.14 to the same extent as if it were a "Lender" and had acquired its interest by assignment pursuant to clause (b) of this Section 10.4; provided that such Participant shall not be entitled to receive any greater payment Section 2.14, with respect to any participation, than the Lender would have been entitled to receive, except to the extent such entitlement to receive a

69

greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by Law, each Participant also shall be entitled to the benefits of <u>Section 10.7</u> as though it were a "Lender".  The Lender shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); provided that the Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) and Section 1.871-14(c) of the United States Treasury Regulations, and proposed Section 1.163-5 of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. This <u>Section 10.4,</u> with respect to any Participant Register, shall be construed so that the Loans are at all times maintained in "registered form" within the meanings of Sections 163(f), 165(j), 871(h)(2), 881(c)(2) and 4701 of the Code and any related regulations (and any successor provisions).

(e)     The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

10.5     <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)     This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be construed in accordance with and be governed by the Law of the State of New York.

(b)     Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court of the Southern District of New York, and of the Supreme Court of the State of New York sitting in New York county and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such District Court or New York state court or, to the extent permitted by applicable Law, such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Nothing in this

Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)      Each Loan Party irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in clause (b) of this Section 10.5 and brought in any court referred to in clause (b) of this Section 10.5.  Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in Section 10.1.  Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by Law.

10.6      WAIVER OF JURY TRIAL.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

10.7      Right of Setoff.  In addition to any rights now or hereafter granted under applicable Law and not by way of limitation of any such rights, the Lender shall have the right, at any time or from time to time upon the occurrence and during the continuance of an Event of Default, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of the Borrower and any of its Subsidiaries at any time held or other obligations at any time owing by the Lender to or for the credit or the account of the Borrower or any of its Subsidiaries against any and all Obligations held by the Lender, as the case may be, irrespective of whether the Lender shall have made demand hereunder and although such Obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set-off and any application made by the Lender; provided, that the failure to give such notice shall not affect the validity of such set-off and application.  The Lender agrees to apply all amounts collected from any such set-off to the Obligations before applying such amounts to any other Indebtedness or other obligations owed by the Borrower and any of its Subsidiaries to the Lender.

71

10.8    Counterparts; Integration.    This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.    This Agreement, the Engagement Letter, the other Loan Documents, and any separate letter agreement(s) relating to any fees payable to the Lender and its Affiliates constitute the entire agreement among the parties hereto and thereto and their affiliates regarding the subject matters hereof and thereof and supersede all prior agreements and understandings, oral or written, regarding such subject matters.    Delivery of an executed counterpart of a signature page of this Agreement and any other Loan Document by facsimile transmission or by any other electronic imaging means (including .pdf), shall be effective as delivery of a manually executed counterpart of this Agreement or such other Loan Document.

10.9    Survival.    All covenants, agreements, representations and warranties made by any Loan Party herein, in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.14 and 10.3 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.    All representations and warranties made herein, in the Loan Documents, in the certificates, reports, notices, and other documents delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement and the other Loan Documents, and the making of the Loans.

10.10    Severability.    Any provision of this Agreement or any other Loan Document held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11    Confidentiality.    The Lender agrees to take normal and reasonable precautions to maintain the confidentiality of any financial information delivered by any Loan Party to the Lender, and any other information relating to the Loan Parties or any of their respective businesses, to the extent designated in writing as confidential and provided to it by the Loan Parties, other than any such information that is available to the Lender on a nonconfidential basis prior to disclosure by the Loan Parties, except that such information may be disclosed (a) to any Related Party of the Lender including without limitation accountants, legal counsel and other advisors, (b) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (c) to the extent requested by any regulatory agency or authority purporting to have jurisdiction over it (including any self-regulatory authority such as the National Association of Insurance Commissioners), (d) to the extent that such information becomes publicly available other than as a result of a breach of this Section 10.11, or which

72

becomes available to the Lender or any Related Party on a non-confidential basis from a source other than the Borrower, (e) in connection with the exercise of any remedy hereunder or under any other Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Documents or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 10.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap or derivative or similar transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder, (g) any rating agency, (h) the CUSIP Service Bureau or any similar organization, (i) to the extent such information is limited to (i) the names and logos of the Loan Parties, (ii) the amount, type and closing date of this Agreement and (iii) the role and titles of the Lender in connection with this Agreement or (j) with the consent of the Borrower.  Any Person required to maintain the confidentiality of any information as provided for in this Section 10.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord its own confidential information.

10.12    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which may be treated as interest on such Loan under applicable Law (collectively, the "Charges"), shall exceed the maximum lawful rate of interest (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.12 shall be cumulated and the interest and Charges payable to the Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment (to the extent permitted by applicable Law), shall have been received by the Lender.

10.13    Waiver of Effect of Corporate Seal.  Each Loan Party represents and warrants to the Lender that neither it nor any other Loan Party is required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Law, agrees that this Agreement is delivered by each Loan Party under seal and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

10.14    Patriot Act.  The Lender hereby notifies the Loan Parties that, (a) pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow the Lender to identify such Loan Party in accordance with the Patriot Act and (b) pursuant to the Beneficial Ownership Regulation, it is required to obtain a Beneficial Ownership Certificate.

10.15    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), Borrower and each other Loan Party acknowledges and agrees and acknowledges its Affiliates' understanding that that: (a) (i) the services regarding this

CHAR1\1875914v7

Agreement provided by the Lender are arm's-length commercial transactions between Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Lender, on the other hand, (ii) each of Borrower and the other Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (iii) Borrower and each other Loan Party is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for Borrower, any other Loan Party, or any of their respective Affiliates, or any other Person and (ii) the Lender has no obligation to Borrower, any other Loan Party or any of their Affiliates with respect to the transaction contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c)  the Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Borrower, the other Loan Parties and their respective Affiliates, and the Lender has no obligation to disclose any of such interests to Borrower, any other Loan Party of any of their respective Affiliates.  To the fullest extent permitted by Law, each of Borrower and the other Loan Parties hereby waive and release, any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

   10.16 <u>Electronic Execution of Assignments and Certain Other Documents</u>.  The words "execution," "execute," "signed," "signature," and words of like import in or related to this Agreement or any other document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Lender, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; <u>provided</u> that notwithstanding anything contained herein to the contrary the Lender is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Lender pursuant to procedures approved by it.

<em>(remainder of page left intentionally blank)</em>

CHAR1\1875914v7

**IN WITNESS WHEREOF**, the Borrower hereto has caused this Agreement to be duly executed by its authorized officer as of the day and year first above written.

**TIJUANA FLATS RESTAURANTS, LLC,**
a Florida limited liability company

By: _____
Louie Psallidas
Chief Financial Officer

**IN WITNESS WHEREOF**, the following Loan Party hereto has caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**TJ FLATS HOLDINGS, LLC,**
a Delaware limited liability company

By: _____
Louie Psallidas
Chief Financial Officer

**IN WITNESS WHEREOF**, each other Loan Party hereto has caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**GUARANTORS,** each, a Florida limited liability company, as Guarantors

| | | |
|---|---|---|
| TJF Franchise Group, LLC | Tijuana Flats #153 LLC | Tijuana Flats #224, LLC |
| Tijuana Flats Burrito Company, LLC | Tijuana Flats #154, LLC | Tijuana Flats #225, LLC |
| Tijuana Flats, LLC | Tijuana Flats #155, LLC | Tijuana Flats #227, LLC |
| Flats 1, LLC | Tijuana Flats #156, LLC | Tijuana Flats #230, LLC |
| Flats II, LLC | Tijuana Flats #157, LLC | Tijuana Flats #231, LLC |
| Flats III, LLC | Tijuana Flats #159, LLC | Tijuana Flats #232, LLC |
| Flats V, LLC | Tijuana Flats #160, LLC | Tijuana Flats #233, LLC |
| Flats IV, LLC | Tijuana Flats #161, LLC | Tijuana Flats #234, LLC |
| Tijuana Flats #109, LLC | Tijuana Flats #162, LLC | Tijuana Flats #236, LLC |
| Tijuana Flats #111, LLC | Tijuana Flats #163, LLC | Tijuana Flats #237, LLC |
| Tijuana Flats #112, LLC | Tijuana Flats #164, LLC | Tijuana Flats #238, LLC |
| Tijuana Flats #113, LLC | Tijuana Flats #165, LLC | Tijuana Flats #239, LLC |
| Tijuana Flats #114, LLC | Tijuana Flats #166, LLC | Tijuana Flats #240, LLC |
| Tijuana Flats #117, LLC | Tijuana Flats #167, LLC | Tijuana Flats #241, LLC |
| Tijuana Flats #119, LLC | Tijuana Flats #168, LLC | Tijuana Flats #242, LLC |
| Tijuana Flats #120, LLC | Tijuana Flats #169, LLC | Tijuana Flats #243, LLC |
| Tijuana Flats #121, LLC | Tijuana Flats #170 LLC | Tijuana Flats #244, LLC |
| Tijuana Flats #122, LLC | Tijuana Flats #171 LLC | Tijuana Flats #245, LLC |
| Tijuana Flats #126, LLC | Tijuana Flats 172, LLC | Tijuana Flats #246, LLC |
| Tijuana Flats #127, LLC | Tijuana Flats #173, LLC | Tijuana Flats #247, LLC |
| Tijuana Flats #128, LLC | Tijuana Flats #175, LLC | Tijuana Flats #249, LLC |
| Tijuana Flats #129, LLC | Tijuana Flats #176 LLC | Tijuana Flats #250, LLC |
| Tijuana Flats #130, LLC | Tijuana Flats #177 LLC | Tijuana Flats #251, LLC |
| Tijuana Flats #131, LLC | Tijuana Flats #179, LLC | Tijuana Flats #253, LLC |
| Tijuana Flats #133, LLC | Tijuana Flats #180 LLC | Tijuana Flats #255, LLC |
| Tijuana Flats #134, LLC | Tijuana Flats #181, LLC | Tijuana Flats #257, LLC |
| Tijuana Flats #135, LLC | Tijuana Flats #182 LLC | Tijuana Flats #258, LLC |
| Tijuana Flats #136, LLC | Tijuana Flats #183, LLC | Tijuana Flats #259, LLC |
| Tijuana Flats #138 LLC | Tijuana Flats #184 LLC | Tijuana Flats #260, LLC |
| Tijuana Flats #139, LLC | Tijuana Flats #186 LLC | Tijuana Flats #261, LLC |
| Tijuana Flats #140, LLC | Tijuana Flats #187, LLC | Tijuana Flats #273, LLC |
| Tijuana Flats #141, LLC | Tijuana Flats #188, LLC | Tijuana Flats #274, LLC |
| Tijuana Flats #142 LLC | Tijuana Flats #190, LLC | Tijuana Flats #275, LLC |
| Tijuana Flats #143, LLC | Tijuana Flats #193, LLC | Tijuana Flats #276, LLC |
| Tijuana Flats #146, LLC | Tijuana Flats #194, LLC | Tijuana Flats #277, LLC |
| Tijuana Flats #147, LLC | Tijuana Flats #196, LLC | Tijuana Flats #145, LLC |
| Tijuana Flats #148, LLC | Tijuana Flats #198, LLC | Tijuana Flats #185, LLC |
| Tijuana Flats #150, LLC | Tijuana Flats #221, LLC | Tijuana Flats #228, LLC |
| Tijuana Flats #151, LLC | Tijuana Flats #222, LLC | Tijuana Flats #248, LLC |
| Tijuana Flats #152, LLC | Tijuana Flats #223, LLC | |

By: _____
Louie Psallidas
Chief Financial Officer

TIJUANA FLATS RESTAURANTS, LLC
CREDIT AGREEMENT

**IN WITNESS WHEREOF**, the Lender has caused this Agreement to be duly executed by its authorized officer as of the day and year first above written.

**TRUIST BANK**
as the Lender

By: _____
Eric Sebille
Senior Vice President

**Schedule 1**

**List of Guarantors**

A.  Guarantors:

| | |
|---|---|
| 1. | TJ FLATS HOLDINGS, LLC |
| 2. | TJF Franchise Group, LLC |
| 3. | TIJUANA FLATS BURRITO COMPANY, LLC |
| 4. | TIJUANA FLATS, LLC |
| 5. | FLATS 1, LLC |
| 6. | FLATS II, LLC |
| 7. | FLATS III, LLC |
| 8. | FLATS V, LLC |
| 9. | FLATS IV, LLC |
| 10. | Tijuana Flats #109, LLC |
| 11. | Tijuana Flats #111, LLC |
| 12. | Tijuana Flats #112, LLC |
| 13. | Tijuana Flats #113, LLC |
| 14. | Tijuana Flats #114, LLC |
| 15. | Tijuana Flats #117, LLC |
| 16. | Tijuana Flats #119, LLC |
| 17. | Tijuana Flats #120, LLC |
| 18. | Tijuana Flats #121, LLC |
| 19. | Tijuana Flats #122, LLC |
| 20. | Tijuana Flats #126, LLC |
| 21. | Tijuana Flats #127, LLC |
| 22. | Tijuana Flats #128, LLC |
| 23. | Tijuana Flats #129, LLC |
| 24. | Tijuana Flats #130, LLC |
| 25. | Tijuana Flats #131, LLC |
| 26. | Tijuana Flats #133, LLC |
| 27. | Tijuana Flats #134, LLC |
| 28. | Tijuana Flats #135, LLC |
| 29. | Tijuana Flats #136, LLC |
| 30. | Tijuana Flats #138 LLC |
| 31. | Tijuana Flats #139, LLC |
| 32. | Tijuana Flats #140, LLC |
| 33. | Tijuana Flats #141, LLC |
| 34. | Tijuana Flats #142 LLC |
| 35. | TIJUANA FLATS #143, LLC |
| 36. | TIJUANA FLATS #145, LLC |
| 37. | Tijuana Flats #146, LLC |
| 38. | TIJUANA FLATS #147, LLC |
| 39. | Tijuana Flats #148, LLC |
| 40. | Tijuana Flats #150, LLC |
| 41. | Tijuana Flats #151, LLC |
| 42. | Tijuana Flats #152, LLC |
| 43. | TIJUANA FLATS #153 LLC |

| 44. | TIJUANA FLATS #154, LLC |
|-----|-------------------------|
| 45. | TIJUANA FLATS #155, LLC |
| 46. | TIJUANA FLATS #156 LLC |
| 47. | TIJUANA FLATS #157, LLC |
| 48. | TIJUANA FLATS #159, LLC |
| 49. | TIJUANA FLATS #160, LLC |
| 50. | TIJUANA FLATS #161, LLC |
| 51. | TIJUANA FLATS #162, LLC |
| 52. | TIJUANA FLATS #163, LLC |
| 53. | TIJUANA FLATS #164, LLC |
| 54. | TIJUANA FLATS #165, LLC |
| 55. | TIJUANA FLATS #166, LLC |
| 56. | TIJUANA FLATS #167, LLC |
| 57. | TIJUANA FLATS #168, LLC |
| 58. | TIJUANA FLATS #169, LLC |
| 59. | TIJUANA FLATS #170 LLC |
| 60. | TIJUANA FLATS #171 LLC |
| 61. | TIJUANA FLATS 172, LLC |
| 62. | TIJUANA FLATS #173, LLC |
| 63. | TIJUANA FLATS #175, LLC |
| 64. | TIJUANA FLATS #176 LLC |
| 65. | TIJUANA FLATS #177 LLC |
| 66. | TIJUANA FLATS #179, LLC |
| 67. | TIJUANA FLATS #180 LLC |
| 68. | TIJUANA FLATS #181, LLC |
| 69. | TIJUANA FLATS #182 LLC |
| 70. | TIJUANA FLATS #183, LLC |
| 71. | TIJUANA FLATS #184 LLC |
| 72. | TIJUANA FLATS #185, LLC |
| 73. | TIJUANA FLATS #186 LLC |
| 74. | TIJUANA FLATS #187, LLC |
| 75. | TIJUANA FLATS #188, LLC |
| 76. | TIJUANA FLATS #190, LLC |
| 77. | TIJUANA FLATS #193, LLC |
| 78. | TIJUANA FLATS #194, LLC |
| 79. | TIJUANA FLATS #196, LLC |
| 80. | TIJUANA FLATS #198, LLC |
| 81. | TIJUANA FLATS #221, LLC |
| 82. | TIJUANA FLATS #222, LLC |
| 83. | TIJUANA FLATS #223, LLC |
| 84. | TIJUANA FLATS #224, LLC |
| 85. | TIJUANA FLATS #225, LLC |
| 86. | TIJUANA FLATS #227, LLC |
| 87. | TIJUANA FLATS #228, LLC |
| 88. | TIJUANA FLATS #230, LLC |
| 89. | TIJUANA FLATS #231, LLC |
| 90. | Tijuana Flats #232, LLC |
| 91. | TIJUANA FLATS #233, LLC |
| 92. | TIJUANA FLATS #234, LLC |

| 93. | Tijuana Flats #236, LLC |
|---|---|
| 94. | Tijuana Flats #237, LLC |
| 95. | Tijuana Flats #238, LLC |
| 96. | Tijuana Flats #239, LLC |
| 97. | Tijuana Flats #240, LLC |
| 98. | Tijuana Flats #241, LLC |
| 99. | Tijuana Flats #242, LLC |
| 100. | Tijuana Flats #243, LLC |
| 101. | Tijuana Flats #244, LLC |
| 102. | Tijuana Flats #245, LLC |
| 103. | Tijuana Flats #246, LLC |
| 104. | Tijuana Flats #247, LLC |
| 105. | TIJUANA FLATS #248, LLC |
| 106. | Tijuana Flats #249, LLC |
| 107. | Tijuana Flats #250, LLC |
| 108. | Tijuana Flats #251, LLC |
| 109. | Tijuana Flats #253, LLC |
| 110. | Tijuana Flats #255, LLC |
| 111. | TIJUANA FLATS #257, LLC |
| 112. | TIJUANA FLATS #258, LLC |
| 113. | TIJUANA FLATS #259, LLC |
| 114. | TIJUANA FLATS #260, LLC |
| 115. | TIJUANA FLATS #261, LLC |
| 116. | TIJUANA FLATS #273, LLC |
| 117. | TIJUANA FLATS #274, LLC |
| 118. | TIJUANA FLATS #275, LLC |
| 119. | TIJUANA FLATS #276, LLC |
| 120. | TIJUANA FLATS #277, LLC |

B.  Early Stage New Subsidiaries:

| 1. | TIJUANA FLATS #278, LLC |
|---|---|
| 2. | TIJUANA FLATS #279, LLC |
| 3. | TIJUANA FLATS #280, LLC |

SCHEDULE 2.13

**SOFR ADDENDUM**

This SOFR ADDENDUM ("Addendum") is hereby made a part of the Credit Agreement dated March 4, 2022 (as amended, supplemented, modified or restated from time to time, the "Credit Agreement"), TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company (the "Borrower"), TJ FLATS HOLDINGS, LLC, a Delaware limited liability company ("Holdings"), the Guarantors identified therein and Truist Bank, a North Carolina banking corporation (the "Bank").

**1.     INTEREST RATE.**  Interest shall accrue during each Interest Period at a variable rate of interest per annum equal to the Adjusted Term SOFR Rate (the "Interest Rate"); provided however, in no instance shall the interest rate ever be less than 2.20% per annum (the "Minimum Rate")

**2.     DEFINITIONS.**  Any capitalized terms not defined herein shall have the meaning set forth in the Credit Agreement.

**"Adjusted Term SOFR Rate"** means the variable annual interest rate calculated for each Interest Period equal to the sum obtained by adding (i) Term SOFR for said Interest Period plus (ii) the Margin.

**"Determination Day"** means that date which is (i) two U.S. Government Securities Business Days prior to the first day of the Interest Period if such day is a U.S. Government Securities Business Day or (ii) if the first day of the Interest Period is not a U.S. Government Securities Business Day then two U.S. Government Securities Business Days prior to the U.S. Government Securities Business Day immediately preceding the commencement of the Interest Period.

**"Interest Period"** means the period commencing on the first calendar day of each month to but excluding the first calendar day of the immediately following month, provided however, the first Interest Period shall commence on the Closing Date and end on March 1, 2022.

**"Margin"** means 2.20%.

**"Term SOFR"** means the Term SOFR reference rate for a one month tenor as administered by the Term SOFR Administrator and quoted by Bloomberg Finance L.P., or any quoting service or commonly available source utilized by Bank on the Determination Day; provided that if as of 5:00 p.m. (New York time) on the Determination Day, Term SOFR for such tenor has not been published by the Term SOFR Administrator, then the rate used will be Term SOFR for such tenor as published by the Term SOFR Administrator for the immediately preceding U.S. Government Securities Business Day on which such rate was published on the Term SOFR Administrator's website so long as such immediately preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Determination Day; and further provided if Term SOFR would be less than zero percent (0%), then it shall be deemed to be zero percent (0%).

**"Term SOFR Administrator"** means CME Group Benchmark Administration Limited or a successor administrator of the Term SOFR Reference Rate selected by Bank in its reasonable discretion.

**"U.S. Government Securities Business Day"** Any day except for (i) a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the

fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

**3.    EFFECT OF BENCHMARK TRANSITION EVENT.**

(a)    In the event Bank determines in its reasonable discretion that (i) there is a public announcement by the administrator of a Benchmark or a Relevant Governmental Body that such Benchmark will cease or has ceased to be published; (ii) a public announcement is made by the administrator of a Benchmark or any Relevant Governmental Body that the Benchmark is no longer representative; or (iii) a Relevant Governmental Body has determined that Bank may no longer utilize the Benchmark for purposes of setting interest rates (each a "Benchmark Transition Event"); Bank will have no obligation to make, fund or maintain a loan based on the Benchmark and on a date and time determined by Bank, without any further action or consent of by Borrower or amendment to this Addendum or any other Loan Document,  the first available alternative set forth in the order below that can be determined by Bank shall replace the Benchmark ("Successor Rate"):

            (x)    Relevant Governmental Body Recommended Rate; or

            (y)    Alternative Benchmark Rate.

(b)    In connection with the implementation of a Successor Rate, Bank will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Successor Rate or Conforming Changes will become effective without any further action or consent of Borrower.  Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than zero percent (0%), the Successor Rate will be deemed to be zero percent (0%) for the purposes of this Addendum and the other Loan Documents.  For avoidance of doubt, following the implementation of a Successor Rate, the Interest Rate will be the Successor Rate plus the Margin, if any and subject to any Minimum Rate.

(c)    Bank will notify (in one or more notices) Borrower of (i) the implementation of any Successor Rate and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Successor Rate. Any determination or decision that may be made by Bank pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in Bank's reasonable discretion and without consent from Borrower.

(d)    In the event Bank determines in its reasonable discretion that Bank cannot make, fund, or maintain a loan based upon the Benchmark due to illegality or the inability to ascertain or determine said rate on the basis provided for herein ("Unavailability Period") and a Benchmark Transition Event has not occurred, then at the election of Bank the Benchmark shall convert to the Alternative Benchmark Rate for purposes of calculating the Interest Rate on the then outstanding principal balance and for interest accruing on any fundings or advances requested by Borrower and, thereafter, the Interest Rate shall adjust simultaneously with any fluctuation in the Alternative Benchmark Rate.  In the event Bank determines that the circumstances giving rise the Unavailability Period have ended, at such time as determined by Bank the Benchmark will revert to the prior Benchmark (provided a Benchmark Transition Event has not occurred).   Bank shall provide notice, which may be after the implementation of the Alternative Benchmark Rate as contemplated hereunder, to Borrower of any Benchmark change that is made pursuant to this Section.  For avoidance of doubt, following conversion to the Alternative Benchmark Rate, the

Interest Rate will be the Alternative Benchmark Rate plus the Margin, if any and subject to any Minimum Rate.

(e)    For purposes of this Section, in addition to the definitions set forth in Section 2, the following definitions shall apply:

**"Alternative Benchmark Rate"** means a rate of interest per annum equal to the Bank's Prime Rate minus two and 5/10 percent (2.5%) which shall adjust daily with changes in Bank's Prime Rate.

**"Bank's Prime Rate"** means, for any day, a rate per annum equal to Bank's announced Prime Rate, and shall change effective on the date any change in Bank's Prime Rate is publicly announced as being effective.

**"Benchmark"** means initially Term SOFR, and thereafter is it will be the then-current Successor Rate.

**"Conforming Changes"** means, with respect to any Successor Rate, any technical, administrative or operational changes (including changes to the definitions such as "Business Day," "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that Bank decides may be appropriate to reflect the adoption and implementation  of such Successor Rate and to permit the administration thereof by Bank in a manner Bank decides is reasonably necessary in connection with the administration of this Addendum and the other Loan Documents.

**"Loan Documents"** has the meaning assigned to such term in the Credit Agreement.

**"Relevant Governmental Body"** means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

**"Relevant Governmental Body Recommended Rate"** means, in respect of any relevant day, the rate (inclusive of any spreads or adjustments which may be positive or negative) recommended as the replacement for the Benchmark by the Relevant Governmental Body (which rate may be produced by the Federal Reserve Bank of New York or another administrator).

**Schedule 4.15**

**Subsidiaries**

(a)

| | Entity Name | Loan Party (Y/N) | Subsidiary (Y/N) | Ownership Interest | Jurisdiction of Organization | Type of entity | Authorized Capital Stock |
|---|---|---|---|---|---|---|---|
| 1. | TJ FLATS HOLDINGS, LLC | Y | N | 100% owned by Tijuana Flats Intermediate Holdco, LLC | Delaware | Limited Liability Company | N/A |
| 2. | TIJUANA FLATS RESTAURANTS, LLC | Y | N | 100% owned by TJ FLATS HOLDINGS, LLC | Florida | Limited Liability Company | N/A |
| 3. | TJF Franchise Group, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 4. | TIJUANA FLATS BURRITO COMPANY, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 5. | TIJUANA FLATS, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 6. | FLATS 1, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 7. | FLATS II, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 8. | FLATS III, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 9. | FLATS V, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

| 10. | FLATS IV, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
|-----|---------------|---|---|----------------------------------------------|---------|---------------------------|-----|
| 11. | Tijuana Flats #109, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 12. | Tijuana Flats #111, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 13. | Tijuana Flats #112, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 14. | Tijuana Flats #113, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 15. | Tijuana Flats #114, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 16. | Tijuana Flats #117, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 17. | Tijuana Flats #119, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 18. | Tijuana Flats #120, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 19. | Tijuana Flats #121, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 20. | Tijuana Flats #122, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 21. | Tijuana Flats #126, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

| 22. | Tijuana Flats #127, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
|-----|-------------------------|---|---|-----------------------------------------------|---------|----------------------------|-----|
| 23. | Tijuana Flats #128, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 24. | Tijuana Flats #129, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 25. | Tijuana Flats #130, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 26. | Tijuana Flats #131, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 27. | Tijuana Flats #133, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 28. | Tijuana Flats #134, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 29. | Tijuana Flats #135, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 30. | Tijuana Flats #136, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 31. | Tijuana Flats #138 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 32. | Tijuana Flats #139, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 33. | Tijuana Flats #140, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

| 34. | Tijuana Flats #141, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 35. | Tijuana Flats #142 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 36. | TIJUANA FLATS #143, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 37. | TIJUANA FLATS #145, LLC | Y[1] | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 38. | Tijuana Flats #146, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 39. | TIJUANA FLATS #147, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 40. | Tijuana Flats #148, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 41. | Tijuana Flats #150, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 42. | Tijuana Flats #151, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 43. | Tijuana Flats #152, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 44. | TIJUANA FLATS #153 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

[1] Dormant Subsidiary.

| 45. | TIJUANA FLATS #154, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
|---|---|---|---|---|---|---|---|
| 46. | TIJUANA FLATS #155, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 47. | TIJUANA FLATS #156 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 48. | TIJUANA FLATS #157, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 49. | TIJUANA FLATS #159, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 50. | TIJUANA FLATS #160, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 51. | TIJUANA FLATS #161, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 52. | TIJUANA FLATS #162, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 53. | TIJUANA FLATS #163, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 54. | TIJUANA FLATS #164, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 55. | TIJUANA FLATS #165, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 56. | TIJUANA FLATS #166, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

| 57. | TIJUANA FLATS #167, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 58. | TIJUANA FLATS #168, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 59. | TIJUANA FLATS #169, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 60. | TIJUANA FLATS #170 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 61. | TIJUANA FLATS #171 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 62. | TIJUANA FLATS 172, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 63. | TIJUANA FLATS #173, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 64. | TIJUANA FLATS #175, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 65. | TIJUANA FLATS #176 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 66. | TIJUANA FLATS #177 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 67. | TIJUANA FLATS #179, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 68. | TIJUANA FLATS #180 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

| 69. | TIJUANA FLATS #181, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
|---|---|---|---|---|---|---|---|
| 70. | TIJUANA FLATS #182 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 71. | TIJUANA FLATS #183, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 72. | TIJUANA FLATS #184 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 73. | TIJUANA FLATS #185, LLC | Y[2] | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 74. | TIJUANA FLATS #186 LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 75. | TIJUANA FLATS #187, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 76. | TIJUANA FLATS #188, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 77. | TIJUANA FLATS #190, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 78. | TIJUANA FLATS #193, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 79. | TIJUANA FLATS #194, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

---

[2] Dormant Subsidiary.

| 80. | TIJUANA FLATS #196, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
|---|---|---|---|---|---|---|---|
| 81. | TIJUANA FLATS #198, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 82. | TIJUANA FLATS #221, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 83. | TIJUANA FLATS #222, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 84. | TIJUANA FLATS #223, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 85. | TIJUANA FLATS #224, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 86. | TIJUANA FLATS #225, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 87. | TIJUANA FLATS #227, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 88. | TIJUANA FLATS #228, LLC | Y[3] | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 89. | TIJUANA FLATS #230, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 90. | TIJUANA FLATS #231, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

---

[3] Dormant Subsidiary.

| 91. | Tijuana Flats #232, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 92. | TIJUANA FLATS #233, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 93. | TIJUANA FLATS #234, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 94. | Tijuana Flats #236, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 95. | Tijuana Flats #237, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 96. | Tijuana Flats #238, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 97. | Tijuana Flats #239, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 98. | Tijuana Flats #240, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 99. | Tijuana Flats #241, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 100. | Tijuana Flats #242, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 101. | Tijuana Flats #243, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 102. | Tijuana Flats #244, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

| 103. | Tijuana Flats #245, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
|---|---|---|---|---|---|---|---|
| 104. | Tijuana Flats #246, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 105. | Tijuana Flats #247, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 106. | TIJUANA FLATS #248, LLC | Y[4] | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 107. | Tijuana Flats #249, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 108. | Tijuana Flats #250, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 109. | Tijuana Flats #251, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 110. | Tijuana Flats #253, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 111. | Tijuana Flats #255, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 112. | TIJUANA FLATS #257, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 113. | TIJUANA FLATS #258, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

---

[4] Dormant Subsidiary.

| 114. | TIJUANA FLATS #259, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 115. | TIJUANA FLATS #260, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 116. | TIJUANA FLATS #261, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 117. | TIJUANA FLATS #273, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 118. | TIJUANA FLATS #274, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 119. | TIJUANA FLATS #275, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 120. | TIJUANA FLATS #276, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 121. | TIJUANA FLATS #277, LLC | Y | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 122. | TIJUANA FLATS #278, LLC | N[5] | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
| 123. | TIJUANA FLATS #279, LLC | N[6] | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |

[5] Early Stage New Subsidiary.
[6] Early Stage New Subsidiary.

| 124. | TIJUANA FLATS #280, LLC | N[7] | Y | 100% owned by TIJUANA FLATS RESTAURANTS, LLC | Florida | Limited Liability Company | N/A |
|------|------|------|------|------|------|------|------|

(b) Pre-emptive or other outstanding rights, options, warrants, conversion rights, commitments or other similar agreements or understandings:

None.

---

[7] Early Stage New Subsidiary.

**Schedule 4.17-1**

**Locations of Real Property**

| Loan Party | Address of Real Property | Owned/Leased |
|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | 2300 Maitland Center Parkway, #306 Maitland, FL 32751 | Leased |
| TIJUANA FLATS BURRITO COMPANY, LLC | 7608 University Blvd Winter Park, FL 32792 | Leased |
| TIJUANA FLATS, LLC | 444 S. Hunt Club Blvd Apopka, FL 32703 | Leased |
| Flats 1, LLC | 3005 W. Lake Mary Blvd. Suite 109 Lake Mary, FL 32746 | Leased |
| FLATS II, LLC | 1955 Aloma Ave Winter Park, FL 32789 | Leased |
| FLATS III, LLC | 9942 Old Baymeadows Rd Jacksonville, FL 32256 | Leased |
| FLATS V, LLC | 1720 W. University Ave Gainesville, FL 32602 | Leased |
| FLATS IV, LLC | 2320 S. Kirkman Rd Orlando, FL 32811 | Leased |
| Tijuana Flats #109, LLC | 431 South Federal Hwy Pompano Beach, FL 33062 | Leased |
| Tijuana Flats #111, LLC | 278 South Federal Hwy Deerfield Beach, FL 33441 | Leased |
| Tijuana Flats #112, LLC | 944 4th Street North Suite 100 St. Petersburg, FL 33701 | Leased |
| Tijuana Flats #113, LLC | 1635 S. Tamiami Trail Sarasota, FL 34239 | Leased |
| Tijuana Flats #114, LLC | 2117 66th St. North St. Petersburg, FL 33710 | Leased |
| Tijuana Flats #117, LLC | 13651 Hunter's Oak Dr. Suite 107 Orlando, FL 32837 | Leased |
| Tijuana Flats #119, LLC | 13770 W. Colonial Dr. Suite 120 Winter Garden, FL 34787 | Leased |
| Tijuana Flats #120, LLC | 180 S. Belcher Rd. Largo, FL 33771 | Leased |
| Tijuana Flats #121, LLC | 3687 Tampa Rd. Suite 203 Oldsmar, FL 34677 | Leased |
| Tijuana Flats #122, LLC | 2401 W. State Rd. 434 Bay 117 Longwood, FL 32779 | Leased |
| Tijuana Flats #126, LLC | 7860 US Highway 19 North Pinellas Park, FL 33781 | Leased |

| | | |
|---|---|---|
| Tijuana Flats #127, LLC | 9161 Narcoossee Rd. Suite 110 Orlando, FL 32827 | Leased |
| Tijuana Flats #128, LLC | 3154 S. Orange Ave. Orlando, FL 32806 | Leased |
| Tijuana Flats #129, LLC | 5030 W. State Rd. 46 Sanford, FL 32771 | Leased |
| Tijuana Flats #130, LLC | 895 E. Altamonte Dr. Altamonte Springs, FL 32701 | Leased |
| Tijuana Flats #131, LLC | 3111 Mahan Dr. Tallahassee, FL 32308 | Leased |
| Tijuana Flats #133, LLC | 2782 B. E. Fowler Tampa, FL 33618 | Leased |
| Tijuana Flats #134, LLC | 10019 N. Dale Mabry Tampa, FL 33618 | Leased |
| Tijuana Flats #135, LLC | 11007 Causeway Blvd Brandon, FL 33511 | Leased |
| Tijuana Flats #136, LLC | 9250 W. Linebaugh, Ave. Tampa, FL 33626 | Leased |
| Tijuana Flats #138, LLC | 1310 E. Millbrook Rd. Raleigh, NC 27609 | Leased |
| Tijuana Flats #139, LLC | 3950 SW College Road Ocala, FL 34474 | Leased |
| Tijuana Flats #140, LLC | 7942 W. Commercial Blvd. Lauderhill, FL 33351 | Leased |
| Tijuana Flats #141, LLC | 13860 Wellington Trace Wellington, FL 33414 | Leased |
| Tijuana Flats #142 LLC | 1619 E. Sunrise Blvd. Ft. Lauderdale, FL 33304 | Leased |
| TIJUANA FLATS #143, LLC | 2020 W. Pensacola St. Tallahassee, FL 32304 | Leased |
| TIJUANA FLATS #145, LLC | 22191 Powerline Rd., Unit 26/27, Boca Raton, FL 33433 | Leased |
| Tijuana Flats #146, LLC | 14633 Miramar Parkway Miramar, FL 33027 | Leased |
| Tijuana Flats #147, LLC | 3404 Clark Rd. Sarasota, FL 34231 | Leased |
| Tijuana Flats #148, LLC | 6970 SR 7, Ste 110 Coconut Creek, FL 33073 | Leased |
| Tijuana Flats #150, LLC | 5635 San Jose Blvd. Jacksonville, FL 32207 | Leased |
| Tijuana Flats #151, LLC | 5907 Rooselvelt Blvd. Ste 100 Jacksonville, FL 32244 | Leased |
| Tijuana Flats #152, LLC | 13529 Beach Blvd. Ste 201B Jacksonville, FL 32224 | Leased |
| TIJUANA FLATS #153 LLC | 2217 Edgewater Dr. Orlando, FL 32804 | Leased |

| | | |
|---|---|---|
| TIJUANA FLATS #154, LLC | 3357 Sheridan St. Hollywood, FL 33021 | Leased |
| TIJUANA FLATS #155, LLC | 151 SE Cary Parkway Cary, NC 27511 | Leased |
| TIJUANA FLATS #156, LLC | 8703 Stirling Rd. Cooper City, FL 33328 | Leased |
| TIJUANA FLATS #157, LLC | 10300 US Hwy 441 #1 Leesburg, FL 34788 | Leased |
| TIJUANA FLATS #159, LLC | 2127 Cortez Rd W. Brandenton, FL 34207 | Leased |
| TIJUANA FLATS #160, LLC | 17501 Preserve Walk Ln, Unit. 103 Tampa, FL 33647 | Leased |
| TIJUANA FLATS #161, LLC | 7560 W. Sand Lake Rd Orlando, FL 32819 | Leased |
| TIJUANA FLATS #162, LLC | 13820 Old St. Augustine Rd #125 Jacksonville, FL 32258 | Leased |
| TIJUANA FLATS #163, LLC | 27709 S.R.56 Unit 101 Wesley Chapel, FL 33543 | Leased |
| TIJUANA FLATS #164, LLC | 10900 S.R.54, Unit. 1001 New Port Richey, FL 34655 | Leased |
| TIJUANA FLATS #165, LLC | 23100 S.R.54, Unit 101 Lutz, FL 33549 | Leased |
| TIJUANA FLATS #166, LLC | 5065 N Dixie Highway Oakland Park, FL 33334 | Leased |
| TIJUANA FLATS #167, LLC | 2914 E Colonial Drive Orlando, FL 32803 | Leased |
| TIJUANA FLATS #168, LLC | 20401 SR 7 Boca Raton, FL 33498 | Leased |
| TIJUANA FLATS #169, LLC | 3205 Clark Butler Blvd #70 Gainesville, FL 32608 | Leased |
| Tijuana Flats #170 LLC | 6204 W Sample Dr Coral Springs, FL 33067 | Leased |
| TIJUANA FLATS #171 LLC | 12598 Pines Blvd. #106 Pembroke Pines, FL 33027 | Leased |
| TIJUANA FLATS 172, LLC | 651 Nautica Dr Jacksonville, FL 32218 | Leased |
| TIJUANA FLATS #173, LLC | 13256/58 Biscayne Blvd N Miami, FL 33181 | Leased |
| TIJUANA FLATS #175, LLC | 1990 SE Federal Hwy Stuart, FL 34994 | Leased |
| TIJUANA FLATS #176 LLC | 2025 Riverside Ave #4/5 Jacksonville, FL 32204 | Leased |
| TIJUANA FLATS #177 LLC | 6201 S Jog Rd Ste 101 Lake Worth, FL 33467 | Leased |
| TIJUANA FLATS #179, LLC | 1110/1112 Weston Rd. Weston, FL 33326 | Leased |

| | | |
|---|---|---|
| TIJUANA FLATS #180 LLC | 12640 S Cleveland Ave 203 Ft. Myers, FL 33907 | Leased |
| TIJUANA FLATS #181, LLC | 10300 Roosevelt Boulevard N. St. Petersburg, FL 33716 | Leased |
| TIJUANA FLATS #182 LLC | 161 Grand Hill Place Holly Springs, NC 27540 | Leased |
| TIJUANA FLATS #183, LLC | 5215 University Pkwy 106 University Park, FL 34201 | Leased |
| TIJUANA FLATS #184 LLC | 1647 CR 220 Suite103 Fleming Island, FL 32003 | Leased |
| TIJUANA FLATS #185, LLC | 1725 S. Federal Highway, Boynton Beach, FL 33435 | Leased |
| TIJUANA FLATS #186 LLC | 11551 University Blvd, Suite. 6 Orlando, FL 32817 | Leased |
| TIJUANA FLATS #187, LLC | 6771 W Indiantown Rd Jupiter, FL 33458 | Leased |
| TIJUANA FLATS #188, LLC | 390 (B) N. Congress Ave Boynton Beach, FL 33426 | Leased |
| TIJUANA FLATS #190, LLC | 2518 State Road 580 Suite A Clearwater, FL 33761 | Leased |
| TIJUANA FLATS #193, LLC | 7165 O'Kelly Chapel Rd Cary, NC 27519 | Leased |
| TIJUANA FLATS #194, LLC | 551 Linton Blvd. Unit #C4 Delray Beach, FL 33444 | Leased |
| TIJUANA FLATS #196, LLC | 8680 Concord Mills Blvd STE #40 Concord, NC 28027 | Leased |
| TIJUANA FLATS #198, LLC | 13100 Seminole Blvd, Suite 105 Largo, FL 33778 | Leased |
| TIJUANA FLATS #221, LLC | 4027 S. Dale Mabry Tampa, FL 33611 | Leased |
| TIJUANA FLATS #222, LLC | 17375 US HWY 441 Mt Dora, FL 32757 | Leased |
| TIJUANA FLATS #223, LLC | 1359 St. Lucie West Blvd Port St. Lucie, FL 34986 | Leased |
| TIJUANA FLATS #224, LLC | 7181 Lake Andrew Dr., Suite 101 Melbourne, FL 32940 | Leased |
| TIJUANA FLATS #225, LLC | 1371 South University Dr. Plantation, FL 33324 | Leased |
| TIJUANA FLATS #227, LLC | 1617 W. Platt Street. Tampa, FL 33606 | Leased |
| TIJUANA FLATS #228, LLC | 106 Percival Rd. Suite 200, Columbia, SC 29206 | Leased |
| TIJUANA FLATS #230, LLC | 280 South SR-7, Suite #300 Royal Palm Beach, FL 33414 | Leased |
| TIJUANA FLATS #231, LLC | 6527 Old Brick Rd, Suite #100 Windermere, FL 34786 | Leased |

| | | |
|---|---|---|
| Tijuana Flats #232, LLC | 2050 Bloomingdale Ave Valrico, FL 33596 | Leased |
| TIJUANA FLATS #233, LLC | 2089 Palm Beach Lakes Blvd. West Palm Beach, FL 33409 | Leased |
| TIJUANA FLATS #234, LLC | 10 E New Haven Ave, Suite #103 Melbourne, FL 32904 | Leased |
| TIJUANA FLATS #236, LLC | 4693 Garden Park Blvd, Suite #101 Orlando, FL 32839 | Leased |
| Tijuana Flats #237, LLC | 4100 13th Street St. Cloud, FL 34769 | Leased |
| Tijuana Flats #238, LLC | 1760 Dunlawton Ave, Suite #105 Port Orange, FL 32127 | Leased |
| Tijuana Flats #239, LLC | 13009 US HWY 301 Riverview, FL 33578 | Leased |
| Tijuana Flats #240, LLC | 833 S Ponce de Leon Blvd, Unit #3 St. Augustine, FL 32084 | Leased |
| Tijuana Flats #241, LLC | 1099 W Orange Blossom Trail Apopka, FL 32712 | Leased |
| Tijuana Flats #242, LLC | 705 Palm Bay Rd NE, Suite #109 West Melbourne, FL 32904 | Leased |
| Tijuana Flats #243, LLC | 12320 Cortez Blvd Brooksville, FL 34613 | Leased |
| Tijuana Flats #244, LLC | 2849 Gulf to Bay Blvd, Unit C Clearwater, FL 33759 | Leased |
| Tijuana Flats #245, LLC | 11700 San Jose Blvd, Unit 24 Jacksonville, FL 32223 | Leased |
| Tijuana Flats #246, LLC | 41 Settlement Drive, Suite 501 Ponte Vedra, FL 32081 | Leased |
| Tijuana Flats #247, LLC | 8274 Champions Gate Blvd Champions Gate, FL 33896 | Leased |
| TIJUANA FLATS #248, LLC | 50545 US North 19, Tarpon Springs, FL 34689 | Leased |
| Tijuana Flats #249, LLC | 17475 N Dale Mabry Hwy Lutz, FL 33548 | Leased |
| Tijuana Flats #250, LLC | 4224 Virginia Beach Blvd, Ste #106 Virginia Beach, VA 23452 | Leased |
| Tijuana Flats #251, LLC | 6113 W Irlo Bronson Memorial Hwy, Unit 101 Kissimmee, FL 34747 | Leased |
| Tijuana Flats #253, LLC | 1400 Village Square  Blvd, Unit 40 Tallahassee, FL 32312 | Leased |

| | | |
|---|---|---|
| Tijuana Flats #255, LLC | 8085 Irlo Bronson Hgwy Kissimmee, FL 34747 | Leased |
| TIJUANA FLATS #257, LLC | 11018 W Colonial Drive Ocoee, FL 34761 | Leased |
| TIJUANA FLATS #258, LLC | O- Town Lake Buena Vista, FL 32836 | Leased |
| TIJUANA FLATS #259, LLC | 14152 NARCOOSSEE ROAD,SUITE 360 Orlando, FL 32751 | Leased |
| TIJUANA FLATS #260, LLC | 14410 SHORESIDE WAY, SUITE 100 Winter Garden, FL 34787 | Leased |

**Schedule 4.17-2**

**Locations of Chief Executive Office, Taxpayer Identification Number, Etc. [8]**

| Entity | Organizational Identification Number | U.S. Taxpayer Identification Number |
|---|---|---|
| TJ FLATS HOLDINGS LLC | 5774139 | 47-4430322 |
| TIJUANA FLATS RESTAURANTS, LLC | L15000114299 | 47-4472442 |
| TJF Franchise Group, LLC | L01000014609 | 59-3740989 |
| TIJUANA FLATS BURRITO COMPANY, LLC | L14000078878 | 59-3300451 |
| TIJUANA FLATS, LLC | L14000078880 | 59-3426895 |
| Flats 1, LLC | L14000078881 | 59-3515255 |
| FLATS II, LLC | L14000078883 | 59-3611791 |
| FLATS III, LLC | L14000078885 | 59-3648962 |
| FLATS V, LLC | L01000006727 | 57-1121284 |
| FLATS IV, LLC | L01000157967 | 59-3748153 |
| Tijuana Flats #109, LLC | L01000017011 | 59-3748273 |
| Tijuana Flats #111, LLC | L02000001367 | 02-0538715 |
| Tijuana Flats #112, LLC | L02000012890 | 04-3688024 |
| Tijuana Flats #113, LLC | L02000012905 | 04-3673476 |
| Tijuana Flats #114, LLC | L03000016931 | 20-0020312 |
| Tijuana Flats #117, LLC | L04000044794 | 20-0951600 |
| Tijuana Flats #119, LLC | L05000042836 | 20-2653925 |
| Tijuana Flats #120, LLC | L05000019797 | 20-2278644 |
| Tijuana Flats #121, LLC | L06000012885 | 20-4158746 |
| Tijuana Flats #122, LLC | L06000012888 | 20-4158923 |
| Tijuana Flats #126, LLC | L07000029502 | 20-5973186 |
| Tijuana Flats #127, LLC | L07000019898 | 20-8380030 |
| Tijuana Flats #128, LLC | L07000035241 | 20-8660344 |
| Tijuana Flats #129, LLC | L07000089701 | 26-0749578 |
| Tijuana Flats #130, LLC | L07000090295 | 26-0749606 |
| Tijuana Flats #131, LLC | L07000112103 | 26-1079148 |
| Tijuana Flats #133, LLC | L07000112320 | 37-1553121 |
| Tijuana Flats #134, LLC | L07000112324 | 36-4618441 |
| Tijuana Flats #135, LLC | L07000112620 | 35-2312648 |
| Tijuana Flats #136, LLC | L07000112301 | 32-0219144 |
| Tijuana Flats #138, LLC | L08000078713 | 30-0497490 |
| Tijuana Flats #139, LLC | L08000078686 | 26-3443708 |
| Tijuana Flats #140, LLC | L08000016734 | 30-0464613 |
| Tijuana Flats #141, LLC | L08000017054 | 30-0464614 |
| Tijuana Flats #142 LLC | L08000061682 | 30-0464617 |
| TIJUANA FLATS #143, LLC | L09000016896 | 26-3456028 |
| TIJUANA FLATS #145, LLC | L12000099198 | 26-4527822 |
| Tijuana Flats #146, LLC | L08000101093 | 26-3540800 |
| Tijuana Flats #147, LLC | L09000000999 | 26-3813896 |

---

[8] Chief executive office address of every Loan Party is 2300 Maitland Center Parkway, #306, Maitland, FL 32751.

| | | |
|---|---|---|
| Tijuana Flats #148, LLC | L08000101097 | 26-3541098 |
| Tijuana Flats #150, LLC | L08000087337 | 94-3439426 |
| Tijuana Flats #151, LLC | L08000087357 | 94-3439427 |
| Tijuana Flats #152, LLC | L08000087331 | 94-3439429 |
| TIJUANA FLATS #153 LLC | L09000120514 | 27-0968834 |
| TIJUANA FLATS #154, LLC | L10000027048 | 27-2084384 |
| TIJUANA FLATS #155, LLC | L10000063418 | 27-2650475 |
| TIJUANA FLATS #156, LLC | L09000118138 | 27-1466249 |
| TIJUANA FLATS #157, LLC | L10000031353 | 27-2038567 |
| TIJUANA FLATS #159, LLC | L11000047981 | 27-3529210 |
| TIJUANA FLATS #160, LLC | L11000022553 | 27-4716843 |
| TIJUANA FLATS #161, LLC | L11000010011 | 27-4632184 |
| TIJUANA FLATS #162, LLC | L11000040298 | 27-4717052 |
| TIJUANA FLATS #163, LLC | L11000023510 | 27-4717143 |
| TIJUANA FLATS #164, LLC | L11000023519 | 27-4717260 |
| TIJUANA FLATS #165, LLC | L11000023536 | 27-4717338 |
| TIJUANA FLATS #166, LLC | L11000040300 | 27-5065814 |
| TIJUANA FLATS #167, LLC | L11000042198 | 27-5066199 |
| TIJUANA FLATS #168, LLC | L11000061927 | 27-5066268 |
| TIJUANA FLATS #169, LLC | L11000086884 | 27-5066344 |
| Tijuana Flats #170 LLC | L12000072094 | 27-5066566 |
| TIJUANA FLATS #171 LLC | L12000072086 | 45-3639454 |
| TIJUANA FLATS 172, LLC | L12000022596 | 45-4725810 |
| TIJUANA FLATS #173, LLC | L12000001286 | 45-3787202 |
| TIJUANA FLATS #175, LLC | L12000038165 | 45-3787316 |
| TIJUANA FLATS #176 LLC | L12000090033 | 45-4775435 |
| TIJUANA FLATS #177 LLC | L12000122945 | 45-4775897 |
| TIJUANA FLATS #179, LLC | L12000046142 | 45-4775811 |
| TIJUANA FLATS #180 LLC | L12000099185 | 45-4776025 |
| TIJUANA FLATS #181, LLC | L12000046178 | 45-4530082 |
| TIJUANA FLATS #182 LLC | L12000101052 | 45-4847067 |
| TIJUANA FLATS #183, LLC | L12000097001 | 45-4847148 |
| TIJUANA FLATS #184 LLC | L12000100994 | 45-4847215 |
| TIJUANA FLATS #185, LLC | L12000100998 | 45-4847472 |
| TIJUANA FLATS #186 LLC | L12000099188 | 45-5231034 |
| TIJUANA FLATS #187, LLC | L13000075908 | 45-5231157 |
| TIJUANA FLATS #188, LLC | L14000068488 | 46-2236495 |
| TIJUANA FLATS #190, LLC | L13000075899 | 46-2804352 |
| TIJUANA FLATS #193, LLC | L13000075911 | 46-2842392 |
| TIJUANA FLATS #194, LLC | L14000068540 | 46-4706502 |
| TIJUANA FLATS #196, LLC | L15000020417 | 47-1491413 |
| TIJUANA FLATS #198, LLC | L14000068546 | 46-4712889 |
| TIJUANA FLATS #221, LLC | L15000120242 | 47-4557268 |
| TIJUANA FLATS #222, LLC | L15000111712 | 47-4382432 |
| TIJUANA FLATS #223, LLC | L15000115038 | 47-4386701 |
| TIJUANA FLATS #224, LLC | L15000039836 | 47-2814619 |
| TIJUANA FLATS #225, LLC | L15000060793 | 47-2405373 |
| TIJUANA FLATS #227, LLC | L14000127893 | 47-1548627 |
| TIJUANA FLATS #228, LLC | L15000100832 | 47-2830624 |

| TIJUANA FLATS #230, LLC | L15000118768 | 47-4248162 |
|---|---|---|
| TIJUANA FLATS #231, LLC | L15000115041 | 47-4498025 |
| Tijuana Flats #232, LLC | L15000194782 | 35-2547334 |
| TIJUANA FLATS #233, LLC | L15000021099 | 47-3003713 |
| TIJUANA FLATS #234, LLC | L15000081453 | 47-3941822 |
| TIJUANA FLATS #236, LLC | L15000195070 | 61-1775467 |
| Tijuana Flats #237, LLC | L15000194786 | 38-3985227 |
| Tijuana Flats #238, LLC | L15000194814 | 37-1797253 |
| Tijuana Flats #239, LLC | L15000195408 | 32-0480528 |
| Tijuana Flats #240, LLC | L15000194682 | 36-4823589 |
| Tijuana Flats #241, LLC | L15000194953 | 30-0889696 |
| Tijuana Flats #242, LLC | L15000195062 | 37-1799521 |
| Tijuana Flats #243, LLC | L15000194777 | 38-3985810 |
| Tijuana Flats #244, LLC | L15000194959 | 30-0890363 |
| Tijuana Flats #245, LLC | L15000194679 | 38-3985746 |
| Tijuana Flats #246, LLC | L16000046823 | 36-4831692 |
| Tijuana Flats #247, LLC | L16000046817 | 30-0930135 |
| TIJUANA FLATS #248, LLC | L16000047814 | 38-3995410 |
| Tijuana Flats #249, LLC | L16000046812 | 38-3994748 |
| Tijuana Flats #250, LLC | L15000181592 | 47-5354352 |
| Tijuana Flats #251, LLC | L16000046806 | 32-0489935 |
| Tijuana Flats #253, LLC | L16000047822 | 36-4833989 |
| Tijuana Flats #255, LLC | L16000047784 | 38-4009816 |
| TIJUANA FLATS #257, LLC | L17000058984 | 82-0816585 |
| TIJUANA FLATS #258, LLC | L20000253854 | 82-0868560 |
| TIJUANA FLATS #259, LLC | L21000264681 | 82-0851829 |
| TIJUANA FLATS #260, LLC | L21000278808 | 82-0904481 |
| TIJUANA FLATS #261, LLC | L21000372555 | 87-2241734 |
| TIJUANA FLATS #273, LLC | L21000372564 | 87-2294770 |
| TIJUANA FLATS #274, LLC | L21000372581 | 87-2308606 |
| TIJUANA FLATS #275, LLC | L21000372585 | 87-2348415 |
| TIJUANA FLATS #276, LLC | L21000372588 | 87-2939835 |
| TIJUANA FLATS #277, LLC | L21000372590 | 87-3818981 |

**Schedule 4.17-3**

**Changes in Legal Name, State of Formation and Structure**

None.

**Schedule 7.1**

**Existing Indebtedness**

None.

**Schedule 7.2**

**Existing Liens**

None.

**Schedule 7.4**

**Existing Investments**

None.

<u>Exhibit 2.3</u>

[FORM OF] NOTICE OF REVOLVING BORROWING

[Date]

Truist Bank
333 S. Garland Avenue, 17th Floor
Orlando, FL 32801
Attention:
Telecopy Number:

To Whom It May Concern:

      Reference is made to the Credit Agreement, dated as of March 4, 2022 (as amended, modified, supplemented, increased and extended from time to time, the "<u>Credit Agreement</u>"), among the undersigned, as Borrower, Holdings, the Guarantors identified therein, and Truist Bank, as Lender. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided in the Credit Agreement. This notice constitutes a Notice of Revolving Borrowing. The Borrower hereby requests a Borrowing of Revolving Loans under the Credit Agreement, and in connection therewith the Borrower specifies the following information with respect to the Borrowing of Revolving Loans requested hereby:

      (A)      Aggregate principal amount of Borrowing of Revolving Loans: _____

      (B)      Date of Borrowing of Revolving Loans (which is a Business Day):_____

      (C)      Location and number of Borrower's account to which proceeds of such Borrowing of Revolving Loans are to be disbursed:_____

[SIGNATURE ON FOLLOWING PAGE]

The Borrower hereby represents and warrants that the conditions specified in Section 3.2 of the Credit Agreement are satisfied.

Very truly yours,

TIJUANA FLATS RESTAURANTS, LLC,
a Florida limited liability company


By: _____
Name:
Title:

Exhibit 2.7

[FORM OF] NOTE

_____, ____

FOR VALUE RECEIVED, TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company (the "Borrower"), hereby promises to pay to TRUIST BANK or its registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each Loan from time to time made by the Lender to the Borrower under the Credit Agreement (as amended, modified, supplemented, increased and extended from time to time, the "Credit Agreement") dated as of March 4, 2022, among the Borrower, Holdings, the Guarantors identified therein, and Truist Bank, as Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Loan from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement.  All payments of principal and interest shall be made to the Lender for the account of the Lender in Dollars in immediately available funds at the Payment Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Note is the Note referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  Upon the occurrence and continuation of one or more of the Events of Default, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Credit Agreement.  Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS NOTE AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

[SIGNATURE ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Borrower has caused this Note to be duly executed by its duly authorized officer as of the day and year first above written.

TIJUANA FLATS RESTAURANTS, LLC,
a Florida limited liability company

By: _____

Name:

Title:

<u>Exhibit 5.1</u>

[FORM OF] COMPLIANCE CERTIFICATE

In connection with the terms of that certain Credit Agreement, dated as of March 4, 2022 (as amended, modified, supplemented, increased and extended from time to time, the "<u>Credit Agreement</u>"), among TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company (the "<u>Borrower</u>"), TJ FLATS HOLDINGS, LLC, a Delaware limited liability company ("<u>Holdings</u>"), the Guarantors identified therein, and Truist Bank, as Lender, the undersigned certifies that the following information is true and correct, in all material respects, as of the date of this Compliance Certificate for the Fiscal Quarter ended _____, 20___:

Capitalized terms used in this Compliance Certificate but not otherwise defined herein shall have the same meanings provided in the Credit Agreement.

*[Use the following paragraph 1 for fiscal year-end financial statements]*

1.      Attached hereto as <u>Schedule 1</u> are the audited annual financial statements required by Section 5.1(a) of the Credit Agreement for the Fiscal Year ending [_____] together with the audit report of [_____] or other independent public accountants reasonably acceptable to the Lender required by such section.

*[Use the following paragraph 1 for fiscal quarter-end financial statements]*

1.      Attached hereto as <u>Schedule 1</u> are the unaudited financial statements required by Section 5.1(b) of the Credit Agreement for the Fiscal Quarter ending [_____, ____].

2.      [No][A] Default or Event of Default has occurred and is continuing. *[If a Default or Event of Default, specify the details thereof and the action which the Borrower has taken or proposes to take]*.

3.      Set forth on <u>Schedule 2</u> are detailed calculations demonstrating compliance with the financial covenants set forth in Article VI of the Credit Agreement.

4.      All representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties are true and correct in all respects) as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) as of such earlier date.

5.      There has been [no][a] change in GAAP or the application thereof since December 31, 2020. *[If any change in GAAP has occurred, please specify the effect of such change on the financial statements accompanying this certificate]*.

6.      There has been [no][a] change in the identity of the Subsidiaries as of the end of the aforementioned [Fiscal Quarter][Fiscal Year] from the Subsidiaries identified to the Lender [on the Closing Date][as of the most recently delivered Compliance Certificate].

[*If any change in the identity of the Subsidiaries has occurred or a new Subsidiary has been formed, please specify the details thereof*]

(a) The following Subsidiaries were formed and now constitute "New Subsidiaries", and in connection with such qualification, are satisfying the requirements of <u>Section 5.10</u> of the Credit Agreement on the date hereof: _____.

(b) The following Subsidiaries were formed and presently constitute "Early Stage New Subsidiaries" and therefore are not required to satisfy the requirements of <u>Section 5.10</u> of the Credit Agreement on the date hereof: _____.

(c) The following Subsidiaries were dissolved in accordance with and in compliance with <u>Section 7.3(a)(iv)</u> of the Credit Agreement: _____.

The foregoing is true and correct, in all material respects, as of the date hereof.

Dated as of _____, ____.

TIJUANA FLATS RESTAURANTS, LLC,
a Florida limited liability company

By: _____
Name:
Title:

<u>Exhibit 5.10</u>

[FORM OF] GUARANTOR JOINDER AGREEMENT

THIS GUARANTOR JOINDER AGREEMENT (this "<u>Agreement</u>"), dated as of _____, ____, is by and between _____, a _____ (the "<u>New Subsidiary</u>"), and Truist Bank, in its capacity as Lender under the Credit Agreement, dated as of March 4, 2022 (as amended, modified, supplemented, increased and extended from time to time, the "<u>Credit Agreement</u>"), by and among TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company (the "<u>Borrower</u>"), TJ FLATS HOLDINGS, LLC, a Delaware limited liability company ("<u>Holdings</u>"), the Guarantors identified therein, and Truist Bank, as Lender. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Loan Parties are required by Section 5.10 of the Credit Agreement to cause the New Subsidiary to become a "Guarantor". Accordingly, the New Subsidiary hereby agrees with the Lender as follows:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a party to the Credit Agreement and a "Guarantor" for all purposes of the Credit Agreement and shall have all of the obligations of a Guarantor thereunder as if it had executed the Credit Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions applicable to the Guarantors contained in the Credit Agreement. Without limiting the generality of the foregoing terms of this <u>paragraph 1</u>, the New Subsidiary hereby, jointly and severally together with the other Guarantors, guarantees to the Lender and each Affiliate of the Lender that enters into Bank Products or Hedging Transactions with the Borrower or any Subsidiary, and each other holder of the Obligations, as provided in Article IX of the Credit Agreement, as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof.

2.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a party to the Security Agreement and an "Obligor" for all purposes of the Security Agreement, and shall have all the obligations of an Obligor thereunder as if it had executed the Security Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Security Agreement. Without limiting the generality of the foregoing terms of this <u>paragraph 2</u>, to secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise, of the Secured Obligations (here and hereinafter as defined in the Security Agreement), the New Subsidiary hereby grants to the Lender, for the benefit of the holders of the Secured Obligations, a continuing security interest in, and a right of set off against any and all right, title and interest of the New Subsidiary in and to the Collateral (as such term is defined in the Security Agreement) of the New Subsidiary.

3.      The New Subsidiary hereby represents and warrants to the Lender that:

        (i)      Set forth on <u>Schedule 1</u> is a list of all real property located in the United States that is owned or leased by the New Subsidiary as of the date hereof.

        (ii)      Set forth on <u>Schedule 2</u> is the chief executive office, U.S. tax payer identification number and organizational identification number of the New Subsidiary as of the date hereof.

        (iii)      The exact legal name and state of organization of the New Subsidiary is as set forth on the signature pages hereto.

(iv)     Set forth on <u>Schedule 3</u> is each location where assets of the New Subsidiary are located as of the date hereof.

(v)     Except as set forth on <u>Schedule 4</u>, the New Subsidiary has not during the five (5) years preceding the date hereof (A) changed its legal name, (B) changed its state of formation, or (C) been party to a merger, consolidation or other change in structure.

(vi)     Set forth on <u>Schedule 5</u> is a list of all IP Rights owned by the New Subsidiary as of the date hereof.

(vii)     As of the date hereof, the New Subsidiary has no commercial tort claims involving a claim for damages in excess of $100,000 in any individual instance or $250,000 in the aggregate when taken together with all commercial tort claims of any of the Loan Parties not subject to a Lien in favor of the Lender, other than as set forth on <u>Schedule 6</u>.

(viii)     Set forth on <u>Schedule 7</u> is each Subsidiary of the New Subsidiary, together with (A) jurisdiction of formation, (B) number of shares of each class of Capital Stock outstanding, (C) the certificate number(s) of the certificates evidencing such Capital Stock and number and percentage of outstanding shares of each class owned by the New Subsidiary (directly or indirectly) of such Capital Stock and (D) number and effect, if exercised, of all outstanding options, warrants, rights of conversion or purchase and all other similar rights with respect thereto.

4.     The address of the New Subsidiary for purposes of all notices and other communications is the address set forth for any Loan Party in Section 10.1 of the Credit Agreement.

5.     The New Subsidiary hereby waives acceptance by the Lender of the guaranty by the New Subsidiary under Article IX of the Credit Agreement.

6.     This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

7.     This Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be construed in accordance with and be governed by the Law of the State of New York.

[SIGNATURE PAGES TO FOLLOW]

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officers, and the Lender, for the benefit of the holders of the Obligations, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By: _____
Name:
Title:

Acknowledged and accepted:

TRUIST BANK, as Lender

By: _____
Name:
Title:

NOTE
9700921685-00001
9700921685-00003

March 4, 2022

FOR VALUE RECEIVED, TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company (the "Borrower"), hereby promises to pay to TRUIST BANK or its registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each Loan from time to time made by the Lender to the Borrower under the Credit Agreement (as amended, modified, supplemented, increased and extended from time to time, the "Credit Agreement") dated as of March 4, 2022, among the Borrower, Holdings, the Guarantors identified therein, and Truist Bank, as Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower promises to pay interest on the unpaid principal amount of each Loan from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement.  All payments of principal and interest shall be made to the Lender for the account of the Lender in Dollars in immediately available funds at the Payment Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Note is the Note referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  Upon the occurrence and continuation of one or more of the Events of Default, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Credit Agreement.  Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS NOTE AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

[SIGNATURE ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Borrower has caused this Note to be duly executed by its duly authorized officer as of the day and year first above written.

TIJUANA FLATS RESTAURANTS, LLC,
a Florida limited liability company

By: _____

Louie Psallidas
Chief Financial Officer

EXECUTION VERSION

SECURITY AND PLEDGE AGREEMENT

THIS SECURITY AND PLEDGE AGREEMENT (as amended, modified, supplemented, increased, extended, restated, refinanced and replaced from time to time, this "<u>Agreement</u>") is entered into as of March 4, 2022, among the parties identified as "Obligors" on the signature pages hereto and such other parties that may become Obligors hereunder after the date hereof (each individually an "<u>Obligor</u>" and collectively the "<u>Obligors</u>"), and TRUIST BANK, a North Carolina banking corporation, in its capacity as Lender (the "<u>Lender</u>").

<u>RECITALS</u>

WHEREAS, pursuant to that certain Credit Agreement (as amended, modified, supplemented, increased, extended, restated, refinanced and replaced from time to time, the "<u>Credit Agreement</u>"), dated as of the date hereof, among TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company (the "<u>Borrower</u>"), TJ FLATS HOLDINGS, LLC, a Delaware limited liability company ("<u>Holdings</u>"), the Guarantors identified therein and the Lender, the Lender has agreed to make Loans upon the terms and subject to the conditions set forth therein; and

WHEREAS, this Agreement is required by the terms of the Credit Agreement.

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Definitions</u>.

(a)    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Credit Agreement, and the following terms which are defined in the Uniform Commercial Code in effect from time to time in the State of New York except as such terms may be used in connection with the perfection of the Collateral and then the applicable jurisdiction with respect to such affected Collateral shall apply (the "<u>UCC</u>"):  Accession, Account, Adverse Claim, As-Extracted Collateral, Chattel Paper, Commercial Tort Claim, Consumer Goods, Deposit Account, Document, Electronic Chattel Paper, Equipment, Farm Products, Financial Asset, Fixtures, General Intangible, Goods, Instrument, Inventory, Investment Company Security, Investment Property, Letter-of-Credit Right, Manufactured Home, Money, Proceeds, Securities Account, Securities Intermediary, Security, Security Entitlement, Software, Supporting Obligation and Tangible Chattel Paper.

(b)    In addition, the following terms shall have the meanings set forth below:

"<u>Agreement</u>" has the meaning provided in the introductory paragraph hereof.

"<u>Collateral</u>" has the meaning provided in <u>Section 2</u> hereof.

"<u>Copyright License</u>" shall mean any written agreement, naming any Obligor as licensor, granting any right under any Copyright.

"<u>Copyrights</u>" shall mean (a) all registered United States copyrights in all Works, now existing or hereafter created or acquired, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Copyright Office, and (b) all renewals thereof.

"<u>Credit Agreement</u>" has the meaning provided in the recitals hereof.

"Lender" has the meaning provided in the introductory paragraph hereof.

"Obligor" and "Obligors" have the meanings provided in the introductory paragraph hereof.

"Patent License" shall mean any written agreement providing for the grant by or to an Obligor of any right to manufacture, use or sell any invention covered by a Patent.

"Patents" shall mean (a) all letters patent of the United States and all reissues and extensions thereof, and (b) all applications for letters patent of the United States and all divisions, continuations and continuations-in-part thereof.

"Pledged Equity" shall mean, with respect to each Obligor, (a) one hundred percent (100%) of the issued and outstanding Capital Stock of each Domestic Subsidiary owned by such Obligor and (b) sixty-five percent (65%) (or such greater percentage that, due to a Change in Law after the date hereof, (i) could not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent and (ii) could not reasonably be expected to cause any adverse tax consequences) of the issued and outstanding Capital Stock entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and one hundred percent (100%) of the issued and outstanding Capital Stock not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each Foreign Subsidiary, in each case, directly owned by such Obligor, including without limitation the Capital Stock in the Subsidiaries owned by such Obligor as set forth on Schedule 1 hereto, in each case together with the certificates (or other agreements or instruments), if any, representing such Capital Stock, and all options and other rights, contractual or otherwise, with respect thereto, including, but not limited to, the following:

(1)    all Capital Stock representing a dividend thereon, or representing a distribution or return of capital upon or in respect thereof, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder thereof, or otherwise in respect thereof; and

(2)    in the event of any consolidation or merger involving the issuer thereof and in which such issuer is not the surviving Person, all shares of each class of the Capital Stock of the successor Person formed by or resulting from such consolidation or merger, to the extent that such successor Person is a direct Subsidiary of an Obligor.

"Secured Obligations" shall mean, without duplication, (a) all Obligations and (b) all reasonable and documented actual out-of-pocket costs and expenses incurred in connection with enforcement and collection of the Obligations, including the reasonable and documented fees, charges and disbursements of counsel.

"Trademark License" shall mean any written agreement providing for the grant by or to an Obligor of any right to use any Trademark.

"Trademarks" shall mean (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, service marks, logos and other source or business identifiers, and the goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any political subdivision thereof, or otherwise (excluding only United States

intent-to-use trademark applications to the extent that and solely during the period in which the grant of a security interest therein would impair, under applicable federal law, the registrability of such applications or the validity or enforceability of registrations issuing from such applications) and (b) all renewals thereof.

"UCC" has the meaning provided in Section 1(a) hereof.

"Work" shall mean any work that is subject to copyright protection pursuant to Title 17 of the United States Code.

2.     Grant of Security Interest in the Collateral.  To secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise, of the Secured Obligations, each Obligor hereby grants to the Lender, for the benefit of the holders of the Secured Obligations, a continuing security interest in, and a right to set off against, any and all right, title and interest of such Obligor in and to all of the following, whether now owned or existing or owned, acquired, or arising hereafter (collectively, the "Collateral"): (a) all Accounts; (b) all Money; (c) all Chattel Paper; (d) those certain Commercial Tort Claims set forth on Schedule 2 hereto; (e) all Copyrights; (f) all Copyright Licenses; (g) all Deposit Accounts; (h) all Documents; (i) all Equipment; (j) all Fixtures; (k) all General Intangibles; (l) all Goods; (m) all Instruments; (n) all Inventory; (o) all Investment Property; (p) all Letter-of-Credit Rights; (q) all Patents; (r) all Patent Licenses; (s) all Pledged Equity; (t) all Software; (u) all Supporting Obligations; (v) all Trademarks; (w) all Trademark Licenses; (x) all books and records related to the Collateral; and (y) all Accessions and all Proceeds of any and all of the foregoing.

Notwithstanding anything to the contrary contained herein, the security interests granted under this Agreement shall not extend to any Excluded Property; provided that upon the occurrence of an event that renders property to no longer constitute Excluded Property, a security interest in such property shall be automatically and simultaneously granted hereunder and shall be included as Collateral hereunder.

The Obligors and the Lender, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest created hereby in the Collateral (i) constitutes continuing collateral security for all of the Secured Obligations, whether now existing or hereafter arising and (ii) is not to be construed as an assignment of any Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks or Trademark Licenses.

3.     Representations and Warranties.  Each of the Obligors hereby represents and warrants to the Lender, for the benefit of the holders of the Secured Obligations, that:

(a)     Ownership.  Such Obligor is the legal and beneficial owner of its Collateral (other than Copyright Licenses, Patent Licenses and Trademark Licenses whereby such Obligor is granted the right to use any Copyrights, Patents or Trademarks owned by another Person) and has the right to pledge, sell, assign or transfer the same.  There exists no Adverse Claim with respect to the Pledged Equity of such Obligor.

(b)     Security Interest/Priority.  This Agreement creates a valid security interest in favor of the Lender, for the benefit of the holders of the Secured Obligations, in the Collateral of such Obligor and, when properly perfected by filing, shall constitute a valid and perfected, first priority security interest in such Collateral (including all uncertificated Pledged Equity consisting of partnership or limited liability company interests that do not constitute securities), to the extent such security interest can be perfected by filing under the UCC, free and clear of all Liens except for Liens permitted by Section 7.2 of the Credit Agreement.  The taking of possession by the Lender of the certificated securities (if any) evidencing the Pledged Equity and all other Instruments

constituting Collateral will perfect and establish the first priority of the Lender's security interest in all the Pledged Equity evidenced by such certificated securities and such Instruments.

(c)    <u>Types of Collateral</u>.  None of the Collateral consists of, or is the Proceeds of, As-Extracted Collateral, Consumer Goods, Farm Products, Manufactured Homes or standing timber.

(d)    <u>Equipment and Inventory</u>.  Subject to Liens permitted by Section 7.2 of the Credit Agreement, with respect to any Equipment and/or Inventory of such Obligor, such Obligor has exclusive possession and control of such Equipment and Inventory of such Obligor except for (i) Equipment leased by such Obligor as a lessee, or (ii) Equipment or Inventory in transit with common carriers. No Inventory of such Obligor is held by a Person other than such Obligor pursuant to consignment, sale or return, sale on approval or similar agreement.

(e)    <u>Authorization of Pledged Equity</u>.  All Pledged Equity is duly authorized and validly issued, is fully paid and, to the extent applicable, nonassessable and is not subject to the preemptive rights, warrants, options or other rights to purchase of any Person, or equityholder, voting trust or similar agreements outstanding with respect to, or property that is convertible, into, or that requires the issuance and sale of, any of the Pledged Equity, except to the extent expressly permitted under the Loan Documents.

(f)    <u>No Other Capital Stock, Instruments, Etc</u>.  As of the Closing Date, such Obligor owns all certificated Capital Stock in any Subsidiary that is required to be pledged and delivered to the Lender hereunder other than as set forth on <u>Schedule 1</u> hereto. Upon the Closing Date, all such certificated Capital Stock set forth on <u>Schedule 1</u> shall be returned to the Obligors by the holder of the Existing Indebtedness, and the Obligors shall summarily destroy such certificated Capital Stock.  Until such destruction, the Obligors shall hold such certificated Capital Stock in trust for the benefit of the Lender, and, upon such destruction, the Pledged Equity formerly evidenced by such certificated Capital Stock shall continue in existence as uncertificated Pledged Equity and shall remain pledged to the Lender hereunder.

(g)    <u>Partnership and Limited Liability Company Interests</u>.  None of the Collateral consisting of an interest in a partnership or a limited liability company (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an Investment Company Security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

(h)    <u>Consents; Etc</u>.  There are no restrictions in any Organization Document governing any Pledged Equity or any other document related thereto which would limit or restrict (i) the grant of a Lien pursuant to this Agreement on such Pledged Equity, (ii) the perfection of such Lien or (iii) the exercise of remedies in respect of such perfected Lien in the Pledged Equity as contemplated by this Agreement. Except for (i) the filing or recording of UCC financing statements, (ii) the filing of appropriate notices with the United States Patent and Trademark Office and the United States Copyright Office, (iii) obtaining control to perfect the Liens created by this Agreement (to the extent required under <u>Section 4(a)</u> hereof), (iv) such actions as may be required by applicable Laws affecting the offering and sale of securities, (v) such actions as may be required by applicable foreign Laws affecting the pledge of the Pledged Equity of Foreign Subsidiaries, (vi) any approvals that may be required to be obtained from any bailee or landlord to collect the Collateral and (vii) consents, authorizations, filings or other actions which have been obtained or made, no consent or authorization of, filing with, or other act by or in respect of, any arbitrator or Governmental Authority and no consent of any other Person (including, without limitation, any stockholder, member or creditor of such Obligor), is required for (A) the grant by such Obligor of the security

interest in the Collateral granted hereby or for the execution, delivery or performance of this Agreement by such Obligor, (B) the perfection of such security interest (to the extent such security interest can be perfected by filing under the UCC, the granting of control (to the extent required under Section 4(a) hereof) or by filing an appropriate notice with the United States Patent and Trademark Office or the United States Copyright Office) or (C) the exercise by the Lender or the holders of the Secured Obligations of the rights and remedies provided for in this Agreement.

(i)     Commercial Tort Claims.  As of the Closing Date, such Obligor has no Commercial Tort Claims seeking damages in excess of $100,000 in any individual instance or $250,000 in the aggregate when taken together with all Commercial Tort Claims of all of the other Obligors, other than as set forth on Schedule 2 hereto.

(j)     Copyrights, Patents and Trademarks.

(i)     Schedule 3 hereto includes all registrations or applications for Copyrights, Patents and Trademarks owned by such Obligor in its own name, and all material Copyright Licenses, Patent Licenses and Trademark Licenses to which any Obligor is a party, as of the date hereof.

(ii)     All registrations or applications pertaining to such Copyrights, Patents and Trademarks have been duly and properly filed, and to any Obligor's knowledge, each registered Copyright, Patent and Trademark of such Obligor is valid, subsisting, unexpired, enforceable and has not been abandoned.

(iii)     Except as set forth on Schedule 3 hereto, none of such Copyrights, Patents and Trademarks owned by any Obligor is the subject of any licensing or franchise agreement as of the date hereof.

(iv)     Except as could not reasonably be expected to have a Material Adverse Effect, to such Obligor's knowledge, no holding, decision or judgment has been rendered by any Governmental Authority that would limit, cancel or question the validity of such Copyright, Patent or Trademark owned by Obligor.

(v)     No action or proceeding is currently pending as of the date hereof, seeking to limit, cancel or question the validity of any Copyright, Patent or Trademark owned by Obligor that could reasonably be expected to have a Material Adverse Effect.

4.     Covenants. Each Obligor covenants that until such time as the Secured Obligations arising under the Loan Documents have been paid in full (other than continuing indemnity or expense reimbursement Obligations) and the Commitments have expired or been terminated (other than continuing indemnity or expense reimbursement Obligations), such Obligor shall:

(a)     Instruments/Chattel Paper/Pledged Equity/Control.

(i)     If any amount in excess of $100,000 in any individual instance or $250,000 in the aggregate payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper, or if any property constituting Collateral shall be stored or shipped subject to a Document, ensure that such Instrument, Tangible Chattel Paper or Document is either in the possession of such Obligor at all times or, if requested by the Lender to perfect its security interest in such Collateral, is delivered to the Lender duly endorsed in a manner satisfactory to the Lender.  Such Obligor shall ensure

that any Collateral consisting of Tangible Chattel Paper is marked with a legend acceptable to the Lender indicating the Lender's security interest in such Tangible Chattel Paper.

(ii)     Deliver to the Lender promptly upon the receipt thereof by or on behalf of such Obligor, all certificates and instruments constituting Pledged Equity.  Prior to delivery to the Lender, all such certificates constituting Pledged Equity shall be held in trust by such Obligor for the benefit of the Lender pursuant hereto.  All such certificates representing Pledged Equity shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, substantially in the form provided in Exhibit 4(a) hereto (or other form acceptable to the Lender in its reasonable discretion).

(iii)     Execute and deliver all agreements, assignments, instruments or other documents as reasonably requested by the Lender for the purpose of obtaining and maintaining control with respect to any Collateral consisting of (A) Investment Property, (B) Letter-of-Credit Rights and (C) Electronic Chattel Paper.

(b)     Filing of Financing Statements, Notices, Etc.  Such Obligor shall execute and deliver to the Lender such agreements, assignments or instruments (including affidavits, notices, reaffirmations and amendments and restatements of existing documents, as the Lender may reasonably request) and do all such other things as the Lender may reasonably deem necessary or appropriate (i) to assure to the Lender its security interests hereunder, including (A) such instruments as the Lender may from time to time reasonably request in order to perfect and maintain the security interests granted hereunder in accordance with the UCC, (B) with regard to registered Copyrights, a Notice of Grant of Security Interest in Copyrights in the form of Exhibit 4(b)(i) hereto, (C) with regard to registered Patents, a Notice of Grant of Security Interest in Patents for filing with the United States Patent and Trademark Office in the form of Exhibit 4(b)(ii) hereto and (D) with regard to registered Trademarks, a Notice of Grant of Security Interest in Trademarks for filing with the United States Patent and Trademark Office in the form of Exhibit 4(b)(iii) hereto, (ii) to consummate the transactions contemplated hereby and (iii) to otherwise protect and assure the Lender of its rights and interests hereunder.  Furthermore, such Obligor also hereby irrevocably makes, constitutes and appoints the Lender, its nominee or any other person whom the Lender may designate, as such Obligor's attorney in fact with full power and for the limited purpose to prepare and file (and, to the extent applicable, sign) in the name of such Obligor any financing statements, or amendments and supplements to financing statements, renewal financing statements, notices or any similar documents which in the Lender's reasonable discretion would be necessary or appropriate in order to perfect and maintain perfection of the security interests granted hereunder, such power, being coupled with an interest, being and remaining irrevocable until such time as the Secured Obligations arising under the Loan Documents have been paid in full (other than continuing indemnity or expense reimbursement Obligations) and the Commitments have expired or been terminated (other than continuing indemnity or expense reimbursement Obligations). Such Obligor hereby agrees that a carbon, photographic or other reproduction of this Agreement or any such financing statement is sufficient for filing as a financing statement by the Lender without notice thereof to such Obligor wherever the Lender may in its sole discretion desire to file the same.

(c)     Collateral Held by Warehouseman, Bailee, Etc.  If any Collateral with a fair market value in excess of $100,000 is at any time in the possession or control of a warehouseman, bailee or any agent or processor of such Obligor and the Lender so requests (i) notify such Person in writing of the Lender's security interest therein, (ii) instruct such Person to hold all such Collateral for the Lender's account and subject to the Lender's instructions and (iii) use commercially reasonable

efforts to obtain a written acknowledgment from such Person that it is holding such Collateral for the benefit of the Lender.

(d)     Commercial Tort Claims.  (i) Promptly forward to the Lender an updated Schedule 2 listing any and all Commercial Tort Claims by or in favor of such Obligor seeking damages in excess of $100,000 in any individual instance or $250,000 in the aggregate for all Commercial Tort Claims of the Obligors not subject to a Lien in favor of the Lender for the benefit of itself and the other holders of the Secured Obligations and (ii) execute and deliver such statements, documents and notices and do and cause to be done all such things as may be reasonably required by the Lender, or required by applicable Law to create, preserve, perfect and maintain the Lender's security interest in any Commercial Tort Claims initiated by or in favor of any Obligor.

(e)     Books and Records.  Each Obligor shall mark its books and records (and shall cause the issuer of the Pledged Equity of such Obligor to mark its books and records) to reflect the security interest granted pursuant to this Agreement.

(f)     Nature of Collateral.  At all times maintain the Collateral as personal property and not affix any of the Collateral having a fair market value in excess of $100,000 in any individual instance to any real property in a manner which would change its nature from personal property to real property or a Fixture to real property, unless the Lender shall have a perfected Lien on such Fixture or real property.

(g)     Issuance or Acquisition of Equity Interests in Partnership or Limited Liability Company.  Not without executing and delivering, or causing to be executed and delivered, to the Lender such agreements, documents and instruments as the Lender may reasonably require, issue or acquire any Pledged Equity consisting of an interest in a partnership or a limited liability company that (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a Security governed by Article 8 of the UCC, (iii) is an Investment Company Security, (iv) is held in a Securities Account or (v) constitutes a Security or a Financial Asset.

(h)     Intellectual Property.

(i)     Not do any act or omit to do any act whereby any material Copyright owned by an Obligor may become invalidated and (A) not do any act, or omit to do any act, whereby any material Copyright owned by an Obligor may become injected into the public domain; (B) notify the Lender promptly if it knows that any material Copyright owned by an Obligor may become injected into the public domain or of any materially adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any court or tribunal in the United States) regarding an Obligor's ownership of any such Copyright or its validity; (C) take all necessary steps as it shall deem appropriate under the circumstances, to maintain and pursue each application (and to obtain the relevant registration) of each material Copyright owned by an Obligor and to maintain each registration of each material Copyright owned by an Obligor; and (D) promptly notify the Lender of any material infringement of any material Copyright owned by an Obligor of which it becomes aware and take such actions as it shall reasonably deem appropriate under the circumstances to protect such Copyright, including, where appropriate, the bringing of suit for infringement, seeking injunctive relief and seeking to recover any and all damages for such infringement.

(ii)     Not make any assignment or agreement in conflict with the security interest in the Copyrights of each Obligor hereunder (except as permitted by the Credit Agreement).

(iii) (A) Continue to use each material Trademark owned by an Obligor on each and every trademark class of services in order to maintain each such material Trademark owned by an Obligor in full force free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under each such material Trademark owned by an Obligor, (C) employ each such material Trademark owned by an Obligor with the appropriate notice of registration, if required, and (D) not knowingly and intentionally (and not permit any licensee or sublicensee thereof to) do any act or omit to do any act whereby any such material Trademark owned by an Obligor may become invalidated.

(iv)     Not do any act, or omit to do any act, whereby any material Patent owned by an Obligor may become abandoned or dedicated to the public.

(v)     Notify the Lender and the holders of the Obligations promptly if it knows that any application or registration relating to any material Patent or Trademark owned by an Obligor may become abandoned or dedicated to the public, or of any materially adverse determination or development (excluding office actions or other similar determinations in the ordinary course of prosecution before the United States Patent and Trademark Office or any court or tribunal in any country) regarding such Obligor's ownership of any Patent or Trademark or its right to register the same or to keep and maintain the same.

(vi)     Take all commercially reasonable steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office, or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of each material Patent and Trademark owned by an Obligor, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(vii)     Promptly notify the Lender and the holders of the Obligations after it learns that any material Patent or Trademark included in the Collateral is infringed, misappropriated or diluted by a third party and promptly take such other actions as it shall reasonably deem appropriate under the circumstances to protect such material Patent or Trademark.

(viii)     Not make any assignment or agreement in conflict with the security interest in the Patents or Trademarks owned by an Obligor hereunder (except as permitted by the Credit Agreement).

Notwithstanding the foregoing, the Obligors may, in their reasonable business judgment, cease to maintain, pursue, preserve or protect any Copyright, Patent or Trademark owned by any Obligor that is not material to their businesses.

(i)     <u>Substitution or Exchanges</u>.  If any Obligor shall at any time be entitled to receive or shall receive any cash, certificate or other property, option or right, upon, in respect of, or in substitution or exchange for any of the Collateral, whether for value paid by such Obligor or

otherwise (which each Obligor hereby agrees shall be deemed to be Collateral), subject to Section 4(a) of this Agreement, if such Collateral is in a form that is required to be delivered to the Lender hereunder, then deliver such Collateral directly to the Lender in each case, accompanied by proper instruments of assignment and powers duly executed by such Obligor in such a form as may be reasonably required by the Lender, to be held by the Lender subject to the terms hereof, as further security for the Obligations (except as otherwise provided herein with respect to the application of the foregoing to the Obligations).

(j)     No Further Encumbrance.  Not, directly, indirectly or by operation of law, sell, transfer, assign, dispose of, pledge, convey, option, mortgage, hypothecate or encumber any of the Collateral other than to the extent permitted by the terms of the Loan Documents.

(k)     Defense of Collateral.  At all times reasonably defend the Collateral against all claims and demands (other than Permitted Liens) of all persons at any time claiming any interest in the Collateral adverse to the Lender's interest in the Collateral as granted hereunder. Each Obligor shall perform all of its material duties, responsibilities and obligations with respect to the Collateral under any document relating thereto.

5.     Authorization to File Financing Statements.  Each Obligor hereby authorizes the Lender to prepare and file such financing statements (including continuation statements) or amendments thereof or supplements thereto or other instruments as the Lender may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted hereunder in accordance with the UCC (including authorization to describe the Collateral as "all personal property", "all assets" or words of similar meaning).

6.     Advances.  On failure of any Obligor to perform any of the covenants and agreements contained herein or in any other Loan Document, the Lender may, at its sole option and in its sole discretion, perform the same and in so doing may expend such sums as the Lender may reasonably deem advisable in the performance thereof, including, without limitation, the payment of any insurance premiums, the payment of any taxes, a payment to obtain a release of a Lien or potential Lien, expenditures made in defending against any adverse claim and all other expenditures which the Lender may make for the protection of the security hereof or which may be compelled to make by operation of Law.  All such sums and amounts so expended shall be repayable by the Obligors on a joint and several basis promptly upon timely notice thereof and demand therefor, shall constitute additional Secured Obligations and shall bear interest from the date said amounts are expended at the rate provided for Default Interest in the Credit Agreement.  No such performance of any covenant or agreement by the Lender on behalf of any Obligor, and no such advance or expenditure therefor, shall relieve the Obligors of any Default or Event of Default.  The Lender may make any payment hereby authorized in accordance with any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien, title or claim except to the extent such payment is being contested in good faith by an Obligor in appropriate proceedings and against which adequate reserves are being maintained in accordance with GAAP.

7.     Remedies.

(a)     General Remedies.  During the continuance of an Event of Default, the Lender shall have, in addition to the rights and remedies provided herein, in the Loan Documents, in any other documents relating to the Secured Obligations, or by applicable Law (including, but not limited to, levy of attachment, garnishment and the rights and remedies set forth in the UCC of the jurisdiction applicable to the affected Collateral), the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights and remedies are asserted and regardless of whether the UCC applies

to the affected Collateral), and further, the Lender may, with or without judicial process or the aid and assistance of others, (i) enter on any premises on which any of the Collateral may be located and, without resistance or interference by the Obligors, take possession of the Collateral, (ii) dispose of any Collateral on any such premises, (iii) require the Obligors to assemble and make available to the Lender at the expense of the Obligors any Collateral at any place and time designated by the Lender which is reasonably convenient to both parties, (iv) remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) without demand and without advertisement, notice, hearing or process of law, all of which each of the Obligors hereby waives to the fullest extent permitted by applicable Law, at any place and time or times, sell and deliver any or all of the Collateral held by or for it at a public or private sale (which in the case of a private sale of Pledged Equity, may be to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof), at any exchange or broker's board or elsewhere, by one or more contracts, in one or more parcels, for cash, upon credit or otherwise, at such prices and upon such terms as the Lender deems advisable, in its sole discretion (subject to any and all mandatory legal requirements). Each Obligor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sale shall be deemed to have been made in a commercially reasonable manner and, in the case of a sale of Pledged Equity, that the Lender shall have no obligation to delay sale of any such securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act of 1933, as amended. Neither the Lender's compliance with applicable Law nor its disclaimer of warranties relating to the Collateral shall be considered to adversely affect the commercial reasonableness of any sale. To the extent the rights of notice cannot be legally waived hereunder, each Obligor agrees that any requirement of reasonable notice shall be met if such notice, specifying the place of any public sale or the time after which any private sale is to be made, is personally served on or mailed, postage prepaid, to the Obligors in accordance with the notice provisions of Section 10.1 of the Credit Agreement at least ten (10) days before the time of sale or other event giving rise to the requirement of such notice. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Obligor further acknowledges and agrees that any offer to sell any Pledged Equity which has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation in the financial community of New York, New York (to the extent that such offer may be advertised without prior registration under the Securities Act of 1933), or (ii) made privately in the manner described above shall be deemed to involve a "public sale" under the UCC, notwithstanding that such sale may not constitute a "public offering" under the Securities Act of 1933, and the Lender may, in such event, bid for the purchase of such securities. The Lender shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. To the extent permitted by applicable Law, any holder of Secured Obligations may be a purchaser at any such sale. To the extent permitted by applicable Law, each of the Obligors hereby waives all of its rights of redemption with respect to any such sale. Subject to the provisions of applicable Law, the Lender may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by applicable Law, be made at the time and place to which the sale was postponed, or the Lender may further postpone such sale by announcement made at such time and place.

(b)     Remedies Relating to Accounts. During the continuance of an Event of Default, whether or not the Lender has exercised any or all of its rights and remedies hereunder, (i) each Obligor will promptly upon request of the Lender instruct all account debtors to remit all payments in respect of Accounts to a mailing location selected by the Lender and (ii) the Lender shall have the right to enforce any Obligor's rights against its customers and account debtors, and the Lender or its designee may notify any Obligor's customers and account debtors that the Accounts of such Obligor have been assigned to the Lender or of the Lender's security interest therein, and may (either in its own name or in the name of an Obligor or both) demand,

collect (including without limitation by way of a lockbox arrangement), receive, take receipt for, sell, sue for, compound, settle, compromise and give acquittance for any and all amounts due or to become due on any Account, and, in the Lender's discretion, file any claim or take any other action or proceeding to protect and realize upon the security interest of the holders of the Secured Obligations in the Accounts. Each Obligor acknowledges and agrees that the Proceeds of its Accounts remitted to or on behalf of the Lender in accordance with the provisions hereof shall be solely for the Lender's own convenience and that such Obligor shall not have any right, title or interest in such Accounts or in any such other amounts except as expressly provided herein. Neither the Lender nor the holders of the Secured Obligations shall have any liability or responsibility to any Obligor for acceptance of a check, draft or other order for payment of money bearing the legend "payment in full" or words of similar import or any other restrictive legend or endorsement or be responsible for determining the correctness of any remittance. Furthermore, during the continuance of an Event of Default, (i) upon prior written notice to the applicable Obligor, the Lender shall have the right, but not the obligation, to make test verifications of the Accounts in any manner and through any medium that it reasonably considers advisable, and the Obligors shall furnish all such assistance and information as the Lender may require in connection with such test verifications, (ii) upon the Lender's request and at the expense of the Obligors, the Obligors shall cause independent public accountants or others satisfactory to the Lender to furnish to the Lender reports showing reconciliations, aging and test verifications of, and trial balances for, the Accounts and (iii) upon prior written notice to the applicable Obligor, the Lender in its own name or in the name of others may communicate with account debtors on the Accounts to verify with them to the Lender's satisfaction the existence, amount and terms of any Accounts.

(c)    Deposit Accounts.  Upon the occurrence of an Event of Default and during the continuation thereof, the Lender may prevent withdrawals or other dispositions of funds in Deposit Accounts maintained with the Lender.

(d)    Access.  In addition to the rights and remedies hereunder, during the continuance of an Event of Default, the Lender shall have the right to enter and remain upon the various premises of the Obligors without cost or charge to the Lender, and use the same, together with materials, supplies, books and records of the Obligors for the purpose of collecting and liquidating the Collateral, or for preparing for sale and conducting the sale of the Collateral, whether by foreclosure, auction or otherwise.  In addition, the Lender may remove Collateral, or any part thereof, from such premises and/or any records with respect thereto, in order to effectively collect or liquidate such Collateral.

(e)    Nonexclusive Nature of Remedies.  Failure by the Lender or the holders of the Secured Obligations to exercise any right, remedy or option under this Agreement, any other Loan Document, any other document relating to the Secured Obligations, or as provided by applicable Law, or any delay by the Lender or the holders of the Secured Obligations in exercising the same, shall not operate as a waiver of any such right, remedy or option.  No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the Lender or the holders of the Secured Obligations shall only be granted as provided herein. To the extent permitted by applicable Law, neither the Lender, the holders of the Secured Obligations, nor any party acting as attorney for the Lender or the holders of the Secured Obligations, shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or law other than their gross negligence or willful misconduct hereunder.  The rights and remedies of the Lender and the holders of the Secured Obligations under this Agreement shall be cumulative and not exclusive of any other right or remedy which the Lender or the holders of the Secured Obligations may have.

(f)      Retention of Collateral.  In addition to the rights and remedies hereunder, the Lender may, in compliance with Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of applicable Law of the relevant jurisdiction, accept or retain the Collateral in satisfaction of the Secured Obligations.  Unless and until the Lender shall have provided such notices, however, the Lender shall not be deemed to have retained any Collateral in satisfaction of any Secured Obligations for any reason.

(g)      Deficiency.   In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which the Lender or the holders of the Secured Obligations are legally entitled, the Obligors shall be jointly and severally liable for the deficiency, together with interest thereon at the rate provided for Default Interest in the Credit Agreement, together with the costs of collection and the fees, charges and disbursements of counsel.  Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Obligors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.  Notwithstanding any provision to the contrary contained herein, in any of the other Loan Documents or in any other documents relating to the Secured Obligations, the obligations of each Obligor under the Credit Agreement and the other Loan Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under Section 548 of the Bankruptcy Code of the United States or any other applicable Debtor Relief Law (including any comparable provisions of any applicable state Law).

8.      Rights of the Lender.

(a)      Power of Attorney.  In addition to other powers of attorney contained herein, each Obligor hereby designates and appoints the Lender, on behalf of the holders of the Secured Obligations, and each of its designees or agents, as attorney-in-fact of such Obligor, irrevocably and with power of substitution, with authority to take any or all of the following actions during the continuance of an Event of Default:

(i)      to demand, collect, settle, compromise, adjust, give discharges and releases, all as the Lender may reasonably determine;

(ii)      to commence and prosecute any actions at any court for the purposes of collecting any Collateral and enforcing any other right in respect thereof;

(iii)      to defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as the Lender may deem reasonably appropriate;

(iv)      to receive, open and dispose of mail addressed to an Obligor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the Goods giving rise to the Collateral of such Obligor on behalf of and in the name of such Obligor, or securing, or relating to such Collateral;

(v)      to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral or the Goods or services which have given rise thereto, as fully and completely as though the Lender were the absolute owner thereof for all purposes;

(vi)      to adjust and settle claims under any insurance policy relating thereto;

(vii)      to execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, security agreements, affidavits, notices and other agreements, instruments and documents that the Lender may determine necessary in order to perfect and maintain the security interests and liens granted in this Agreement and in order to fully consummate all of the transactions contemplated herein;

(viii)    to institute any foreclosure proceedings that the Lender may deem appropriate;

(ix)    to sign and endorse any drafts, assignments, proxies, stock powers, verifications, notices and other documents relating to the Collateral;

(x)    to exchange any of the Pledged Equity or other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issuer thereof and, in connection therewith, deposit any of the Pledged Equity with any committee, depository, transfer agent, registrar or other designated agency upon such terms as the Lender may reasonably deem appropriate;

(xi)    subject to 8(e) hereof, to vote for a shareholder resolution, or to sign an instrument in writing, sanctioning the transfer of any or all of the Pledged Equity into the name of the Lender or one or more of the holders of the Secured Obligations or into the name of any transferee to whom the Pledged Equity or any part thereof may be sold pursuant and subject to Section 7 hereof;

(xii)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral;

(xiii)    to direct any parties liable for any payment in connection with any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Lender or as the Lender shall direct;

(xiv)    to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral; and

(xv)    to do and perform all such other acts and things as the Lender may reasonably deem to be necessary, proper or convenient to accomplish the purposes of the Loan Documents.

This power of attorney is a power coupled with an interest and shall be irrevocable until such time as the Secured Obligations arising under the Loan Documents have been paid in full (other than continuing indemnity or expense reimbursement Obligations) and the Commitments have expired or been terminated (other than continuing indemnity or expense reimbursement Obligations).  The Lender shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Lender in this Agreement, and shall not be liable for any failure to do so or any delay in doing so.  The Lender shall not be liable for any act or omission or for any error of judgment or any mistake of fact or law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence or willful misconduct.  This power of attorney is conferred on the Lender solely to protect, preserve and realize upon its security interest in the Collateral.

(b)    Assignment by the Lender.  The Lender may from time to time assign the Secured Obligations to a successor Lender appointed in accordance with the Credit Agreement, and such successor shall be entitled to all of the rights and remedies of the Lender under this Agreement in relation thereto.

(c)    The Lender's Duty of Care.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Lender hereunder, the Lender shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Obligors shall be responsible for preservation of all rights in the Collateral, and the Lender shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the Obligors.  The Lender shall be deemed

to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Lender accords its own property, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the Lender shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral.  In the event of a public or private sale of Collateral pursuant to <u>Section 7</u> hereof, the Lender shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Lender has or is deemed to have knowledge of such matters, or (ii) taking any steps to clean, repair or otherwise prepare the Collateral for sale.

(d)      <u>Liability with Respect to Accounts</u>.  Anything herein to the contrary notwithstanding, each of the Obligors shall remain liable under each of the Accounts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account.  Neither the Lender nor any holder of Secured Obligations shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Lender or any holder of Secured Obligations of any payment relating to such Account pursuant hereto, nor shall the Lender or any holder of Secured Obligations be obligated in any manner to perform any of the obligations of an Obligor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(e)      <u>Voting and Payment Rights in Respect of the Pledged Equity</u>.

(i)      So long as no Event of Default shall exist, each Obligor may (A) exercise any and all voting and other consensual rights pertaining to the Pledged Equity of such Obligor or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Credit Agreement and (B) receive and retain any and all dividends, distributions, principal or interest paid in respect of the Pledged Equity to the extent they are allowed under the Credit Agreement; and

(ii)      During the continuance of an Event of Default, upon not less than three (3) Business Days' prior written notice to the Obligors, (A) all rights of an Obligor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to <u>clause (i)(A)</u> above shall cease and all such rights shall thereupon become vested in the Lender which shall then have the sole right to exercise such voting and other consensual rights, (B) all rights of an Obligor to receive the dividends, principal and interest payments which it would otherwise be authorized to receive and retain pursuant to <u>clause (i)(B)</u> above shall cease and all such rights shall thereupon be vested in the Lender which shall then have the sole right to receive and hold as Collateral such dividends, principal and interest payments, and (C) all dividends, principal and interest payments which are received by an Obligor contrary to the provisions of <u>clause (ii)(B)</u> above shall be received in trust for the benefit of the Lender, shall be segregated from other property or funds of such Obligor, and shall be forthwith paid over to the Lender as Collateral in the exact form received, to be held by the Lender as Collateral and as further collateral security for the Secured Obligations.

(f)      <u>Releases of Collateral</u>.  (i) If any Collateral shall be sold, transferred or otherwise disposed of by any Obligor in a transaction permitted by the Credit Agreement, then the Lender, at the request and sole expense of such Obligor, shall promptly execute and deliver to such Obligor all releases and other

documents, and take such other action, reasonably necessary for the release of the Liens created hereby or by any other Collateral Document on such Collateral.  (ii) The Lender may release any of the Pledged Equity from this Agreement or may substitute any of the Pledged Equity for other Pledged Equity without altering, varying or diminishing in any way the force, effect, lien, pledge or security interest of this Agreement as to any Pledged Equity not expressly released or substituted, and this Agreement shall continue as a first priority lien on all Pledged Equity not expressly released or substituted.

9.      Application of Proceeds.  Upon the acceleration of the Obligations under the Loan Documents pursuant to Section 8.1 of the Credit Agreement, any payments in respect of the Secured Obligations and any proceeds of the Collateral, when received by the Lender or any holder of the Secured Obligations in Money or its equivalent, will be applied in reduction of the Secured Obligations in the order set forth in Section 8.2 of the Credit Agreement.

10.     Continuing Agreement.

(a)      This Agreement shall remain in full force and effect until such time as the Secured Obligations arising under the Loan Documents have been paid in full (other than continuing indemnity or expense reimbursement Obligations) and the Commitments have expired or been terminated (other than continuing indemnity or expense reimbursement Obligations), at which time this Agreement shall be automatically terminated and the Lender shall, upon the request and at the expense of the Obligors, forthwith release all of its liens and security interests hereunder and shall execute and deliver all UCC termination statements and/or other documents reasonably requested by the Obligors evidencing such termination.

(b)      This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Lender or any holder of the Secured Obligations as a preference, fraudulent conveyance or otherwise under any Debtor Relief Law, all as though such payment had not been made; provided that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable and documented out of pocket costs and expenses (including without limitation any reasonable and documented legal fees and disbursements) incurred by the Lender or any holder of the Secured Obligations in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

11.     Amendments; Waivers; Modifications, Etc.  This Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except as set forth in Section 10.2 of the Credit Agreement; provided that any update or revision to Schedule 2 hereof delivered by any Obligor shall not constitute an amendment for purposes of this Section 11 or Section 10.2 of the Credit Agreement.

12.     Successors in Interest.  This Agreement shall be binding upon each Obligor, its successors and assigns and shall inure, together with the rights and remedies of the Lender and the holders of the Secured Obligations hereunder, to the benefit of the Lender and the holders of the Secured Obligations and their successors and permitted assigns.

13.     Notices.  All notices required or permitted to be given under this Agreement shall be in conformance with the requirements of Section 10.1 of the Credit Agreement.

14.     Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  It shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  Delivery of an executed counterpart of a signature

page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

15.    <u>Headings</u>.  The headings of the sections hereof are provided for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

16.    <u>Governing Law; Submission to Jurisdiction; Venue; WAIVER OF JURY TRIAL</u>.  The terms of Sections 10.5 and 10.6 of the Credit Agreement with respect to governing law, submission to jurisdiction, venue, consent to service of process and waiver of jury trial are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

17.    <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

18.    <u>Entirety</u>.  This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to the Lender, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

19.    <u>Other Security</u>.  To the extent that any of the Secured Obligations are now or hereafter secured by property other than the Collateral (including, without limitation, real property and securities owned by an Obligor), or by a guarantee, endorsement or property of any other Person, then the Lender shall have the right to proceed against such other property, guarantee or endorsement during the continuance of any Event of Default, and the Lender shall have the right, in its sole discretion, to determine which rights, security, liens, security interests or remedies the Lender shall at any time pursue, relinquish, subordinate, modify or take with respect thereto, without in any way modifying or affecting any of them or the Secured Obligations or any of the rights of the Lender or the holders of the Secured Obligations under this Agreement, under any other of the Loan Documents or under any other document relating to the Secured Obligations.

20.    <u>Joinder</u>.  At any time after the date of this Agreement, one or more additional Persons may become party hereto by executing and delivering to the Lender a Guarantor Joinder Agreement.  Immediately upon such execution and delivery of such Guarantor Joinder Agreement (and without any further action), each such additional Person will become a party to this Agreement as an "Obligor" and have all of the rights and obligations of an Obligor hereunder and this Agreement and the schedules hereto shall be deemed amended by such Guarantor Joinder Agreement.

21.    <u>Joint and Several Obligations of Obligors</u>.

(a)    Subject to <u>subsection (c)</u> of this <u>Section 21</u>, each of the Obligors is accepting joint and several liability hereunder, in consideration of the financial accommodation to be provided by the holders of the Obligations, of each of the Obligors and in consideration of the undertakings of each of the Obligors to accept joint and several liability for the obligations of each of them.

(b)    Subject to <u>subsection (c)</u> of this <u>Section 21</u>, each of the Obligors jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Obligors with respect to the payment and performance of all of the Secured

Obligations arising under this Agreement, the other Loan Documents and any other documents relating to the Secured Obligations, it being the intention of the parties hereto that all the Secured Obligations shall be the joint and several obligations of each of the Obligors without preferences or distinction among them.

(c)     Notwithstanding any provision to the contrary contained herein, in any other of the Loan Documents or in any other documents relating to the Secured Obligations, the obligations of each Guarantor under the Credit Agreement, the other Loan Documents and the other documents relating to the Secured Obligations shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provisions of any other Debtor Relief Law.

22.     <u>Consent of Issuers of Pledged Equity</u>.  Each issuer of Pledged Equity party to this Agreement hereby acknowledges, consents and agrees to the grant of the security interests in such Pledged Equity by the applicable Obligors pursuant to this Agreement, together with all rights accompanying such security interest as provided by this Agreement and applicable Laws, notwithstanding any anti-assignment provisions in any operating agreement, limited partnership agreement or similar organizational or governance documents of such issuer.

Each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

OBLIGOR:

**TIJUANA FLATS RESTAURANTS, LLC,**
a Florida limited liability company

By: _____
Louie Psallidas
Chief Financial Officer

**TJ FLATS HOLDINGS, LLC,**
a Delaware limited liability company

By: _____
Louie Psallidas
Chief Financial Officer

[signature page continues]

OBLIGOR:

| | | |
|---|---|---|
| TJF Franchise Group, LLC | Tijuana Flats #153 LLC | Tijuana Flats #224, LLC |
| Tijuana Flats Burrito Company, LLC | Tijuana Flats #154, LLC | Tijuana Flats #225, LLC |
| Tijuana Flats, LLC | Tijuana Flats #155, LLC | Tijuana Flats #227, LLC |
| Flats 1, LLC | Tijuana Flats #156 LLC | Tijuana Flats #230, LLC |
| Flats II, LLC | Tijuana Flats #157, LLC | Tijuana Flats #231, LLC |
| Flats III, LLC | Tijuana Flats #159, LLC | Tijuana Flats #232, LLC |
| Flats V, LLC | Tijuana Flats #160, LLC | Tijuana Flats #233, LLC |
| Flats IV, LLC | Tijuana Flats #161, LLC | Tijuana Flats #234, LLC |
| Tijuana Flats #109, LLC | Tijuana Flats #162, LLC | Tijuana Flats #236, LLC |
| Tijuana Flats #111, LLC | Tijuana Flats #163, LLC | Tijuana Flats #237, LLC |
| Tijuana Flats #112, LLC | Tijuana Flats #164, LLC | Tijuana Flats #238, LLC |
| Tijuana Flats #113, LLC | Tijuana Flats #165, LLC | Tijuana Flats #239, LLC |
| Tijuana Flats #114, LLC | Tijuana Flats #166, LLC | Tijuana Flats #240, LLC |
| Tijuana Flats #117, LLC | Tijuana Flats #167, LLC | Tijuana Flats #241, LLC |
| Tijuana Flats #119, LLC | Tijuana Flats #168, LLC | Tijuana Flats #242, LLC |
| Tijuana Flats #120, LLC | Tijuana Flats #169, LLC | Tijuana Flats #243, LLC |
| Tijuana Flats #121, LLC | Tijuana Flats #170 LLC | Tijuana Flats #244, LLC |
| Tijuana Flats #122, LLC | Tijuana Flats #171 LLC | Tijuana Flats #245, LLC |
| Tijuana Flats #126, LLC | Tijuana Flats 172, LLC | Tijuana Flats #246, LLC |
| Tijuana Flats #127, LLC | Tijuana Flats #173, LLC | Tijuana Flats #247, LLC |
| Tijuana Flats #128, LLC | Tijuana Flats #175, LLC | Tijuana Flats #249, LLC |
| Tijuana Flats #129, LLC | Tijuana Flats #176 LLC | Tijuana Flats #250, LLC |
| Tijuana Flats #130, LLC | Tijuana Flats #177 LLC | Tijuana Flats #251, LLC |
| Tijuana Flats #131, LLC | Tijuana Flats #179, LLC | Tijuana Flats #253, LLC |
| Tijuana Flats #133, LLC | Tijuana Flats #180 LLC | Tijuana Flats #255, LLC |
| Tijuana Flats #134, LLC | Tijuana Flats #181, LLC | Tijuana Flats #257, LLC |
| Tijuana Flats #135, LLC | Tijuana Flats #182 LLC | Tijuana Flats #258, LLC |
| Tijuana Flats #136, LLC | Tijuana Flats #183, LLC | Tijuana Flats #259, LLC |
| Tijuana Flats #138 LLC | Tijuana Flats #184 LLC | Tijuana Flats #260, LLC |
| Tijuana Flats #139, LLC | Tijuana Flats #186 LLC | Tijuana Flats #261, LLC |
| Tijuana Flats #140, LLC | Tijuana Flats #187, LLC | Tijuana Flats #273, LLC |
| Tijuana Flats #141, LLC | Tijuana Flats #188, LLC | Tijuana Flats #274, LLC |
| Tijuana Flats #142 LLC | Tijuana Flats #190, LLC | Tijuana Flats #275, LLC |
| Tijuana Flats #143, LLC | Tijuana Flats #193, LLC | Tijuana Flats #276, LLC |
| Tijuana Flats #146, LLC | Tijuana Flats #194, LLC | Tijuana Flats #277, LLC |
| Tijuana Flats #147, LLC | Tijuana Flats #196, LLC | Tijuana Flats #145, LLC |
| Tijuana Flats #148, LLC | Tijuana Flats #198, LLC | Tijuana Flats #185, LLC |
| Tijuana Flats #150, LLC | Tijuana Flats #221, LLC | Tijuana Flats #228, LLC |
| Tijuana Flats #151, LLC | Tijuana Flats #222, LLC | Tijuana Flats #248, LLC |
| Tijuana Flats #152, LLC | Tijuana Flats #223, LLC | |

Each a Florida liability company

By: _____
     Louie Psallidas
     Chief Financial Officer

Accepted and agreed to as of the date first written above.

TRUIST BANK, as Lender

By: _____

Name:  Eric Sebille
Title:  Senior Vice President

**<u>SCHEDULE 1</u>**

**PLEDGED EQUITY**

| Obligor | Name of Subsidiary | Number of Shares/Units | Certificate Number | Percentage Ownership | Percentage Pledged |
|---|---|---|---|---|---|
| TJ FLATS HOLDINGS, LLC | TIJUANA FLATS RESTAURANTS, LLC | 1,000 Units | 2 | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TJF Franchise Group, LLC | 1,000 Units | 5 | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS BURRITO COMPANY, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Flats 1, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | FLATS II, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | FLATS III, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | FLATS V, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | FLATS IV, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #109, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #111, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #112, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #113, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #114, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #117, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #119, LLC | 100% membership interest | N/A | 100% | 100% |

| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #120, LLC | 100% membership interest | N/A | 100% | 100% |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #121, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #122, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #126, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #127, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #128, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #129, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #130, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #131, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #133, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #134, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #135, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #136, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #138, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #139, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #140, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #141, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #142 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #143, LLC | 100% membership interest | N/A | 100% | 100% |

| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #145, LLC | 100% membership interest | N/A | 100% | 100% |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #146, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #147, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #148, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #150, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #151, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #152, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #153 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #154, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #155, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #156, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #157, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #159, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #160, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #161, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #162, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #163, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #164, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #165, LLC | 100% membership interest | N/A | 100% | 100% |

| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #166, LLC | 100% membership interest | N/A | 100% | 100% |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #167, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #168, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #169, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #170 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #171 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS 172, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #173, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #175, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #176 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #177 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #179, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #180 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #181, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #182 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #183, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #184 LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #185, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #186 LLC | 100% membership interest | N/A | 100% | 100% |

| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #187, LLC | 100% membership interest | N/A | 100% | 100% |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #188, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #190, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #193, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #194, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #196, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #198, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #221, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #222, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #223, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #224, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #225, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #227, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #228, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #230, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #231, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #232, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #233, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #234, LLC | 100% membership interest | N/A | 100% | 100% |

| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #236, LLC | 100% membership interest | N/A | 100% | 100% |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #237, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #238, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #239, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #240, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #241, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #242, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #243, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #244, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #245, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #246, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #247, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #248, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #249, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #250, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #251, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #253, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats #255, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #257, LLC | 100% membership interest | N/A | 100% | 100% |

| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #258, LLC | 100% membership interest | N/A | 100% | 100% |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #259, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #260, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #261, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #273, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #274, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #275, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #276, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #277, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #278, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #279, LLC | 100% membership interest | N/A | 100% | 100% |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS #280, LLC | 100% membership interest | N/A | 100% | 100% |

## SCHEDULE 2

### COMMERCIAL TORT CLAIMS

None.

## SCHEDULE 3

## COPYRIGHTS, PATENTS AND TRADEMARKS

Patents: None.

Patent Licenses: None.

Trademarks:

| Credit Party Owner | Trademark Name | Application Number | Registration Number | App. Date/Filing Date | Reg. Date/Issue Date |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | SMACK WINGS | 90819716 | N/A | 7/9/2021 | N/A |
| TIJUANA FLATS RESTAURANTS, LLC | Flat Outrageous | 86939323 | 5172905 | 3/14/2016 | 3/28/2017 |
| TIJUANA FLATS RESTAURANTS, LLC | FLATS LIFE | 90736474 | N/A | 5/26/2021 | N/A |
| TIJUANA FLATS RESTAURANTS, LLC | GIVE HEAT A CHANCE | 76322589 | 2731322 | 10/5/2001 | 7/1/2003 |
| TIJUANA FLATS RESTAURANTS, LLC | MAKE IT WET | 78216358 | 2806702 | 2/19/2003 | 1/20/2004 |
| TIJUANA FLATS RESTAURANTS, LLC | LET US ROLL YOU A FAT ONE | 78220724 | 2830046 | 3/3/2003 | 4/6/2004 |
| TIJUANA FLATS RESTAURANTS, LLC | CHET'S GONE MAD | 78781792 | 3205474 | 12/28/2005 | 2/6/2007 |
| TIJUANA FLATS RESTAURANTS, LLC | DEATH TO TINY TACOS | 87923582 | 5642876 | 5/16/2018 | 1/1/2019 |
| TIJUANA FLATS RESTAURANTS, LLC | DON'T BE A CHICKEN SHIT! HOTSAUCE | 87511242 | 5987153 | 6/29/2017 | 2/18/2020 |
| TIJUANA FLATS RESTAURANTS, LLC | FLATHEAD | 88506484 | 6105242 | 6/9/2019 | 7/21/2020 |
| TIJUANA FLATS RESTAURANTS, LLC | Flat Outrageous | 86939323 | 5172905 | 08/08/2016 | 03/28/2017 |
| TIJUANA FLATS RESTAURANTS, LLC | GIVE HEAT A CHANCE | 76322589 | 2731322 | 10/05/2001 | 07/01/2003 |
| TIJUANA FLATS RESTAURANTS, LLC | GOING POSTAL | 77810270 | 3771052 | 08/21/2009 | 04/06/2010 |

| Credit Party Owner | Trademark Name | Application Number | Registration Number | App. Date/Filing Date | Reg. Date/Issue Date |
|---|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | HOT BAR | 85895184 | 4550208 | 04/04/2013 | 04/01/2014 |
| TIJUANA FLATS RESTAURANTS, LLC | HOT IS THE NEW COOL | 78546868 | 3041685 | 01/13/2005 | 10/18/2005 |
| TIJUANA FLATS RESTAURANTS, LLC | Keepin' it Fresh! | 85395184 | 4121439 | 08/11/2011 | 04/03/2012 |
| TIJUANA FLATS RESTAURANTS, LLC | LET US ROLL YOU A FAT ONE | 78220724 | 2830046 | 03/03/2003 | 04/06/2004 |
| TIJUANA FLATS RESTAURANTS, LLC | MAKE IT A POWER LITE | 78438405 | 2970669 | 06/21/2004 | 07/19/2005 |
| TIJUANA FLATS RESTAURANTS, LLC | MAKE IT MEGA | 87923541 | 5642872 | 05/16/2018 | 01/01/2019 |
| TIJUANA FLATS RESTAURANTS, LLC | MEGAJUANA | 87923500 | 5708016 | 05/16/2018 | 03/26/2019 |
| TIJUANA FLATS RESTAURANTS, LLC | MAKE IT WET | 78216358 | 2806702 | 02/19/2003 | 01/20/2004 |
| TIJUANA FLATS RESTAURANTS, LLC | ROCK OUT WITH YOUR GUACOUT | 78749332 | 3180290 | 11/08/2005 | 12/05/2006 |
| TIJUANA FLATS RESTAURANTS, LLC | SMACK MY ASS & CALL MESALLY (and Design) | 75113219 | 2131823 | 06/03/1996 | 01/27/1998 |
| TIJUANA FLATS RESTAURANTS, LLC | SMACK PACK | 78749380 | 3196261 | 11/8/2005 | 01/09/2007 |
| TIJUANA FLATS RESTAURANTS, LLC | THAT'S HOW WE ROLL... | 78859771 | 3292167 | 04/12/2006 | 09/11/2007 |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS TEX-MEX FOR ALL | 88705397 | 6111985 | 11/25/2019 | 07/28/2020 |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA BANGIN' CHICKEN BURRITO | 77864693 | 3781206 | 11/04/2009 | 04/27/2010 |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS | 78557933 | 3054614 | 02/01/2005 | 01/31/2006 |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS (and | 78545373 | 3062951 | 01/11/2005 | 02/28/2006 |

| Credit Party Owner | Trademark Name | Application Number | Registration Number | App. Date/Filing Date | Reg. Date/Issue Date |
|---|---|---|---|---|---|
| | Design) | | | | |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS BURRITO CO. | 77125581 | 3368001 | 03/08/2007 | 01/15/2008 |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA FLATS HOT (and Design) | 78669354 | 3173521 | 07/13/2005 | 11/21/2006 |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats Tex-Mex and design | 86826146 | 5039492 | 11/19/2015 | 09/13/2016 |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANATRIO | 85450703 | 4146710 | 10/19/2011 | 05/22/2012 |
| TIJUANA FLATS RESTAURANTS, LLC | TIJUANA TUESDAZE | 86058018 | 4542570 | 11/06/2013 | 07/03/2014 |
| TIJUANA FLATS RESTAURANTS, LLC | WELCOME TO OUR WORLD | 78545414 | 3050299 | 1/11/2005 | 01/24/2006 |
| TIJUANA FLATS RESTAURANTS, LLC | WHO SAYS SIZE DOESN'T MATTER | 78216377 | 2994160 | 02/19/2003 | 09/13/2005 |

Trademark Licenses: Trademarks licensed pursuant to Franchise Agreements.

Copyrights:

| Credit Party Owner | Copyright Title | Registration Number | Registration Date |
|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats Burrito Company menu hot sauce catalog & news. | VA0001105437 | 11/06/2001 |
| TIJUANA FLATS RESTAURANTS, LLC | Tijuana Flats Menu. | TX0007172806 | 01/19/2010 |
| TIJUANA FLATS BURRITO COMPANY, LLC | Tijuana Flats 2010 Manifesto. | VA0001730083 | 07/13/2010 |
| TIJUANA FLATS BURRITO COMPANY, LLC | Tijuana Flats Burrito Co.menu. | TX0006444376 | 07/24/2006 |

Copyright Licenses: Copyrights licensed pursuant to Franchise Agreements.

EXHIBIT 4(a)

IRREVOCABLE [STOCK][UNIT] POWER

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to:

_____

the following equity interests of _____, a _____ [corporation][limited liability company]:

No. of [Shares][Units] _____    Certificate No. _____

and irrevocably appoints _____ its agent and attorney-in-fact to transfer all or any part of such equity interests and to take all necessary and appropriate action to effect any such transfer.  The agent and attorney-in-fact may substitute and appoint one or more persons to act for him.

Dated: _____, 20___

_____

By:_____
Name:
Title:

EXHIBIT 4(b)(i)

NOTICE

OF

GRANT OF SECURITY INTEREST

IN

COPYRIGHTS

United States Copyright Office

Ladies and Gentlemen:

Please be advised that pursuant to the Security and Pledge Agreement, dated as of March [●], 2022 (as the same may be amended, modified, extended or restated from time to time, the "Agreement") by and among the Obligors party thereto (each an "Obligor" and collectively, the "Obligors"), and Truist Bank, as Lender (the "Lender") for the holders of the Secured Obligations referenced therein, the undersigned Obligor has granted a continuing security interest in, and a right to set off against, any and all right, title and interest of such Obligor in and to the registered copyrights set forth on Schedule 1 hereto to the Lender for the ratable benefit of the holders of the Secured Obligations.

The undersigned Obligor and the Lender, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest in the foregoing copyrights (i) may only be terminated in accordance with the terms of the Agreement and (ii) is not to be construed as an assignment of any copyright.

Very truly yours,

_____
[Obligor]

By:_____
Name:
Title:

[Address]

Acknowledged and Accepted:

TRUIST BANK, as Lender

By:_____
Name:
Title:


Truist Bank
333 S. Garland Avenue, 17th Floor
Orlando, FL 32801
Attention:
Telecopy Number:

EXHIBIT 4(b)(ii)

NOTICE

OF

GRANT OF SECURITY INTEREST

IN

PATENTS

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that pursuant to the Security and Pledge Agreement, dated as of March [●], 2022 (as the same may be amended, modified, extended or restated from time to time, the "Agreement") by and among the Obligors party thereto (each an "Obligor" and collectively, the "Obligors"), and Truist Bank, as Lender (the "Lender") for the holders of the Secured Obligations referenced therein, the undersigned Obligor has granted a continuing security interest in, and a right to set off against, any and all right, title and interest of such Obligor in and to the patents set forth on Schedule 1 hereto to the Lender for the ratable benefit of the holders of the Secured Obligations.

The undersigned Obligor and the Lender, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest in the foregoing patents (i) may only be terminated in accordance with the terms of the Agreement and (ii) is not to be construed as an assignment of any patent.

Very truly yours,

_____
[Obligor]

By:_____
Name:
Title:

[Address]

Acknowledged and Accepted:

TRUIST BANK, as Lender

By:_____
Name:
Title:

Truist Bank
333 S. Garland Avenue, 17th Floor
Orlando, FL 32801
Attention:
Telecopy Number:

EXHIBIT 4(b)(iii)

NOTICE

OF

GRANT OF SECURITY INTEREST

IN

TRADEMARKS

United States Patent and Trademark Office

Ladies and Gentlemen:

      Please be advised that pursuant to the Security and Pledge Agreement, dated as of March [●], 2022 (as the same may be amended, modified, extended or restated from time to time, the "Agreement") by and among the Obligors party thereto (each an "Obligor" and collectively, the "Obligors"), and Truist Bank, as Lender (the "Lender") for the holders of the Secured Obligations referenced therein, the undersigned Obligor has granted a continuing security interest in, and a right to set off against, any and all right, title and interest of such Obligor in and to the trademarks set forth on Schedule 1 hereto to the Lender for the ratable benefit of the holders of the Secured Obligations.

      The undersigned Obligor and the Lender, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest in the foregoing trademarks (i) may only be terminated in accordance with the terms of the Agreement and (ii) is not to be construed as an assignment of any trademark.

Very truly yours,

_____
[Obligor]

By:_____
Name:
Title:

[Address]

Acknowledged and Accepted:

TRUIST BANK, as Lender

By:_____
Name:
Title:

Truist Bank
333 S. Garland Avenue, 17th Floor
Orlando, FL 32801
Attention:
Telecopy Number:

# EXHIBIT "B"

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Brett Weber - (704) 331-1000 - brettweber@mvalaw.com

**B. Email Address**

**C. SEND ACKNOWLEDGEMENT TO:**
Name    Moore & Van Allen PLLC

Address  100 N. Tryon Street

Address  Suite 4700

City/State/Zip  Charlotte, NC 28202

FLORIDA SECURED TRANSACTION REGISTRY

FILED

2022 Mar 04 03:45 PM

****** 202200713272 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

---

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1.a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1.c MAILING ADDRESS Line One | This space not available. | | | |
| 2300 Mailland Center Parkway, Suite #306 | | | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |
| | Maitland | | FL | 32751 | USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2.a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2.c MAILING ADDRESS Line One | This space not available. | | | |
| | | | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |
| | | | | | |

**3. SECURED PARTY'S NAME  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)**

| 3.a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TRUIST BANK | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3.c MAILING ADDRESS Line One | This space not available. | | | |
| 333 S. Garland Avenue, 17th Floor | | | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |
| | Orlando | | FL | 32801 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets.

---

**5. ALTERNATE DESIGNATION (if applicable)** ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR
☐ AG LIEN  ☐ NON-UCC FILING  ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**
☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

*6P*

---

STANDARD FORM - FORM UCC-1 (REV.05/2013)        Filing Office Copy        Approved by the Secretary of State, State of Florida

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**   9418 - BB & T - MASTER

FILED

2022 Dec 19 12:39 PM

****** 202203960491 ******

Lien Solutions                    90448793
P.O. Box 29071
Glendale, CA  91209-9071          FLFL

File with: Department of State, FL

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
202200713272  3/4/2022  SS FL

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                                     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☒ **COLLATERAL CHANGE:** Also check one of these four boxes: ☒ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:
All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); together with, all insurance policies and refunds, all good will, all records and data and embedded software,  all equipment, inventory and software to utilize, create, maintain and process any

☐ All documentary stamps due and payable
or to become due and payable pursuant to s. 201.22,F.S. have been paid

☒ Florida documentary stamp tax is not required

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Truist Bank | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: TIJUANA FLATS RESTAURANTS, LLC
90448793          8560171                                    Commercial

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as Item 1a on Amendment form

202200713272  3/4/2022  SS FL

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as Item 9 on Amendment form

| 12a. ORGANIZATION'S NAME | |
|---|---|
| Truist Bank | |

OR

| 12b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| | FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction Item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| 13a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TIJUANA FLATS RESTAURANTS, LLC | | | |

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

Debtor Name and Address:
TIJUANA FLATS RESTAURANTS, LLC - 2300 Maitland Center Parkway, Suite #306 , Mailand, FL 32751

Secured Party Name and Address:
Truist Bank - P O Box 1626 , Wilson, NC 27894-9961

records and data on electronic media, and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired and wherever located; and all accessions, additions, substitutions, replacements, products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing.

15. This FINANCING STATEMENT AMENDMENT:

  ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in Item 17
(if Debtor does not have a record interest):

17. Description of real estate:

18. MISCELLANEOUS: 90448793-FL-0   9418 - BB & T - MASTER NC          Truist Bank          File with: Department of State, FL     5560171   Commercial

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
LAUREN MERTINS; 9042327200

**B. Email** LMERTINS@BURR.COM

**C. SEND ACKNOWLEDGEMENT TO:**
Name
Address
Address
City/State/Zip

Florida Secured Transaction Registry

# FILED

2024 Mar 28 07:44 AM

********* 202400806029 *********

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|---|
| 202200713272 | | |

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME TIJUANA FLATS RESTAURANTS, LLC | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME TRUIST BANK | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**4.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** ☑ **ASSIGNMENT** ☑ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and give name of assignor in item 11.

**7.** ☐ **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.
☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.   ☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.   ☐ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME TRUIST BANK | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9a. ORGANIZATION'S NAME LSC2022, LLC | | | | |
|---|---|---|---|---|
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 9c. MAILING ADDRESS Line One 16130 VENTURA BLVD., SUITE 250 | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY ENCINO | STATE CA | POSTAL CODE 91436 | COUNTRY USA |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral   ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA**

STANDARD FORM - FORM UCC-3 (REV.08/2018)          Filing Office Copy          Approved by the Secretary of State, State of Florida

# EXHIBIT "C"

## AMENDMENT TO
## LOAN DOCUMENTS

This Amendment to Loan Documents (the "Agreement") is made and entered into as of the _16th_ day of May, 2023, by and among TIJUANA FLATS RESTAURANTS, LLC, a Florida limited liability company ("Borrower"), TJ FLATS HOLDINGS, LLC, a Delaware limited liability company ("Holdings"), and the other Guarantors identified in the Schedule attached hereto (collectively, "Additional Guarantors"), all collectively referred to as the "Loan Parties", and TRUIST BANK, a North Carolina banking corporation, as the lender ("Lender").

### R E C I T A L S:

A.    Lender previously advanced (i) a revolving credit facility loan in the amount of $1,000,000.00 (the "Revolving Loan"), and (ii) a term loan in the amount of $20,000,000.00 (the "Term Loan") (the Revolving Loan and the Term Loan are collectively referred to as the "Loan") to Borrower, as evidenced by that certain Credit Agreement dated March 4, 2022 (the "Credit Agreement").

B.    The Loan Parties and Lender also previously entered into that certain Security and Pledge Agreement dated March 4, 2022 (the "Security Agreement"); and

C.    The Credit Agreement, the Security Agreement and all other documents evidencing the Loan shall be collectively referred to herein as the "Loan Documents".

D.    The Loan Parties have requested, and Lender has agreed to modify certain terms set forth in the Loan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Loan Parties and Lender agree to amend the Loan Documents as hereinafter set forth.

1.    The above recitals are true and correct and incorporated by reference herein. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Credit Agreement.

2.    The Loan Parties have failed to comply with the covenants related to (i) the required Consolidated Fixed Charge Coverage Ratio for the period ending December 31, 2022 pursuant to the provisions of Section 6.1 of the Credit Agreement, and (ii) the required Consolidated Lease-Adjusted Leverage Ratio for the period ending December 31, 2022 pursuant to the provisions of Section 6.2 of the Credit Agreement (collectively, the "December 2022 Covenant Breach"). Lender has elected to waive the December 2022 Covenant Breach. In extending such courtesies, Lender has not intended to waive or otherwise modify any term of the Loan Documents or agree to any future waiver of the Loan Parties' failure to comply with the terms and conditions of the Loan Documents with the exception that Lender's election to waive these violations and not to pursue remedies otherwise available to us as a result of these violations is expressly limited to the December 2022 Covenant Breach and shall not operate as a waiver of any other default or of the same default in the future.

- 1 -

3.    Simultaneous with the execution of this Agreement, Borrower shall deliver to Lender funds in the amount of $1,200,000.00 to create a Borrower reserve account with Lender (the "Reserve Account"). The Reserve Account shall be a non-interest bearing account and Borrower shall have no access to such account, subject to the terms of this Section 3. In the event the Loan Parties default upon their obligations under the any Loan Document, the Lender shall have the right, but not the obligation, to apply any of the proceeds in the Reserve Account to any amounts outstanding under the Loan Documents, including principal, at the Lender's sole and absolute discretion.

Provided there is no Event of Default by the Loan Parties under any Loan Document at such time nor any event or condition which with the passage of time or giving of notice, or both, would constitute an Event of Default under any Loan Document (which have not been cured or otherwise waived by the Lender in this Amendment), Lender hereby agrees to release any "hold" on the Reserve Account and Borrower may have full access and control with respect to the Reserve Account upon Lender's verification, in Lender's sole and absolute discretion, that the Loan Parties have complied with each and every financial covenant requirement set forth in Article VI of the Credit Agreement for two (2) consecutive fiscal quarter periods beginning no earlier than fiscal quarter ending September 30, 2023 (collectively, the "Release Conditions"). Borrower may request Lender to provide written confirmation of Lender's acknowledgement of Borrower's compliance with the foregoing Release Conditions.

4.    The Loan Parties hereby acknowledge and agree that Borrower shall have no right to receive any advance of funds under the Revolving Loan until such time as the Release Conditions have been satisfied.

5.    With regard to the Liquidity requirements set forth in Section 6.4 of the Credit Agreement, the Lender hereby acknowledges and agrees that at all times funds on deposit in the Reserve Account shall be deemed Borrower Liquidity.

6.    The (i) Consolidated Fixed Charge Coverage Ratio required pursuant to the provisions of Section 6.1 of the Credit Agreement, and (ii) the required Consolidated Lease-Adjusted Leverage Ratio required pursuant to the provisions of Section 6.2 of the Credit Agreement shall not be tested by Lender for the fiscal quarters ending (i) March 31, 2023, (ii) June 30, 2023 and (iii) September 30, 2023.

7.    The Loan Parties warrant and represent that, as of the date hereof, they have no defenses, claims or rights of offset to enforcement of the Loan Documents, including no defenses or counterclaims to repossession or foreclosure of Lender's security interest in all of the collateral described in the Security Agreement, and the Loan Parties hereby expressly waive and release any defenses, claims, rights of offsets, and counterclaims, known or unknown, which the Loan Parties purport to have or may have. The Loan Parties acknowledge and agree that Lender has fully complied with the terms and conditions of the Loan Documents.

8.    Except as modified herein, the Loan Documents shall remain in full force and effect in accordance with its terms. The parties hereby agree that an executed facsimile or pdf copy of this Agreement may be transmitted to either party and be deemed an original for purposes hereof.

- 2 -



9.      The Loan Parties and Lender acknowledge and agree that this Agreement shall not constitute a novation of the indebtedness evidenced by the Loan Documents, and further that the terms and provisions the Loan Documents shall remain valid and in full force and effect except as may be hereinabove modified and amended.

10.     Section 10.6 of the Credit Agreement is incorporated herein by reference, *mutatis mutandis,* as if fully set forth herein.[1]

---

[1] NTD: the prior waiver provision differed from the language in the credit agreement so we have revised to simply incorporate the wavier of jury trial provision from the credit agreement.

50826126 v1



**IN WITNESS WHEREOF,** the Borrower hereto has caused this Agreement to be duly executed by its authorized officer as of the day and year first above written.

**TIJUANA FLATS RESTAURANTS, LLC,**
a Florida limited liability company

By: _____, CFO
David A. Pearl
Chief Financial Officer

**IN WITNESS WHEREOF**, the following Loan Party and Guarantor has caused this Agreement to be duly executed by its authorized officer as of the day and year first above written.

**TJ FLATS HOLDINGS, LLC,** a Delaware limited liability company

By: _____

David A. Pearl
Chief Financial Officer

- 5 -

**IN WITNESS WHEREOF,** each other Loan Party hereto has caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**GUARANTORS,** each, a Florida limited liability company, as Guarantors

| | | |
|---|---|---|
| TJF Franchise Group, LLC | Tijuana Flats #153, LLC | Tijuana Flats #224, LLC |
| Tijuana Flats Burrito Company, LLC | Tijuana Flats #154, LLC | Tijuana Flats #225, LLC |
| Tijuana Flats, LLC | Tijuana Flats #155, LLC | Tijuana Flats #227, LLC |
| Flats I, LLC | Tijuana Flats #156, LLC | Tijuana Flats #230, LLC |
| Flats II, LLC | Tijuana Flats #157, LLC | Tijuana Flats #231, LLC |
| Flats III, LLC | Tijuana Flats #159, LLC | Tijuana Flats #232, LLC |
| Flats V, LLC | Tijuana Flats #160, LLC | Tijuana Flats #233, LLC |
| Flats IV, LLC | Tijuana Flats #161, LLC | Tijuana Flats #234, LLC |
| Tijuana Flats #109, LLC | Tijuana Flats #162, LLC | Tijuana Flats #236, LLC |
| Tijuana Flats #111, LLC | Tijuana Flats #163, LLC | Tijuana Flats #237, LLC |
| Tijuana Flats #112, LLC | Tijuana Flats #164, LLC | Tijuana Flats #238, LLC |
| Tijuana Flats #113, LLC | Tijuana Flats #165, LLC | Tijuana Flats #239, LLC |
| Tijuana Flats #114, LLC | Tijuana Flats #166, LLC | Tijuana Flats #240, LLC |
| Tijuana Flats #117, LLC | Tijuana Flats #167, LLC | Tijuana Flats #241, LLC |
| Tijuana Flats #119, LLC | Tijuana Flats #168, LLC | Tijuana Flats #242, LLC |
| Tijuana Flats #120, LLC | Tijuana Flats #169, LLC | Tijuana Flats #243, LLC |
| Tijuana Flats #121, LLC | Tijuana Flats #170 LLC | Tijuana Flats #244, LLC |
| Tijuana Flats #122, LLC | Tijuana Flats #171 LLC | Tijuana Flats #245, LLC |
| Tijuana Flats #126, LLC | Tijuana Flats #172, LLC | Tijuana Flats #246, LLC |
| Tijuana Flats #127, LLC | Tijuana Flats #173, LLC | Tijuana Flats #247, LLC |
| Tijuana Flats #128, LLC | Tijuana Flats #175, LLC | Tijuana Flats #249, LLC |
| Tijuana Flats #129, LLC | Tijuana Flats #176 LLC | Tijuana Flats #250, LLC |
| Tijuana Flats #130, LLC | Tijuana Flats #177 LLC | Tijuana Flats #251, LLC |
| Tijuana Flats #131, LLC | Tijuana Flats #179, LLC | Tijuana Flats #253, LLC |
| Tijuana Flats #133. LLC | Tijuana Flats #180, LLC | Tijuana Flats #255, LLC |
| Tijuana Flats #134, LLC | Tijuana Flats #181, LLC | Tijuana Flats #257, LLC |
| Tijuana Flats #135, LLC | Tijuana Plats #182, LLC | Tijuana Flats #258, LLC |
| Tijuana Flats #136, LLC | Tijuana Flats #183, LLC | Tijuana Plats #259, LLC |
| Tijuana Flats #138 LLC | Tijuana Flats #184, LLC | Tijuana Flats #260, LLC |
| Tijuana Flats #139, LLC | Tijuana Flats #186, LLC | Tijuana Flats #261, LLC |
| Tijuana Flats #140, LLC | Tijuana Flats #187, LLC | Tijuana Flats #273, LLC |
| Tijuana Flats #141, LLC | Tijuana Flats #188, LLC | Tijuana Flats #274, LLC |
| Tijuana Flats #142 LLC | Tijuana Flats #190, LLC | Tijuana Flats #275, LLC |
| Tijuana Flats #143, LLC | Tijuana Flats #193, LLC | Tijuana Flats #276, LLC |
| Tijuana Flats #146, LLC | Tijuana Flats #194, LLC | Tijuana Flats #277, LLC |
| Tijuana Flats #147, LLC | Tijuana Flats #196, LLC | Tijuana Flats #145, LLC |
| Tijuana Flats #148, LLC | Tijuana Flats #198, LLC | Tijuana Flats #185, LLC |
| Tijuana Flats #150, LLC | Tijuana Flats #221, LLC | Tijuana Flats #228, LLC |
| Tijuana Flats #151, LLC | Tijuana Flats #222, LLC | Tijuana Flats #248, LLC |
| Tijuana Flats #152, LLC | Tijuana Flats #223, LLC | |

- 6 -

By: _____ , CFO
David A. Pearl
Chief Financial Officer

**IN WITNESS WHEREOF,** the Lender has caused this Agreement to be duly executed by its authorized officer as of the day and year first above written.

**TRUIST BANK**
as the Lender

By: _____

Name: Kimberly A Jones

Its: Senior Vice President

50826126 v1

# EXHIBIT "D"

**Tijuana Flats**
13-Week Cash Forecast

| | | 1 Week End 4/26/24 | 2 Week End 5/3/24 | 3 Week End 5/10/24 | 4 Week End 5/17/24 | 5 Week End 5/24/24 | 6 Week End 5/31/24 | 7 Week End 6/7/24 | 8 Week End 6/14/24 | 9 Week End 6/21/24 | 10 Week End 6/28/24 | 11 Week End 7/5/24 | 12 Week End 7/12/24 | 13 Week End 7/19/24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Cash Balance 4/19/24 | 405,066 | | | | | | | | | | | | | |
| # of Locations | | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| Total Net Inflows | | 1,928,233 | 1,872,384 | 2,530,190 | 1,849,476 | 1,804,459 | 1,572,436 | 1,799,763 | 1,753,433 | 1,773,647 | 1,774,748 | 1,430,162 | 1,765,519 | 1,780,612 |
| | | | | | | | | | | | | | | |
| Payroll | | (580,000) | (901,467) | (701,947) | (884,358) | (685,023) | (678,081) | (664,440) | (594,130) | (663,017) | (648,977) | (655,103) | (655,436) | (551,016) |
| Food/Beverage | | (559,188) | (542,991) | (733,755) | (536,348) | (523,293) | (456,006) | (521,931) | (508,496) | (514,358) | (514,677) | (414,747) | (512,001) | (516,377) |
| Insurance | | (83,077) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) | (61,724) |
| CC Fees, Bank Fees & Amex | | | (156,250) | (72,050) | | | | (188,100) | | | | (188,100) | | |
| Utilities | | (44,000) | (44,000) | (35,269) | (35,269) | (35,269) | (35,269) | (35,269) | (111,681) | (35,269) | (35,269) | (35,269) | (35,269) | (111,681) |
| Total Planned AP | | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) | (186,999) |
| Total Planned Rent | | | | | | | | (597,883) | | | | (597,883) | | |
| Sales Tax | | (80,316) | | | | (489,283) | | | | (480,454) | | | | |
| All Other | | | | | | | | | | | | | | |
| Additional Payments: | | | | | | | | | | | | | | |
| Legal - Employment/general | | | | | | | | (30,000) | | | | (90,000) | | |
| Noticing agent | | | | | | (10,000) | | | | | (10,000) | | | |
| TM | | | | | | | | (45,000) | | | | (45,000) | | |
| US Trustee Fees | | | | | | | | | | | | | | (150,000) |
| Insurance | | | | | | | | | | | | | | |
| Past-Due AP | | | | | | | | | | | | | | |
| Term Loan Principal | | | | | | | | | | | | | | |
| Term Loan Interest | | | | | | | | | | | | | | |
| Total Outflows | | (1,533,580) | (1,893,432) | (1,791,744) | (1,704,698) | (1,991,591) | (1,418,080) | (2,331,346) | (1,463,029) | (1,941,821) | (1,457,646) | (2,274,825) | (1,451,429) | (1,577,798) |
| Change in Cash | | 394,654 | (21,048) | 738,446 | 144,778 | (187,132) | 154,356 | (531,583) | 290,404 | (168,174) | 317,102 | (844,662) | 314,090 | 202,814 |
| Ending Balance | | 799,720 | 778,672 | 1,517,118 | 1,661,896 | 1,474,764 | 1,629,121 | 1,097,538 | 1,387,942 | 1,219,768 | 1,536,870 | 692,207 | 1,006,298 | 1,209,112 |

# EXHIBIT "E"

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**<u>JACKSONVILLE DIVISION</u>**

In re                                                    )

TIJUANA FLATS RESTAURANTS,             )      Case No.: 3:24-bk-1128-BAJ
LLC, a Florida limited liability company,[1]

                                                          )

          Debtor.                                    )      Chapter 11

_____     )

**ORDER AUTHORIZING THE DEBTOR'S USE**
**<u>OF CASH COLLATERAL ON AN INTERIM BASIS</u>**

          This Chapter 11 case came before the Court upon the motion filed by debtor,

Tijuana Flats Restaurants, LLC for itself and its subsidiary, Tijuana Flats #176, LLC

("Debtor"), seeking the entry of interim and final orders, pursuant to §§ 105(a), 361,

363(c), 503(b) and 507 of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

authorizing the Debtor to utilize the cash collateral of it secured creditor, LSC 2022, LLC

("LSC 2022").  A preliminary hearing on the motion was held April _____, 2024.  Upon

consideration of the motion, it is ORDERED:

---

[1]  The Federal Employer Identification Number of the Debtor is 47-4472442.  The principal address of the
Debtor is 2300 Maitland Center Parkway, Suite 306, Maitland, Florida 32751

1.      Pursuant to 11 U.S.C. § 363(c)(2), Debtor is hereby authorized to use the cash collateral of LSC 2022 on an interim basis until this order is amended or superseded in accordance with the Budget appended to the Motion as **Exhibit A**.

2.      As adequate protection for any diminution in the value of cash collateral and other prepetition collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), LSC 2022 shall be entitled to a continuing replacement lien and security interest (the "Rollover Lien") in all assets of Debtor existing on or after the Petition Date of the same type as the prepetition collateral, together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the liens and security interests of LSC 2022 as of the Petition Date.  The Rollover Lien shall be limited to the amount of any Diminution and does not extend to any avoidance claims held by the estate.

3.      With the exception of $200,000 administrative "carve-out" for Debtor's professionals (the "Carve-Out"), the Rollover Lien shall not be subject or subordinate to (i) any liens arising after the Petition Date except for any liens or security interests in favor of any federal, state, municipal or other government unit, commission, board or court for any tax liability of the Debtor, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both and a tax of a kind specified in 11 U.S.C. § 507(a)(8), or (ii) any other lien or security interest under 11 U.S.C. §§ 363 or 364, or otherwise.

4.      As additional adequate protection for any Diminution, LCS2022 shall have a superpriority administrative expense claim pursuant to § 507(b) of the Bankruptcy Code, with recourse to and payable from any and all assets of the Debtor's estate,

including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual which for any reason cannot be made the subject of the Rollover Lien (the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims shall be subject only to the Carve-Out and shall have priority over any and all administrative expenses, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in §§ 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

5.      All cash, income or revenues received by Debtor shall be deposited into the debtor in possession bank account or such other accounts as may be permitted to be maintained pursuant to separate order of this Court (the "DIP Accounts") and shall only be used for the payment of actual and necessary expenses of preserving the estate, including professional fees and costs authorized under §§ 328 and 330 of the Bankruptcy Code. All disbursements from the DIP Accounts shall be accounted for in the monthly debtor in possession operating reports to be filed by Debtor with the Court.

6.      The lien granted hereunder shall be valid and perfected without the need for the execution of filing of any further document or instrument otherwise required to be filed under applicable non-bankruptcy law.

7.      The Debtor's authority to use Cash Collateral hereunder shall terminate without any further action by this Court and a Termination Event shall occur without prior notice upon the occurrence of any of the following (also a "Termination Event"):

i.    the Debtor's Chapter 11 case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

ii.   the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in §§ 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion, application or other pleading consenting to or acquiescing in any such appointment;

iii.  this Interim Order becomes stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of LSC 2022;

iv.   an order is entered in the Chapter 11 Case over the objection of LSC 2022 approving financing pursuant to § 364 that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claim granted to LSC 2022 under this Interim Order; or

v.    an adversary proceeding or contested matter is commenced by the Debtor challenging the amount, validity, enforceability, priority or extent of LSC 2022's liens, security interests or claims.

8.    LSC 2022 shall be entitled to the full protections of § 363(m) of the Bankruptcy Code with respect to the Rollover Lien and all other adequate protection created or authorized by the cash collateral order in the event that the order or any authorization contained therein is stayed, vacated, reversed or modified on appeal. Any stay, modification, reversal, or vacation of the cash collateral order shall not affect the validity of any obligation of the Debtor to LSC 2022, incurred pursuant to the cash collateral order.

9.    The Court will conduct a final hearing on the Motion on May _____, 2024, beginning at _____ p.m. before the Honorable _____. The hearing will be held in Courtroom _____, United States Bankruptcy Court, Middle District of Florida Jacksonville Division, 300 North Hogan Street, Suite 3-150, Jacksonville, Florida 32202.

Richard R. Thames, Esq. is directed to serve this Order on parties who are non-CM/ECF users and to file proof of same within 3 days of the date of this Order.

# EXHIBIT "F"

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| TIJUANA FLATS RESTAURANTS, | ) | Case No.: 3:24-bk-1128-BAJ |
| LLC, a Florida limited liability company,[1] | ) | |
| | ) | |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |

**ORDER AUTHORIZING THE DEBTOR'S USE**
**OF CASH COLLATERAL ON A FINAL BASIS**

This Chapter 11 case came before the Court upon the motion filed by debtor, Tijuana Flats Restaurants, LLC ("Debtor"), seeking the entry of interim and final orders, pursuant to §§ 105(a), 361, 363(c), 503(b) and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to utilize the cash collateral of it secured creditor, LSC2022, LLC ("LSC2022"). A final hearing on the motion was held May ____, 2024. Upon consideration of the motion, it is ORDERED:

---

[1] The Federal Employer Identification Number of the Debtor is 47-4472442. The principal address of the Debtor is 2300 Maitland Center Parkway, Suite 306, Maitland, Florida 32751

1.      Pursuant to 11 U.S.C. § 363(c)(2), Debtor and Tijuana Flats #176, LLC, are hereby authorized to use the cash collateral of LSC2022 on a final basis until this order is amended or superseded in accordance with the Budget appended to the Motion as **Exhibit A**. The Budget may be updated and amended from time to time by an agreement of Debtor and LSC2022 without the necessity of Court approval. Debtor shall provide monthly actual to budget variance reports to LSC2022 contemporarily with filing of the Debtor's Monthly Operating Reports.

2.      As adequate protection for any diminution in the value of cash collateral and other prepetition collateral resulting from the Debtor's use thereof after the Petition Date ("Diminution"), LSC2022 shall be entitled to a continuing replacement lien and security interest (the "Rollover Lien") in all assets of Debtor and Tijuana Flats #176, LLC existing on or after the Petition Date of the same type as the prepetition collateral, together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the liens and security interests of LSC2022 as of the Petition Date. The Rollover Lien shall be limited to the amount of any Diminution and does not extend to any avoidance claims held by the estate.

3.      With the exception of $200,000 administrative "carve-out" for Debtor's professionals (the "Carve-Out"), the Rollover Lien shall not be subject or subordinate to (i) any liens arising after the Petition Date except for any liens or security interests in favor of any federal, state, municipal or other government unit, commission, board or court for any tax liability of the Debtor, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both and a tax of a kind specified in 11

U.S.C. § 507(a)(8), or (ii) any other lien or security interest under 11 U.S.C. §§ 363 or 364, or otherwise.

4.      As additional adequate protection for any Diminution, LCS2022 shall have a superpriority administrative expense claim pursuant to § 507(b) of the Bankruptcy Code, with recourse to and payable from any and all assets of the Debtor's estate, including but not limited to rights of the Debtor, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual which for any reason cannot be made the subject of the Rollover Lien (the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims shall be subject to only the Carve-Out and shall have priority over any and all administrative expenses, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in §§ 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

5.      All cash, income or revenues received by Debtor and Tijuana Flats #176, LLC shall be deposited into the debtor in possession bank account or such other accounts as may be permitted to be maintained pursuant to separate order of this Court (the "DIP Accounts") and shall only be used for the payment of actual and necessary expenses of preserving the estate, including professional fees and costs authorized under §§ 328 and 330 of the Bankruptcy Code. All disbursements from the DIP Accounts shall be accounted for in the monthly debtor in possession operating reports to be filed by Debtor with the Court.

6.     The lien granted hereunder shall be valid and perfected without the need for the execution of filing of any further document or instrument otherwise required to be filed under applicable non-bankruptcy law.

7.     The authority to use Cash Collateral hereunder shall terminate without any further action by this Court and a Termination Event shall occur without prior notice upon the occurrence of any of the following (also a "Termination Event"):

 i.  the Debtor's Chapter 11 case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

 ii.  the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in §§ 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) for the Debtor; or (z) the date the Debtor files a motion, application or other pleading consenting to or acquiescing in any such appointment;

 iii.  this Interim Order becomes stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of LSC2022;

 iv.  an order is entered in the Chapter 11 Case over the objection of LSC2022 approving financing pursuant to § 364 that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claim granted to LSC2022 under this Interim Order; or

 v.  an adversary proceeding or contested matter is commenced by the Debtor challenging the amount, validity, enforceability, priority or extent of LSC2022's liens, security interests or claims.

8.     LSC2022 shall be entitled to the full protections of § 363(m) of the Bankruptcy Code with respect to the Rollover Lien and all other adequate protection created or authorized by the cash collateral order in the event that the order or any authorization contained therein is stayed, vacated, reversed or modified on appeal.  Any stay, modification, reversal, or vacation of the cash collateral order shall not affect the

validity of any obligation of the Debtor to LSC2022, incurred pursuant to the cash collateral order.

Richard R. Thames, Esq. is directed to serve this Order on parties who are non-CM/ECF users and to file proof of same within 3 days of the date of this Order.